## IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| Alley's of Kingsport, Inc.; Arrow Ford, Inc.; Axelrod Chrysler Dodge Jeep, Inc.; Axelrod Chrysler, Inc.; Barry Dodge Inc.; Bennett AutoPlex Inc.; Benson Motor Inc.; Bob Taylor Jeep, Inc.; Bondy's Ford, Inc.; Brother's Motors, Inc.; Cardenas Motors, Inc.; Carson Automotive Inc.; CDOHY, Inc.; Crain CDJ, LLC; Cunningham Chrysler Jeep, Inc.; Curfin Investments, Inc.; DET Automotive Group, Inc.; DJ-Mack Inc.; Don Phillips & Son Enterprises, Inc.; Douglas Automotive Group, Inc.; Ertley Chrysler Jeep Dodge, LLC; Fitzgerald Auto Malls, Inc.; FT Automotive II, LLC; FT Automotive IV, LLC; G.K. Alcombrack, Inc.; Golden Motors, Inc.; Hahn Motor Company; Hoover Motors Holding Co., Inc.; Hoover Dodge, Inc.; I.M. Jarrett & Son, Inc.; Jeff Hunter Motors, Inc.; Johnson County Motors, L.C.; Bill Kay Suzuki, Inc.; Kingston Dodge, Inc.; LFCJ, Inc.; Mancari's of Orland Hills, Inc.; Marketplace Suzuki, Inc.; Marstaller Motors, Inc.; Melchiorre, Inc.; Miller-Campbell Company; Miller Motor Car Corporation; Milner O'Quinn Chrysler Dodge Jeep, Inc.; Morong Brunswick; Neil Huffman Enterprises, Inc.; Neil Huffman, Inc.; Painter Sales and Leasing; Painter's Sun Country Chrysler, Inc.; Pen Motors, Inc.; Pleasant Valley Motors, Inc.; Preston Chrysler Jeep, Inc.; Pride Chrysler Jeep, Inc.; Reuther Dodge LLC; Reuther's Investment Company; RFJS Company, LLC; SCK, Inc.; Scotia Motors, Inc.; Shoemaker Auto Group, Inc.; South Shore Autolines, Inc.; Star Chrysler, Inc.; Tamaroff 12 Mile Motors, Inc.; Tarbox Chrysler Jeep, LLC; Tarbox Motors Inc.; Tenafly Chrysler Jeep, Inc.; The Union Sales Company; Thomas Sales & Service, Inc.; Verona Motor Sales, Inc.; Waco Dodge Sales, Inc.; Walker Motors, Inc.; Westminster Dodge, Inc.; Wheaton Motor City, Inc.; Wheeler Leasing Co. II, Inc.; Whitey's, Inc.; William T. Pritchard, Inc.; Wyckoff Chrysler, Inc.; and, Young Volkswagen, Inc., | Case No.11-CV-00100 (RHH) Sr. Judge Robert H. Hodges, Jr. |
| Plaintiffs, | |
| v. | |
| United States of America, | |
| Defendant. | |

**FIRST AMENDED COMPLAINT FOR JUST COMPENSATION**

This is a suit under the Fifth Amendment by the former owners of 75 franchised Chrysler auto dealerships for the uncompensated taking of their property rights (including their franchise contracts, ongoing auto businesses, and state statutory auto dealer rights) resulting from the Government-imposed requirement that Chrysler, as a condition of its restructuring, terminate approximately 25% of its existing franchised dealers.  This taking served the public purposes of promoting stability to the financial system of the United States and preventing a significant disruption of the American automotive industry that would pose a systemic risk to financial market stability and have a negative effect on the United States economy.  This is a loss that should not, however, be borne by a few individual auto dealers but, by reason of its broad and salutary public purpose, must in fairness and justice be borne by the public as a whole.

In taking Plaintiffs' property without just compensation, the United States acted under the authority granted to it by Congress under the Troubled Asset Relief Program ("TARP"), 12 U.S.C. § 5211(a)(1).

**The Parties**

1.      Plaintiff Alley's of Kingsport, Inc., doing business as Alley's Chrysler Dodge World ("AOKI"), was at all relevant times a for-profit corporation properly organized and existing under the laws of the State of Tennessee and during all relevant times operated an automotive dealership business in Kingsport, Tennessee 37660 by engaging in the sale and service of automobiles manufactured by Chrysler under a franchise with Chrysler. AOKI's automotive dealership franchise was protected in Tennessee by state statutes, T.C.A. § 47-25-1503, that prohibit the franchisor from terminating a franchise prior to the expiration of its term, except for good cause asserted in good faith, and written notice is provided of the facts and

circumstances establishing good cause, and giving the franchisee a reasonable opportunity of at least thirty (30) days to cure the alleged failure, and by T.C.A § 47-25-1509, that allowed AOKI to bring an action to recover damages and penalties from a manufacturer that violated § 47-25-1503.  *See also* TCA §§ 55-17-101, et seq.

2.      Plaintiff Arrow Ford, Inc., doing business as Arrow Chrysler Jeep ("Arrow"), was at all relevant times a for-profit corporation properly organized and existing under the laws of the State of Texas and during all relevant times operated an automotive dealership business in Abilene, Texas 79605 by engaging in the sale and service of automobiles manufactured by Chrysler under a franchise from Chrysler. Arrow's automotive dealership franchise was protected in Texas exclusively by Chapter 2301 of the Texas Occupations Code ("Tex. Occ. C.") §§ 2301.001, et seq., including Tex. Occ. C. § 2301.453 that prohibits the manufacturer from canceling or failing to renew a dealer's franchise without proof of good cause submitted to the Texas motor vehicle board ("the MV board") and prohibits, after a timely protest by a franchised dealer, the manufacturer from terminating the franchise until the MV board issues its final order or decision. Moreover, the following sections of the Tex. Occ. C. protected Arrow's automotive dealership franchise:  (a) § 2301.455 requires the MV board to consider in determining good cause all existing circumstances, including *inter alia* the dealer's investment and obligations, injury or benefit to the public, and the parties' compliance with the franchise; (b) Tex. Occ. C. § 2301.465 required the manufacturer, after the termination of a franchise, to pay a franchised dealer for its automotive inventory, parts, signage, supplies, special tools, data processing equipment, and automotive service equipment; (c) Tex. Occ. C. § 2301.454 prohibits a manufacturer from modifying or replacing a franchise if the modification or replacement would adversely affect to a substantial degree the dealer's sales, investment, or obligations to provide

3

service to the public; and (d) Tex. Occ. C. § 2301.478 imposes on the manufacturer and dealer a duty of good faith and fair dealing that is actionable in tort.

3.      Plaintiff Axelrod Chrysler Dodge Jeep, Inc. ("Axelrod CDJ") was at all relevant times a for-profit corporation properly organized and existing under the laws of the State of Ohio and during all relevant times operated an automotive dealership business in Wadsworth, Ohio 44282 by engaging in the sale and service of automobiles manufactured by Chrysler under a franchise from Chrysler. Axelrod CDJ's automotive dealership franchise was protected in Ohio by state statute, R.C. § 4517.54, that prohibits the manufacturer from canceling or failing to renew an Ohio dealer's franchise without good cause as determined by the applicable board.  Moreover, the following Ohio statutes protected Axelrod CDJ's automotive franchise: (a) R.C. § 4517.57 imposes on the franchisor the burden of going forward and of persuasion to establish at a hearing that there is good cause for the franchisor's termination of the dealer's franchise and (b) R.C. § 4517.542 provides that the franchisor must pay the terminated franchisee upon the termination of a franchise the franchisee's cost of new unsold motor vehicles, the fair market value of signage, special tools, automotive service equipment, dealership facilities assistance, and under certain circumstances, the fair market value of the dealership.

4.      Plaintiff Axelrod Chrysler, Inc. ("Axelrod Chrysler") was at all relevant times a for-profit corporation properly organized and existing under the laws of the State of Ohio and during all relevant times operated an automotive dealership business in Parma, Ohio 44129 by engaging in the sale and service of automobiles manufactured by Chrysler under a franchise from Chrysler. Axelrod Chrysler's automotive dealership franchise was protected in Ohio by state statutes, R.C. §§ 4517.54, 4517.57 and 4517.542, as described in ¶ 3.

4

5.      Plaintiff Barry Dodge, Inc. ("Barry") was at all relevant times a for-profit corporation properly organized and existing under the laws of the State of New York and during all relevant times operated an automotive dealership business in Brockport, New York 14420 by engaging in the sale and service of automobiles manufactured by Chrysler under a franchise from Chrysler. Barry's automotive dealership franchise was protected in New York by state statute, McKinney's Vehicle and Traffic Law § 463(2)(d), that prohibits the manufacturer from canceling or failing to renew a New York dealer's franchise without proof of the dealer's substantial breach of a provision of its dealer agreement. Under McKinney's Vehicle and Traffic Law § 469, a franchised New York motor vehicle dealer aggrieved by a violation of § 463 can request an adjudicatory proceeding or sue for injunctive relief and damages in any court of the state having jurisdiction over the parties.

6.      Plaintiff Bennett AutoPlex Inc. ("Bennett") was at all relevant times a for-profit corporation properly organized and existing under the laws of the State of Kansas and during all relevant times operated an automotive dealership business in Salina, Kansas 67401 by engaging in the sale and service of automobiles manufactured by Chrysler under a franchise from Chrysler. Bennett's automotive dealership franchise was protected in Kansas by state statute, K.S.A. 8-2414, that protects the dealer by, in part, prohibiting the manufacturer from terminating a Kansas dealer's franchise without proof of good cause determined by the applicable Kansas agency. Regardless of whether the termination was voluntary or involuntary, K.S.A. 8-2414 requires the manufacturer to pay a terminated Kansas dealer, *inter alia*, for inventory, parts, supplies, accessories, tools, computers and data systems, and the fair market value of its place of business.

7.      Plaintiff Benson Motor, Inc. ("Benson") was at all relevant times a for-profit corporation properly organized and existing under the laws of the State of Iowa and during all relevant times operated an automotive dealership business in Ames, Iowa 50010 by engaging in the sale and service of automobiles manufactured by Chrysler under a franchise from Chrysler. Benson's automotive dealership franchise was protected in Iowa by state statute, I.C.A. § 322A.2, that prohibits the manufacturer, *inter alia*, from terminating a dealer's franchise unless the franchiser has first established in a hearing, pursuant to I.C.A. § 322A.7, that the franchiser has good cause for termination and that another franchise in the same line-make will become effective in the same community, without diminution of the motor vehicle service formerly provided, or that the community cannot be reasonably expected to support such a dealership.

8.      Plaintiff Bob Taylor Jeep, Inc. ("BTJI") was at all relevant times a for-profit corporation properly organized and existing under the laws of the State of Florida and during all relevant times operated an automotive dealership business in Naples, Florida 34109 by engaging in the sale and service of automobiles manufactured by Chrysler under a franchise from Chrysler. BTJI's automotive dealership franchise was protected in Florida by state statute, the Florida Dealer Protection Act, Fla. Stat. §§ 320.60, et seq., including section 320.641 that prohibits the manufacturer from canceling or failing to renew a Florida dealer's franchise without proof of good cause determined by the applicable Florida agency and further prohibits the manufacturer from terminating the franchise of the Florida dealer until a final determination by that agency.  Under section 320.697, any Florida dealership adversely affected by a manufacturer's violation of the Florida Dealer Protection Act may bring an action against the

manufacturer in any court of competent jurisdiction for damages in an amount equal to three times the pecuniary loss, costs, and a reasonable attorney's fee.

9.     Plaintiff Bondy's Ford Inc., doing business as Bondy's Jeep ("Bondy"), was at all relevant times a for-profit corporation properly organized and existing under the laws of the State of Alabama and during all relevant times operated an automotive dealership business in Dothan, Alabama 36303 by engaging in the sale and service of automobiles manufactured by Chrysler under a franchise from Chrysler. Bondy's automotive dealership franchise was protected in Alabama by state statute, Ala. Code 1975 § 8-20-4, that prohibits the manufacturer from canceling or failing to renew an Alabama's dealer's franchise without proof of "good cause," including proof that the dealer has failed after notice within six months to substantially comply with the reasonable performance provisions of the franchise. A terminated automotive dealer in Alabama, pursuant to Ala. Code 1975 § 8-20-5, has the right to bring an action in a court of competent jurisdiction to challenge the termination of its franchise by a manufacturer, and the dealer retains all rights and remedies under the terms and conditions of such franchise, including the right to sell or transfer the dealer's ownership interest until a final determination by a court of competent jurisdiction, including appeal. Upon termination for "good cause," the statute also requires the manufacturer to pay a terminated Alabama dealer fair compensation for inventory, parts, supplies, accessories, tools, computers and data systems, and the net cost of any upgrades or alterations made by the dealer to the dealership facilities recommended in writing by the manufacturer.

10.     Plaintiff Brother's Motors Inc., doing business as Diamond Dodge-Chrysler-Plymouth ("BMI"), was at all relevant times a for-profit corporation properly organized and existing under the laws of the State of Arizona and during all relevant times operated an

7

automotive dealership business in Flagstaff, Arizona 86001 by engaging in the sale and service of automobiles manufactured by Chrysler under a franchise from Chrysler. BMI's automotive dealership franchise was protected in Arizona by state statutes, A.R.S. §§ 28-4452 and 28-4457, that prohibit the manufacturer from terminating a dealer's franchise without proof of good cause, as determined by an administrative law judge.

11.     Plaintiff Cardenas Motors, Inc. ("Cardenas") was at all relevant times a for-profit corporation properly organized and existing under the laws of the State of Texas and during all relevant times operated an automotive dealership business in Brownsville, Texas 78521 by engaging in the sale and service of automobiles manufactured by Chrysler under a franchise from Chrysler. Cardenas's automotive dealership franchise was protected in Texas by state statutes, Tex. Occ. C. §§ 2301.453, 2301.454, 2301.455, 2301.465, and 2301.478, as described in ¶ 2.

12.     Plaintiff Carson Automotive, Inc., doing business as Carson Jeep ("Carson"), was at all relevant times a for-profit corporation properly organized and existing under the laws of the State of Nevada and during all relevant times operated an automotive dealership business in Carson City, Nevada 89701 by engaging in the sale and service of automobiles manufactured by Chrysler under a franchise from Chrysler. Carson's automotive dealership franchise was protected in Nevada by state statute, N.R.S. § 482.36352 that prohibits the manufacturer from terminating a dealer's franchise unless it has received the written consent of the dealer or has given written notice of its intention to the dealer and the Nevada motor vehicle director; and, either the dealer does not file a timely protest with the Director or after the dealer has filed a protest and the Director has conducted a hearing on the matter, the director issues an order authorizing the manufacturer or distributor to terminate the franchise. N.R.S. § 482.36355 requires that in determining whether good cause has been established for permitting a

manufacturer to terminate a franchise, the Director shall consider inter alia whether the proposed action would be injurious or beneficial to the public welfare and the extent of the dealer's failure, if any, to comply with the terms of the franchise. Moreover, under N.R.S. 482.363521, upon the termination of a Nevada franchise, the manufacturer must compensate the dealer for new automotive inventory, parts, equipment, furnishings, signage, special tools, and the fair rental value of the premises for at least a three month period.

13.     Plaintiff CDOHY, Inc., formerly known as Colonial Dodge, Inc. ("Colonial"), was at all relevant times a Delaware corporation admitted to do business in Maryland and during all relevant times operated an automotive dealership business in Kensington, Maryland 20895 by engaging in the sale and service of automobiles manufactured by Chrysler under a franchise from Chrysler. Colonial's automotive dealership franchise was protected in Maryland by state statute, MD Code, Transportation § 15-209, that, in part, prohibits a manufacturer from terminating the franchise of a dealer unless the dealer has failed to comply substantially with the reasonable requirements of the franchise.  Pursuant to MD Code, Transportation § 15-209(f)(1), a manufacturer that terminates the franchise of a dealer in violation of this statute is required to pay to the dealer the fair value of his business as a going concern.

14.     Plaintiff Crain CDJ, LLC ("Crain") was at all relevant times a for-profit limited liability company properly organized and existing under the laws of the State of Arkansas and during all relevant times operated an automotive dealership business in Little Rock, Arkansas 72209 by engaging in the sale and service of automobiles manufactured by Chrysler under a franchise from Chrysler. Crain's automotive dealership franchise was protected in Arkansas by state statute, Ark. Code Ann. § 23-112-403, that prohibits the manufacturer from canceling or failing to renew a dealer's franchise without proof of "due cause." Pursuant to Ark. Code

Ann. § 23-112-403, the manufacturer is required to pay an Arkansas dealer after the termination of the franchise, *inter alia*, (a) for new, unsold, undamaged, and complete motor vehicles of current model year and one (1) year prior model year in the dealer's inventory; (b) the dealer cost of each new, unused, undamaged, and unsold part or accessory; (c) the fair market value of each undamaged sign purchased at the request of the manufacturer; (d) the fair market value of all special tools and automotive service equipment; (e) compensation for the actual pecuniary loss caused by the franchise termination unless for due cause. If the dealer and the manufacturer cannot agree on the amount of compensation to be paid under the Arkansas statute, either party may file an action in a court of competent jurisdiction.

15.     Plaintiff Cunningham Chrysler Jeep, Inc. ("Cunningham") was at all relevant times a for-profit corporation properly organized and existing under the laws of the State of Pennsylvania and during all relevant times operated an automotive dealership business in North East, Pennsylvania 16428 by engaging in the sale and service of automobiles manufactured by Chrysler under a franchise from Chrysler. Cunningham's automotive dealership franchise was protected in Pennsylvania by state statute, 63 P.S. § 818.13, that prohibits the manufacturer from terminating a dealer's franchise without due regard to the equities of the dealer and without just cause. The manufacturer must also prove that its own acts, in whole or in significant part, did not cause the dealer to be unable to comply substantially with the reasonable and material requirements of the franchise. Under 63 P.S. §§ 818.17 and 818.18, upon the termination of a Pennsylvania franchise, the manufacturer must compensate the dealer for new automotive inventory, parts, and special tools, and for a specified period, rental costs for the dealer's facility.

16.     Plaintiff Curfin Investments, Inc., doing business as Currie Motors of Forest Park ("Curfin"), was at all relevant times a for-profit corporation properly organized and existing

under the laws of the State of Illinois and during all relevant times operated an automotive

dealership business in Forest Park, Illinois 60130 by engaging in the sale and service of

automobiles manufactured by Chrysler under a franchise from Chrysler. Curfin's automotive

dealership franchise was protected in Illinois by state statute, the Motor Vehicle Franchise Act,

815 ILCS § 710/1, et seq., that in part prohibits the manufacturer from terminating a dealer's

franchise without good cause, but if with good cause, not until the franchisee receives fair and

reasonable compensation for the value of the business and business premises.

17.     Plaintiff DET Automotive Group, Inc., doing business as Gengas Chrysler Jeep

("DET"), was at all relevant times a for-profit limited liability company properly organized and

existing under the laws of the State of Pennsylvania and during all relevant times operated an

automotive dealership business in Philadelphia, Pennsylvania 19124 by engaging in the sale

and service of automobiles manufactured by Chrysler under a franchise from Chrysler.

DET's automotive dealership franchise was protected in Pennsylvania by state statutes,

63 P.S. §§ 818.13, 818.17 and 818.18, as described in ¶ 15.

18.     Plaintiff Don Phillips & Son Enterprises, Inc. ("DPSEI") was at all relevant times

a for-profit corporation admitted to do business in Maryland and during all relevant times

operated an automotive dealership business in Frederick, Maryland 21702 by engaging in the

sale and service of automobiles manufactured by Chrysler under a franchise from Chrysler.

DPSEI's automotive dealership franchise was protected in Maryland by state statute, MD Code,

Transportation § 15-209, as described in ¶ 13.

19.     Plaintiff DJ-Mack Inc., doing business as Claxton Chrysler Dodge Jeep ("DJ-

Mack"), was at all relevant times a for-profit corporation properly organized and existing under

the laws of the State of Georgia and during all relevant times operated an automotive dealership

business in Claxton, Georgia 30417 by engaging in the sale and service of automobiles manufactured by Chrysler under a franchise from Chrysler. DJ-Mack's automotive dealership franchise was protected in Georgia by state statute, Georgia Motor Vehicle Dealer's Day in Court Act (GDDCA), Ga. Code Ann., § 10-1-623, that prohibits the manufacturer from terminating a dealer's franchise without good cause and if the franchisor is terminated for lack of good cause, a Georgia dealer may bring an action in any court of competent jurisdiction for damages and equitable relief including injunctive relief and the dealer may recover damages in any amount equal to the greater of (1) the actual pecuniary loss or (2) three times the actual pecuniary loss, not to exceed $750,000.00, costs, and reasonable attorney's fees. Under the GDDCA, Ga. Code Ann. § 10-1-651, the manufacturer must pay the terminated dealer for automotive inventory, unused parts, supplies, equipment, and special tools.

20.     Plaintiff Douglas Automotive Group, Inc., formerly known as St. Pete Jeep, Inc. and as St. Pete Jeep Chrysler ("Douglas Automotive"), was at all relevant times a Delaware corporation admitted to do business in Florida and during all relevant times operated an automotive dealership business in St. Petersburg, Florida 33713 by engaging in the sale and service of automobiles manufactured by Chrysler under a franchise from Chrysler. Douglas Automotive's dealership franchise was protected in Florida by state statute, the Florida Dealer Protection Act, Fla. Stat. §§ 320.60, et seq., which includes the protections afforded by  sections 320.641 and 320.697, as described in ¶ 8.

21.     Plaintiff Ertley Chrysler Jeep Dodge, LLC ("Ertley") was at all relevant times a for-profit limited liability company properly organized and existing under the laws of the State of Pennsylvania and during all relevant times operated an automotive dealership business in Moosic, Pennsylvania 18507 by engaging in the sale and service of automobiles manufactured

by Chrysler under a franchise from Chrysler.  Ertley's automotive dealership franchise was protected in Pennsylvania by state statutes, 63 P.S. §§ 818.13, 818.17 and 818.18, as described in ¶ 15.

22.     Plaintiff Fitzgerald Auto Malls, Inc., doing business as Frederick Dodge ("FAMI"), is a Delaware corporation admitted to do business in Maryland and during all relevant times operated an automotive dealership business in Frederick, Maryland 21702 by engaging in the sale and service of automobiles manufactured by Chrysler under a franchise from Chrysler. FAMI's automotive dealership franchise was protected in Maryland by state statute, MD Code, Transportation § 15-209, as described in ¶ 13.

23.     Plaintiff FT Automotive II, LLC, doing business as United Dodge, LLC ("FT Automotive II"), was at all relevant times a for-profit limited liability company properly organized and existing under the laws of the State of Nevada and during all relevant times operated an automotive dealership business in Las Vegas, Nevada 89104 by engaging in the sale and service of automobiles manufactured by Chrysler under a franchise from Chrysler. FT Automotive II's automotive dealership franchise was protected in Nevada by state statutes, N.R.S. §§ 482.36352, 482.36355 and 482.363521, as described in ¶ 12.

24.     Plaintiff FT Automotive IV, LLC, doing business as United Chrysler Jeep ("FT Automotive IV"), was at all relevant times a for-profit limited liability company properly organized and existing under the laws of the State of Nevada and during all relevant times operated an automotive dealership business in Las Vegas, Nevada 89104 by engaging in the sale and service of automobiles manufactured by Chrysler under a franchise from Chrysler. FT Automotive IV's automotive dealership franchise was protected in Nevada by state statutes, N.R.S. §§ 482.36352, 482.36355 and 482.363521, as described in ¶ 12.

25.     Plaintiff G. K. Alcombrack, Inc., doing business as Liberty Motors  ("GKAI"), was at all relevant times a for-profit corporation properly organized and existing under the laws of the State of California and during all relevant times operated an automotive dealership business in Grass Valley, California 95949 by engaging in the sale and service of automobiles manufactured by Chrysler under a franchise from Chrysler.  GKAI's automotive dealership franchise was protected in California by state statute, West's Ann. Cal. Vehicle Code § 3060, that prohibits the manufacturer from terminating a dealer's franchise without proof submitted to the California New Motor Vehicle Board of "good cause," such as the extent of franchisee's failure to comply with the terms of the franchise. After a timely protest by a franchised dealer, the manufacturer may not terminate the franchise until the board makes its findings.

26.     Plaintiff Golden Motors, Inc., doing business as Venice Chrysler ("Golden"), was at all relevant times a for-profit corporation properly organized and existing under the laws of the State of Florida and during all relevant times operated an automotive dealership business in Venice, Florida 34293 by engaging in the sale and service of automobiles manufactured by Chrysler under a franchise from Chrysler. Golden's automotive dealership franchise was protected in Florida by state statutes, the Florida Dealer Protection Act, Fla. Stat. §§ 320.60, et seq., which includes the protections afforded by §§ 320.641 and 320.697, as described in ¶ 8.

27.     Plaintiff Hahn Motor Company ("Hahn") was at all relevant times a for-profit corporation properly organized and existing under the laws of the State of Washington and during all relevant times operated an automotive dealership business in Yakima, Washington 98901 by engaging in the sale and service of automobiles manufactured by Chrysler under a franchise from Chrysler. Hahn's automotive dealership franchise was protected in Washington by state statutes, Wash. Rev. Code §§ 46.96.030 and 46.70.180. Section 46.96.030 prohibits a

manufacturer, *inter alia*, from terminating a franchise with a new motor vehicle dealer, unless the manufacturer has complied with statutory notice requirements and an administrative law judge has determined, if timely requested, after a hearing, that there is good cause for the termination of the franchise and that the manufacturer has acted in good faith regarding the termination. Between the time of issuance of the required notice and the effective termination of the franchise, the rights, duties, and obligations of the new motor vehicle dealer and the manufacturer under the franchise are unaffected. Moreover, as provided by Section 46.70.180, a manufacturer is prohibited from canceling the franchise of any Washington vehicle dealer without fairly compensating the dealer at a fair going business value for his or her capital investment, which shall include but not be limited to the dealer's tools, equipment, and parts inventory, if the cancellation was not done in good faith.

28.     Plaintiff Hoover Motors Holding Co., Inc., formerly known as Hoover Chrysler Jeep, Inc. ("Hoover CJ"), was at all relevant times a for-profit corporation properly organized and existing under the laws of the State of South Carolina and during all relevant times operated an automotive dealership business in Charleston, South Carolina 29414 by engaging in the sale and service of automobiles manufactured by Chrysler under a franchise from Chrysler.  Hoover CJ's automotive dealership franchise was protected in South Carolina by state statute, S.C. Code 1976 § 56-15-90, that prohibits the manufacturer from terminating a dealer's franchise without "good cause."  Pursuant to S.C. Code 1976 §56-15-70 it shall be unlawful directly or indirectly to impose unreasonable restrictions on the motor vehicle dealer or franchisee relative *inter alia* to  termination, and pursuant to § 56-15-90, if the manufacturer terminates a South Carolina franchised dealer, without due cause, the franchisee must receive fair and reasonable compensation for the value of the business, including the dealer's inventory, signage, special

tools, automotive service equipment, and compensation for its dealership facilities or location. Moreover, pursuant to § 56-15-110 a dealer injured in his business or property by a violation, *inter alia*, of § 56-15-90 may sue in the S.C. Court of Common Pleas and recover double his actual damages, and costs including a reasonable attorney's fee.

29.     Plaintiff Hoover Dodge, Inc. ("Hoover Dodge") was at all relevant times a for-profit corporation properly organized and existing under the laws of the State of South Carolina and during all relevant times operated an automotive dealership business in Summerville, South Carolina 29483 by engaging in the sale and service of automobiles manufactured by Chrysler under a franchise from Chrysler. Hoover Dodge's automotive dealership franchise was protected in South Carolina by state statutes, S.C. Code 1976 §§ 56-15-70, 56-15-90, and 56-15-110, as described in ¶ 28.

30.     Plaintiff I.M. Jarrett & Son, Inc. ("Jarrett") was at all relevant times a for-profit corporation properly organized and existing under the laws of the State of Pennsylvania and during all relevant times operated an automotive dealership business in Hatboro, Pennsylvania 19040 by engaging in the sale and service of automobiles manufactured by Chrysler under a franchise from Chrysler. Jarrett's automotive dealership franchise was protected in Pennsylvania by state statutes, 63 P.S. §§ 818.13, 818.17 and 818.18, as described in ¶ 15.

31.     Plaintiff Jeff Hunter Motors, Inc. ("Jeff Hunter") was at all relevant times a for-profit corporation properly organized and existing under the laws of the State of Texas and during all relevant times operated an automotive dealership business in Waco, Texas 76711 by engaging in the sale and service of automobiles manufactured by Chrysler under a franchise from Chrysler. Jeff Hunter's automotive dealership franchise was protected in Texas by state statutes, Tex. Occ. C. §§ 2301.453, 2301.454, 2301.455, 2301.465, and 2301.478, as described in ¶ 2.

32.     Plaintiff Johnson County Motors, L.C., doing business as McGurk Meyers Chrysler ("Johnson County"), was at all relevant times a for-profit limited liability company properly organized and existing under the laws of the State of Iowa and during all relevant times operated an automotive dealership business in Coralville, Iowa 52241 by engaging in the sale and service of automobiles manufactured by Chrysler under a franchise from Chrysler. Johnson County's automotive dealership franchise was protected in Iowa by state statutes, I.C.A. §§ 322A.2 and 322A.7, as described in ¶ 7.

33.     Plaintiff Bill Kay Suzuki, Inc., formerly known as Ogden Chrysler, Inc. and doing business as Bill Kay Chrysler of Downers Grove ("Kay"), was at all relevant times a Delaware corporation admitted to do business in Illinois and during all relevant times operated an automotive dealership business in Downers Grove, Illinois 60515 by engaging in the sale and service of automobiles manufactured by Chrysler under a franchise from Chrysler. Kay's automotive dealership franchise was protected in Illinois by state statute, the Motor Vehicle Franchise Act, 815 ILCS § 710/1, et seq., as described in ¶ 16.

34.     Plaintiff Kingston Dodge, Inc., doing business as Pompey Dodge ("Kingston"), was at all relevant times a for-profit corporation properly organized and existing under the laws of the State of Pennsylvania and during all relevant times operated an automotive dealership business in Kingston, Pennsylvania 18704 by engaging in the sale and service of automobiles manufactured by Chrysler under a franchise from Chrysler. Kingston's automotive dealership franchise was protected in Pennsylvania by state statutes, 63 P.S. §§ 818.13, 818.17 and 818.18, as described in ¶ 15.

35.     Plaintiff LFCJ, Inc., formerly known as Lakeforest Chrysler Jeep ("LFCJ"), was at all relevant times a Delaware corporation admitted to do business in Maryland and during all

relevant times operated an automotive dealership business in Gaithersburg, Maryland 20879 by engaging in the sale and service of automobiles manufactured by Chrysler under a franchise from Chrysler. LFCJ's automotive dealership franchise was protected in Maryland by state statute, MD Code, Transportation § 15-209, as described in ¶ 13.

36.     Plaintiff Mancari's of Orland Hills, Inc. ("MOHI") was at all relevant times a for-profit corporation properly organized and existing under the laws of the State of Illinois and during all relevant times operated an automotive dealership business in Oak Forest, Illinois 60452 by engaging in the sale and service of automobiles manufactured by Chrysler under a franchise from Chrysler. MOHI's automotive dealership franchise was protected in Illinois by state statute, the Motor Vehicle Franchise Act, 815 ILCS § 710/1, et seq., as described in ¶ 16.

37.     Plaintiff Marketplace Suzuki, Inc., formerly known as Marketplace Chrysler-Plymouth, Inc. ("Marketplace"), was at all relevant times a for-profit corporation properly organized and existing under the laws of the State of New York and during all relevant times operated an automotive dealership business in Rochester, New York 14623 by engaging in the sale and service of automobiles manufactured by Chrysler under a franchise from Chrysler. Marketplace's automotive dealership franchise was protected in New York by state statutes, McKinney's Vehicle and Traffic Law §§ 463(2)(d) and 469, as described in ¶ 4.

38.     Plaintiff Marstaller Motors, Inc. ("Marstaller") was at all relevant times a for-profit corporation properly organized and existing under the laws of the State of Texas and during all relevant times operated an automotive dealership business in Waco, Texas 76711 by engaging in the sale and service of automobiles manufactured by Chrysler under a franchise from Chrysler. Marstaller's automotive dealership franchise was protected in Texas by state statutes, Tex. Occ. C. §§ 2301.453, 2301.454, 2301.455, 2301.465, and 2301.478, as described in ¶ 10.

39.     Plaintiff Melchiorre, Inc., doing business as Warner Chrysler Jeep ("Melchiorre"), was at all relevant times a for-profit corporation properly organized and existing under the laws of the State of Pennsylvania and during all relevant times operated an automotive dealership business in Hummelstown, Pennsylvania 17036 by engaging in the sale and service of automobiles manufactured by Chrysler under a franchise from Chrysler.  Melchiorre's automotive dealership franchise was protected in Pennsylvania by state statutes, 63 P.S. §§ 818.13, 818.17 and 818.18, as described in ¶ 15.

40.     Plaintiff Miller-Campbell Company, doing business as Jack Miller Chrysler Jeep ("Miller-Campbell"), was at all relevant times a for-profit corporation properly organized and existing under the laws of the State of Missouri and during all relevant times operated an automotive dealership business in Kansas City, Missouri 64118 by engaging in the sale and service of automobiles manufactured by Chrysler under a franchise from Chrysler. Miller-Campbell's automotive dealership franchise was protected in Missouri by state statute, Mo. Ann. Stat. V.A.M.S. § 407.825, that prohibits the manufacturer from terminating a dealer's franchise without "good cause," and from failing to pay the terminated franchisee compensation for the fair market value of the franchise, the dealer's inventory, signage, special tools, data processing programs, equipment and automotive service equipment, and the specified compensation for the cost of leasing its dealership facilities or location.

41.     Plaintiff Miller Motor Car Corporation ("Miller Motor") was at all relevant times a for-profit corporation properly organized and existing under the laws of the State of New York and during all relevant times operated an automotive dealership business in Vestal, New York 13850 by engaging in the sale and service of automobiles manufactured by Chrysler under a franchise from Chrysler. Miller Motor's automotive dealership franchise was protected in New

York by state statutes, McKinney's Vehicle and Traffic Law §§ 463(2)(d), and 469, as described in ¶ 5.

42.     Plaintiff Milner O'Quinn Chrysler Dodge Jeep, Inc. ("Milner") was at all relevant times a for-profit corporation properly organized and existing under the laws of the State of Missouri and during all relevant times operated an automotive dealership business in Harrisonville, Missouri 64071 by engaging in the sale and service of automobiles manufactured by Chrysler under a franchise from Chrysler. Milner's automotive dealership franchise was protected in Missouri by state statute, Mo. Ann. Stat. V.A.M.S. § 407.825, as described in ¶ 40.

43.     Plaintiff Morong Brunswick ("Morong") was at all relevant times a for-profit corporation properly organized and existing under the laws of the State of Maine and during all relevant times operated an automotive dealership business in Brunswick, Maine 04011 by engaging in the sale and service of automobiles manufactured by Chrysler under a franchise from Chrysler. Morong's automotive dealership franchise was protected in Maine by state statute, 10 M.R.S.A. § 1174, that prohibits the manufacturer from terminating a dealer's franchise without good cause and from failing to pay the terminated franchisee compensation for the fair market value of the franchise, the dealer's inventory, signage, supplies, equipment and furnishings, parts, special tools, and automotive service equipment, and specified compensation for the dealer's rental obligation or if dealer owned, for the reasonable rental value of the facilities. In the event that the manufacturer fails to prove there was good cause for the termination or fails to prove that it acted in good faith, then, in lieu of any injunctive relief or any other damages, the manufacturer may pay the new motor vehicle dealer fair and reasonable compensation for the value of the dealership as an ongoing business.

44.     Plaintiff Neil Huffman Enterprises, Inc., doing business as Neil Huffman Dodge ("NHEI"), was at all relevant times a for-profit corporation properly organized and existing under the laws of the State of Kentucky and during all relevant times operated an automotive dealership business in Louisville, Kentucky 40207 by engaging in the sale and service of automobiles manufactured by Chrysler under a franchise from Chrysler.  NHEI's automotive dealership franchise was protected in Kentucky by state statute, KRS § 190.045, that in part prohibits a manufacturer from terminating any franchise with a licensed new motor vehicle dealer unless the manufacturer has satisfied the statute's notice requirement, has good cause for the termination, has acted in good faith as defined by statute, and has established the statutory requirements in state administrative proceedings if the action is protested in a timely manner by the new motor vehicle dealer. Moreover, KRS §190.045 also provides, in part, that upon the termination of any franchise, the new motor vehicle dealer shall be allowed fair and reasonable compensation by the manufacturer for new current vehicle inventory, supplies, parts, equipment, furnishings, and special tools. KRS § 190.045 also provides, in part, that if, in an action for damages, the manufacturer fails to prove either that the manufacturer has acted in good faith or that there was good cause for the franchise termination, then the manufacturer may terminate the franchise upon payment to the new motor vehicle dealer of an amount equal to the value of the dealership as an ongoing business.

45.     Plaintiff Neil Huffman, Inc., doing business as Neil Huffman Chrysler Jeep ("NHI"), was at all relevant times a for-profit corporation properly organized and existing under the laws of the State of Kentucky and during all relevant times operated an automotive dealership business in Louisville, Kentucky 40207 by engaging in the sale and service of automobiles manufactured by Chrysler under a franchise from Chrysler. NHI's automotive

21

dealership franchise was protected in Kentucky by state statute, KRS § 190.045, as described in ¶ 44.

46.     Plaintiff Painter Sales and Leasing, doing business as Painter Chrysler Dodge Jeep ("Painter"), was at all relevant times a for-profit corporation properly organized and existing under the laws of the State of Utah and during all relevant times operated an automotive dealership business in Nephi, Utah 84648 by engaging in the sale and service of automobiles manufactured by Chrysler under a franchise from Chrysler. Painter's automotive dealership franchise was protected in Utah by state statute, the New Automobile Franchise Act, which includes U.C.A. 1953 §§ 13-14-301, et seq., that prohibits the manufacturer from terminating a dealer's franchise without "good cause," and from failing to pay the terminated franchisee upon the termination of a franchise the franchisee's cost of new unsold motor vehicles, the fair market value of signage, special tools, equipment, furnishings, reasonable compensation to the franchisee for any cost incurred pertaining to the unexpired term of a lease agreement for the dealership's existing location, and fair market value of the dealership premises in accordance with the statutory formula.  Pursuant to section 13-14-308, a Utah dealer has a private right of action for actual damages and reasonable attorneys' fees against a franchisor for a violation of the New Automobile Franchise Act that results in damage to the franchisee.

47.     Plaintiff Painter's Sun County Chrysler, Inc. ("PSCCI") was at all relevant times a for-profit corporation properly organized and existing under the laws of the State of Utah and during all relevant times operated an automotive dealership business in St. George, Utah 84770 by engaging in the sale and service of automobiles manufactured by Chrysler under a franchise from Chrysler. PSCCI's automotive dealership franchise was protected in Utah by state statute,

the New Automobile Franchise Act, which includes U.C.A. 1953 §§ 13-14-301, et seq., and 13-14-308, as described in ¶ 46.

48.     Plaintiff Pen Motors, Inc., doing business as Miller Hill Chrysler Jeep ("PMI"), was at all relevant times a for-profit corporation properly organized and existing under the laws of the State of Minnesota and during all relevant times operated an automotive dealership business in Hermantown, Minnesota 55811 by engaging in the sale and service of automobiles manufactured by Chrysler under a franchise from Chrysler. PMI's automotive dealership franchise was protected in Minnesota by state statute, M.S.A. § 80E.06, that prohibits the manufacturer from terminating a dealer's franchise unless the manufacturer has (a) satisfied the statutory notice requirement, (b) acted in good faith in accordance with the statutory requirements, and (c) good cause for the termination, which is defined, *inter alia*, to mean the failure by the dealer to comply with a provision of the franchise which is both reasonable and of material significance to the franchise relationship, provided that the dealer has been notified in writing of the failure within 180 days after the manufacturer first acquired knowledge of the failure. Under M.S.A. § 80E.17, the Minnesota automotive dealer may bring an action to recover the actual damages sustained by a violation of section 80E.06 together with costs and disbursements plus reasonable attorneys' fees.

49.     Plaintiff Pleasant Valley Motors, Inc.("PVMI") was at all relevant times a for-profit limited liability company properly organized and existing under the laws of the State of Pennsylvania and during all relevant times operated an automotive dealership business in Brodheadsville, Pennsylvania 18322 by engaging in the sale and service of automobiles manufactured by Chrysler under a franchise from Chrysler. PVMI's automotive dealership

franchise was protected in Pennsylvania by state statutes, 63 P.S. §§ 818.13, 818.17 and 818.18, as described in ¶ 15.

50.     Plaintiff Preston Chrysler Jeep, Inc. ("Preston CJ") was at all relevant times a Delaware corporation admitted to do business in Texas and during all relevant times operated an automotive dealership business in Dallas, Texas 75240 by engaging in the sale and service of automobiles manufactured by Chrysler under a franchise from Chrysler. Preston CJ's automotive dealership franchise was protected in Texas by state statutes, Tex. Occ. C. §§ 2301.453, 2301.454, 2301.455, 2301.465, and 2301.478, as described in ¶ 2.

51.     Plaintiff Pride Chrysler Jeep, Inc. ("Pride CJ") was at all relevant times a for-profit corporation properly organized and existing under the laws of the State of Massachusetts and during all relevant times operated an automotive dealership business in Seekonk, Massachusetts 02771 by engaging in the sale and service of automobiles manufactured by Chrysler under a franchise from Chrysler. Pride CJ's automotive dealership franchise was protected in Massachusetts by state statutes, M.G.L.A. 93B §§ 5(a)(1) and 15, that prohibit the manufacturer from terminating a dealer's franchise without "good cause," requires the manufacturer to pay the terminated Massachusetts dealer for the dealer's new automotive inventory, parts, accessories, signage, special tools and manuals, and allows the Massachusetts dealer to file a complaint in Massachusetts Superior Court to enjoin a termination and seek damages. Pending a decision by the court on any motion for an injunction, the manufacturer and motor vehicle dealer are required in good faith to perform all obligations incumbent upon them under the franchise agreement and applicable law.

52.     Plaintiff Reuther Dodge LLC ("Reuther Dodge") was at all relevant times a for-profit limited liability company properly organized and existing under the laws of the State of

Missouri and during all relevant times operated an automotive dealership business in Creve Coeur, Missouri 63141 by engaging in the sale and service of automobiles manufactured by Chrysler under a franchise from Chrysler. Reuther Dodge's automotive dealership franchise was protected in Missouri by state statute, Mo. Ann. Stat. V.A.M.S. § 407.825, as described in ¶ 40.

53.    Plaintiff Reuther's Investment Company, doing business as Reuther's Jeep-Chrysler-Plymouth ("RIC"), was at all relevant times a for-profit corporation properly organized and existing under the laws of the State of Missouri and during all relevant times operated an automotive dealership business in Creve Coeur, Missouri 63141 by engaging in the sale and service of automobiles manufactured by Chrysler under a franchise from Chrysler. RIC's automotive dealership franchise was protected in Missouri by state statute, Mo. Ann. Stat. V.A.M.S. § 407.825, as described in ¶ 40.

54.    Plaintiff RFJS Company, LLC, formerly doing business as Frederick Chrysler Jeep Dodge ("RFJS"), was at all relevant times a for-profit limited liability company properly organized and existing under the laws of the State of Ohio and during all relevant times operated an automotive dealership business in Boardman, Ohio 44512 by engaging in the sale and service of automobiles manufactured by Chrysler under a franchise from Chrysler. RFJS' automotive dealership franchise was protected in Ohio by state statutes, R.C. §§ 4517.54, 4517.57 and 4517.542, as described in ¶ 3.

55.    Plaintiff SCK, Inc., doing business as Brewer Mitsubishi ("SCK"), was at all relevant times a for-profit corporation properly organized and existing under the laws of the State of New Mexico and during all relevant times operated an automotive dealership business in Clovis, New Mexico 88101 by engaging in the sale and service of automobiles manufactured by Chrysler under a franchise from Chrysler. SCK's automotive dealership franchise was protected

in New Mexico by state statutes, NM St. § 57-16-5, that prohibits the manufacturer from terminating a dealer's franchise without "good cause," meaning a material breach by a dealer, due to matters within the dealer's control, of a lawful provision of a franchise agreement and section 57-16-9.2 that requires the manufacturer to pay the terminated New Mexico dealer for the inventory, vehicle brand-specific tools, signage, other specialized systems, equipment and real estate required by the manufacturer, and the economic loss to the dealer resulting from idled or underused dealer facility real estate due to the involuntary termination.  Pursuant to sections 57-16-11 and 57-16-13, a civil suit may be instituted in a New Mexico district court for injunctive relief and for recovery of actual damages, costs and reasonable attorneys' fees, and punitive damages under appropriate circumstances.

56.     Plaintiff Scotia Motors, Inc. ("Scotia") was at all relevant times a for-profit corporation properly organized and existing under the laws of the State of New York and during all relevant times operated an automotive dealership business in Scotia, New York 12302 by engaging in the sale and service of automobiles manufactured by Chrysler under a franchise from Chrysler. Scotia's automotive dealership franchise was protected in New York by state statutes, McKinney's Vehicle and Traffic Law §§ 463(2)(d) and 469, as described in ¶ 5.

57.     Plaintiff Shoemaker Auto Group, Inc., formerly known as Shoemaker's Jeep Inc. ("Shoemaker"), was at all relevant times a for-profit corporation properly organized and existing under the laws of the State of Pennsylvania and during all relevant times operated an automotive dealership business in Allentown, Pennsylvania 18104 by engaging in the sale and service of automobiles manufactured by Chrysler under a franchise from Chrysler. Shoemaker's automotive dealership franchise was protected in Pennsylvania by state statutes, 63 P.S. §§ 818.13, 818.17 and 818.18, as described in ¶ 15.

58.     Plaintiff South Shore Autolines, Inc., formerly known as South Shore Chrysler

Plymouth Inc. ("South Shore"), was at all relevant times a for-profit corporation properly

organized and existing under the laws of the State of Massachusetts and during all relevant times

operated an automotive dealership business in Braintree, Massachusetts 02184 by engaging in

the sale and service of automobiles manufactured by Chrysler under a franchise from Chrysler.

South Shore's automotive dealership franchise was protected in Massachusetts by state statutes,

M.G.L.A. 93B §§ 5(a)(1) and 15, as described in ¶ 51.

59.     Plaintiff Star Chrysler, Inc., doing business as Bill Kay Chrysler of Naperville

("Star"), was at all relevant times a for-profit corporation properly organized and existing under

the laws of the State of Illinois and during all relevant times operated an automotive dealership

business in Naperville, Illinois 60515 by engaging in the sale and service of automobiles

manufactured by Chrysler under a franchise from Chrysler. Star's automotive dealership

franchise was protected in Illinois by state statute, the Motor Vehicle Franchise Act,

815 ILCS § 710/1, et seq., as described in ¶ 16.

60.     Plaintiff Tamaroff 12 Mile Motors, Inc., formerly known as Tamaroff Dodge, Inc.

("Tamaroff"), was at all relevant times a for-profit corporation properly organized and existing

under the laws of the State of Michigan and during all relevant times operated an automotive

dealership business in Southfield, Michigan 48034, by engaging in the sale and service of

automobiles manufactured by Chrysler under a franchise from Chrysler. Tamaroff's automotive

dealership franchise was protected in Michigan by state statutes, M.C.L.A. §§ 445.1567 and

445.1569.  Pursuant to these statutes, a manufacturer shall not terminate any dealer agreement

with a new motor vehicle dealer unless the manufacturer has satisfied the statutory notice

requirement, acted in good faith, and has good cause for the termination; the manufacturer has the burden of proof to establish that these elements have been satisfied.

61.     Plaintiff Tarbox Chrysler Jeep, LLC ("Tarbox CJ") was at all relevant times a for-profit limited liability company properly organized and existing under the laws of the State of Massachusetts and during all relevant times operated an automotive dealership business in Attleboro, Massachusetts 02703 by engaging in the sale and service of automobiles manufactured by Chrysler under a franchise from Chrysler. Tarbox CJ's automotive dealership franchise was protected in Massachusetts by state statutes, M.G.L.A. 93B §§ 5(a)(1) and 15, as described in ¶ 51.

62.     Plaintiff Tarbox Motors, Inc. ("TMI") was at all relevant times a for-profit corporation properly organized and existing under the laws of the State of Rhode Island and during all relevant times operated an automotive dealership business in North Kingstown, Rhode Island 02852 by engaging in the sale and service of automobiles manufactured by Chrysler under a franchise from Chrysler. TMI's automotive dealership franchise was protected in Rhode Island by state statute, Chapter 5.1, Regulation of Business Practices Among Motor Vehicle Manufacturers, Distributors, and Dealers ("Chapter 5.1."), including section 31-5.1-4, that prohibits the manufacturer from terminating a dealer's franchise without "good cause," and requires the manufacturer to pay the terminated Rhode Island dealer for the dealer's new automotive inventory, parts and accessories, signage, special tools and automotive services equipment and compensation for the dealer's rental obligation or if dealer owned, for the reasonable rental value of the facilities. The statute also provides that in the event that the manufacturer fails to prove there was good cause for the termination or fails to prove that it acted in good faith, then the manufacturer shall pay the new motor vehicle dealer fair and reasonable

compensation for the value of the dealership as an ongoing business.  Pursuant to § 31-5.1-13, any motor vehicle dealer or franchisee shall have the right to civil damages, including a reasonable attorney's fee, for any loss sustained as a result of a violation of Chapter 5.1.

63.     Plaintiff Tenafly Chrysler-Jeep, Inc. ("Tenafly CJ") was at all relevant times a for-profit corporation properly organized and existing under the laws of the State of New Jersey and during all relevant times operated an automotive dealership business in Tenafly, New Jersey 07670 by engaging in the sale and service of automobiles manufactured by Chrysler under a franchise from Chrysler.  Tenafly CJ's automotive dealership franchise was protected in New Jersey by the Franchise Practices Act, N.J.S.A. § 56:10-1, et seq., that in part prohibits the manufacturer from terminating a dealer's franchise without good cause and permits a New Jersey franchisee to bring an action against its franchisor for violation of N.J.S.A. § 56:10-5 in New Jersey Superior Court to seek damages and injunctive relief.  Under N.J.S.A. § 56:10-13.2, the franchisor is required to repurchase from the terminated New Jersey franchisee the dealer's inventory, parts, supplies and accessories, special tools, and signs.

64.     Plaintiff The Union Sales Company ("Union") was at all relevant times a for-profit corporation properly organized and existing under the laws of the State of West Virginia and during all relevant times operated an automotive dealership business in Martinsburg, West Virginia 25401 by engaging in the sale and service of automobiles manufactured by Chrysler under a franchise from Chrysler. Union's automotive dealership franchise was protected in West Virginia by state statute, W. Va. Code § 17A-6A-4, that prohibits the manufacturer from terminating a dealer's franchise without good cause and requires the manufacturer to demonstrate that the termination is necessary due to a material breach of a reasonable term or terms of the agreement by a dealer when weighed against the interests of the dealer and the

public.  Under W. Va. Code § 17A-6A-8, upon the termination of any dealer agreement, the manufacturer is required to pay the West Virginia new motor vehicle dealer for the dealer's new motor vehicle inventory, supplies and parts inventory, equipment, furnishings and signs purchased from the manufacturer, special computer software, hardware, license fees and other programs mandated by the manufacturer, and compensation relating to rental owed or the rental value of the premises, if the premises are dealer owned.

65.     Plaintiff Thomas Sales & Service, Inc., doing business as Subaru of Bend ("TSSI"), was at all relevant times a for-profit corporation properly organized and existing under the laws of the State of Oregon and during all relevant times operated an automotive dealership business in Bend, Oregon 97708 by engaging in the sale and service of automobiles manufactured by Chrysler under a franchise from Chrysler. TSSI's automotive dealership franchise was protected in Oregon by state statute, Chapter 650, Franchise Transactions, O.R.S. § 650.001, et seq., including section 650.140 that prohibits the manufacturer from terminating a dealer's franchise without "good cause" and O.R.S. § 650.170, that grants any Oregon dealer injured by a manufacturer's violation of section 650.140 the right to sue to enjoin such illegal conduct and authorizes the court to award damages to a dealer who demonstrates an actual loss of money as a result of illegal conduct by a manufacturer.

66.     Plaintiff Verona Motor Sales, Inc., doing business as Verona Jeep ("Verona"), was at all relevant times a for-profit corporation properly organized and existing under the laws of the State of Pennsylvania and during all relevant times operated an automotive dealership business in Verona, Pennsylvania 15147 by engaging in the sale and service of automobiles manufactured by Chrysler under a franchise from Chrysler. Verona's automotive dealership

franchise was protected in Pennsylvania by state statutes 63 P.S. §§ 818.13, 818.17 and 818.18, as described in ¶ 15.

67.     Plaintiff Waco Dodge Sales, Inc. ("Waco Dodge") was at all relevant times a Delaware corporation admitted to do business in Texas and during all relevant times operated an automotive dealership business in Waco, Texas 76710 by engaging in the sale and service of automobiles manufactured by Chrysler under a franchise from Chrysler.  Waco Dodge's automotive dealership franchise was protected in Texas by state statutes, Tex. Occ. C. §§ 2301.453, 2301.454, 2301.455, 2301.465, and 2301.478, as described in ¶ 2.

68.     Plaintiff Walker Motors, Inc. ("Walker") was at all relevant times a for-profit corporation properly organized and existing under the laws of the State of Vermont and during all relevant times operated an automotive dealership business in Montpelier, Vermont 05601 by engaging in the sale and service of automobiles manufactured by Chrysler under a franchise from Chrysler. Walker's automotive dealership franchise was protected in Vermont by state statute, 9 V.S.A. § 4089, that prohibits the manufacturer from terminating a dealer's franchise without "good cause," and requires the manufacturer to demonstrate to the Vermont transportation board that the termination was for "good cause." The statute also provides that if a dealer protest is filed to challenge the termination, the franchise agreement remains in effect until a final determination by the board and any appeal. As provided by 9 V.S.A. § 4091, the manufacturer must pay the terminated Vermont new motor vehicle dealer for the dealer's new motor vehicle inventory, parts, accessories, inventory, the fair market value of all special tools owned by the dealer, and the fair market value of signage. 9 V.S.A. § 4092 provides, in part, that if, in the dealer's action for damages, the manufacturer fails to prove that the manufacturer has acted in good faith or that there was good cause for the franchise termination, then the court shall order,

*inter alia*, that the manufacturer pay the new motor vehicle dealer an amount equal to the value

of the dealership, as an ongoing business location.

69.     Plaintiff Westminster Dodge Inc. ("Westminster") was at all relevant times a

Delaware corporation admitted to do business in Massachusetts and during all relevant times

operated an automotive dealership business in Dorchester, Massachusetts 02122 by engaging in

the sale and service of automobiles manufactured by Chrysler under a franchise from Chrysler.

Westminster's automotive dealership franchise was protected in Massachusetts by state statutes,

M.G.L.A. 93B §§ 5(a)(1) and 15, as described in ¶ 51.

70.      Plaintiff Wheaton Motor City, Inc., formerly known as Wheaton Dodge City, Inc.

("Wheaton"), was at all relevant times a Delaware corporation admitted to do business in

Maryland, and during all relevant times operated an automotive dealership business in Wheaton,

Maryland 20902 by engaging in the sale and service of automobiles manufactured by Chrysler

under a franchise from Chrysler. Wheaton's automotive dealership franchise was protected in

Maryland by state statute, MD Code, Transportation § 15-209, as described in ¶ 13.

71.     Plaintiff Wheeler Leasing Co. II, Inc., doing business as Wheeler Jeep

("Wheeler"), was at all relevant times a for-profit corporation properly organized and existing

under the laws of the State of California and during all relevant times operated an automotive

dealership business in Yuba City, California 95991 by engaging in the sale and service of

automobiles manufactured by Chrysler under a franchise from Chrysler. Wheeler's automotive

dealership franchise was protected in California by state statute, West's Ann. Cal. Vehicle Code

§ 3060, as described in ¶ 25.

72.     Plaintiff Whitey's, Inc. ("Whitey's") was at all relevant times a for-profit

corporation properly organized and existing under the laws of the State of Ohio and during all

relevant times operated an automotive dealership business in Mansfield, Ohio 44906 by engaging in the sale and service of automobiles manufactured by Chrysler under a franchise from Chrysler. Whitey's automotive dealership franchise was protected in Ohio by state statutes, R.C. §§ 4517.54, 4517.57 and 4517.542, as described in ¶ 3.

73.     Plaintiff William T. Pritchard, Inc. ("WTPI") was at all relevant times a for-profit corporation properly organized and existing under the laws of the State of New York and during all relevant times operated an automotive dealership business in Ithaca, New York 14850 by engaging in the sale and service of automobiles manufactured by Chrysler under a franchise from Chrysler. WTPI's automotive dealership franchise was protected in New York by state statutes, McKinney's Vehicle and Traffic Law §§ 463(2)(d), and 469, as described in ¶ 5.

74.     Plaintiff Wyckoff Chrysler, Inc. ("Wyckoff") was at all relevant times a for-profit corporation properly organized and existing under the laws of the State of New Jersey and during all relevant times operated an automotive dealership business in Wyckoff, New Jersey 07481 by engaging in the sale and service of automobiles manufactured by Chrysler under a franchise from Chrysler. Wyckoff's automotive dealership franchise was protected in New Jersey by the Franchise Practices Act, N.J.S.A. §§ 56:10-1 et seq., 56:10-5, and 56:10-13.2, as described in ¶ 63.

75.     Plaintiff Young Volkswagen, Inc. ("Young") was at all relevant times a for-profit corporation properly organized and existing under the laws of the State of Pennsylvania and during all relevant times operated an automotive dealership business in Easton, Pennsylvania 18045 by engaging in the sale and service of automobiles manufactured by Chrysler under a franchise from Chrysler.  Young's automotive dealership franchise was

protected in Pennsylvania by state statutes, 63 P.S. §§ 818.13, 818.17, and 818.18, as described in ¶ 15.

76.     Defendant, United States of America, is a republic formed under the Constitution of the United States and exercising the powers described therein subject to certain limitations, including the Fifth Amendment to the United States Constitution, which prohibits the taking of private property for public use without payment of just compensation.

**Operative Facts**

<u>**Chrysler and Its Authorized Dealers**</u>

77.     The Chrysler Corporation was founded on June 6, 1925 by Walter Chrysler, the result of the reorganization of the Maxwell Motor Company.  The first Chrysler vehicle was the 1924 Chrysler Six, featuring two significant innovations: a light, high compression six-cylinder engine and the first time four-wheel hydraulic brakes came standard on a passenger car.  Through the decades, Chrysler would be responsible for significant breakthroughs such as replaceable oil filters, downdraft carburetors, one-piece curved windshields, safety cushion dashboards, push-button transmissions, and power steering.  By 1936, the company held the second-place position in United States sales, a position it held until 1949.  After expanding into Europe in the 1960s, Chrysler faced some of its most tumultuous times in the 1970s due to restrictive anti-trust laws and the burgeoning oil crisis.  CEO Lee Iacocca rejuvenated the brand in 1984 with the introduction of the Town and Country minivan.  The Chrysler Corporation would also undergo several name changes approaching and into the 21st Century:  DaimlerChrysler AG in 1998, to Chrysler LLC in 2007, to the current Chrysler Group LLC in 2009.

78.     Over the years, Chrysler brands have included Plymouth, DeSoto, Fargo, Imperial, and Valiant.  Today, Chrysler manufactures automobiles under the Chrysler, Dodge, Jeep, and Ram brands.

79.     Chrysler does not sell its automobiles directly to consumers.  Instead, throughout its history, Chrysler has sold its new automobiles to the public exclusively through authorized retail auto dealers, such as Plaintiffs.  The rights and obligations of Plaintiffs and Chrysler were at all times governed by franchise agreements that imposed numerous obligations on dealers including the dealer's obligation to establish facilities, sell the company's vehicles, provide service to owners of Chrysler vehicles, and maintain a substantial inventory of parts to fulfill its service obligation.

80.     Over the years, each Plaintiff has expended substantial sums in reliance on its Chrysler franchise to construct showrooms and shop facilities, purchase and finance inventory, train and employ sales, service and accounting staff, purchase parts and repair equipment, and advertise the dealership.  For example, a group of four plaintiff dealers in Maryland (*see* ¶¶ 13, 22, 34, and 70) expended almost nine million dollars in improvements of facilities, furniture, signage, equipment, and parts.  One of the Maryland dealerships invested $1.2 million alone to expand and improve the service lane, customer lounge, internet offices, and service advisor experience.  The Chrysler franchise agreement also requires a dealer to invest extensively in furniture, signs, and equipment to sell vehicles.  As of 2008, this Maryland dealer had invested for the dealership group almost $2.5 million in furniture, signs, and equipment.  A Chrysler dealer was required to provide service to Chrysler vehicle owners.  To do that, as of 2008, the Maryland dealer invested about $2.6 million in service equipment and company and service vehicles of more than $800,000.  To meet its service requirements, a dealer must also have a

substantial and active parts department.  By December 2008, this Maryland dealer invested almost $1.5 million in parts and accessories equipment.

**The Financial Crisis Of 2008**

81.     A global credit crisis dried up the financial liquidity markets in the fall of 2008. What had begun as the United States subprime mortgage crisis spread to the primary and secondary credit markets globally and to the banking system as a whole.  By October 2008, the credit crisis had effectively frozen the secondary asset-backed securities credit market worldwide and caused several major financial institutions to fail.  Because of this unprecedented global credit crisis, other major financial institutions became dependent upon substantial emergency government financing or were forced into liquidation or sales to other entities.  In this global economic downturn, despite the monumental efforts of the U.S. Treasury and the Federal Reserve System—not to mention the efforts of other governments around the world—to inject capital and create liquidity in the financial markets, there was little, if any, credit available to most businesses.

82.     The sales of all automobiles plummeted as securitizations of wholesale loans (i.e., loans to auto dealers) and retail loans (i.e., loans to consumers) came to an abrupt halt in the fall of 2008.  Because the credit market was not functioning, there was little market for new auto loans, and thus limited access to capital for the auto finance companies.

83.     The credit crisis also eroded consumer confidence.  In the second half of 2008 and the beginning of 2009, consumers and small businesses dramatically reduced their spending, leading to a collapse in demand for light-duty vehicles and the lowest United States automobile sales in decades.  Automobile sales in 2009 were 9.8 million units compared to a 2008 figure of 15.6 million units, representing a more than 37% decrease and the lowest level in 26 years.

**The Troubled Asset Relief Program (TARP)**
**Commits Funding to the Auto Industry____**

84.     In response to the global financial crisis, on October 3, 2008, Congress enacted

the Emergency Economic Stabilization Act of 2008 ("EESA") to restore liquidity and stability

to the American "financial system."  12 U.S.C. § 5201(1).  Under the EESA, Congress

created the Troubled Asset Relief Program ("TARP"), which granted the Secretary of the Treasury

broad authority to purchase troubled assets from financial institutions.  12 U.S.C. § 5211(a)(1).

Specifically, Congress authorized the Secretary of the Treasury "to purchase, and to make and

fund commitments to purchase, troubled assets from any financial institution, on such terms

and conditions as are determined by the Secretary, and in accordance with this Act and the

policies and procedures developed and published by the Secretary."  12 U.S.C. § 5211(a)(1).

Congress funded TARP with approximately $787 billion in federal funds, and invested the

President with broad powers to disburse these funds.

85.     Although TARP was aimed at financial institutions, the Secretary of the Treasury

determined that TARP funds could also be used to aid automobile manufacturers that (like

Chrysler) provided credit to auto purchasers.  On December 19, 2008, Treasury Secretary

Henry M. Paulson made the determination that

> thrift and other holding companies engaged in the manufacturing of automotive
> vehicles and the provision of credit and financing in connection with the
> manufacturing and purchase of such vehicles are "financial institutions" for
> purposes of section 3(5) of the Act . . . .

Secretary Paulson further determined that

> the obligations of such financial institutions are financial instruments the purchase
> of which is necessary to promote stability to the financial system of the United
> States, and, as such, are "troubled assets," as that term is defined in section
> 3(9)(B) of the Act, and eligible to be purchased under the TARP. . . .

37

86.     Relying on his December 19, 2008 determination that the auto industry qualified for TARP funds, that same day the Secretary of the Treasury created the Automotive Industry Financing Program to permit Treasury to invest in the automakers and their financing arms.  The program's stated goal was to prevent a significant disruption of the American automotive industry that would pose a systemic risk to financial market stability and have a negative effect on the United States economy.  To date, the United States has committed $80.7 billion through the Automotive Industry Financing Program to facilitate restructuring and to support the automotive manufacturing companies and their financing arms to "avoid a disorderly bankruptcy of one or more automotive companies."

87.     That same day, President Bush announced that the United States would invest $4 billion of TARP funds in Chrysler.  The United States provided those funds on January 2, 2009.  On January 16, 2009, Chrysler Financial, the company's retail financing division, received an additional $1.5 billion in TARP funds from the United States to provide automobile loans for purchasers of its cars.

88.     Over the ensuing months, the Government ultimately committed $12.5 billion in TARP funds to Chrysler and $49.5 billion to General Motors, in addition to the $1.5 billion for Chrysler Financial (Chrysler's financing arm) and $17.2 billion for GMAC LLC (General Motors's financing arm) for a total Government commitment to the automobile industry of $80.7 billion.

89.     On March 20, 2009, the U.S. Treasury announced that it had created the Auto Supplier Support Program, to provide up to $5 billion in support for automotive suppliers of Chrysler and General Motors, of which $1.5 billion was designated for Chrysler suppliers.  The

Government also announced a Federal Warranty Commitment Program to back warranties for cars purchased during Chrysler's restructuring period.

**The Government Requires Chrysler To**
**Terminate Plaintiffs' Dealer Franchises**

90.     On February 20, 2009, President Obama established the President's Auto Task Force to oversee the restructuring of Chrysler (and General Motors as well).  Co-chaired by Treasury Secretary Timothy Geithner and National Economic Council Director Lawrence Summers, the members of the Auto Task Force included other cabinet and cabinet-level officials, including the Secretary of Transportation, the Secretary of Commerce, the Secretary of Labor, the Secretary of Energy, the Chair of the President's Council of Economic Advisers, the Director of the Office of Management and Budget, the Environmental Protection Agency Administrator, and the Director of the White House Office of Energy and Climate Change.

91.     On February 17, 2009, as required by the Government, Chrysler submitted to the Auto Task Force its proposed restructuring plan.  The Chrysler Restructuring Plan did not call for the termination of Plaintiffs' dealer franchises or the filing of bankruptcy.

92.     To provide day-to-day support for the Auto Task Force, a Treasury Department Auto Team was created.  Appointed to lead the Auto Team was Steven Rattner, the co-founder of the Quadrangle Group, a private-equity firm.  The Auto Team launched seven-day-a-week negotiations with all parties that would ultimately result in a thorough restructuring of Chrysler (and General Motors).

93.     The Government rejected Chrysler's proposed restructuring plan and instead required that Chrysler "rationalize" its dealer network by terminating a substantial number of dealer franchises using Section 363 of the Bankruptcy Code.

39

94.     Therefore, on April 30, 2009, Chrysler and its affiliated companies filed a petition for bankruptcy in the District Court for the Southern District of New York.

95.     And on May 14, 2009, in compliance with the Government-announced restructuring plan, Chrysler moved the Bankruptcy Court for rejection (termination) of the franchise agreements it had with 789 Chrysler dealers including Plaintiffs—about 25% of all Chrysler dealer franchises—and on June 9, 2009, the U.S. Bankruptcy Court issued the Rejection Order, providing that rejected dealers "shall have no further rights (direct, indirect, contractual or otherwise) to act as an Authorized Dealer . . . ."

96.     By July 1, 2009, Plaintiffs had ceased doing business as franchised Chrysler dealers, having been deprived by the Government's actions of all contractual and statutory rights as Chrysler dealers.

## FIRST CLAIM FOR RELIEF

## TAKING OF DEALER FRANCHISES IN VIOLATION OF THE FIFTH AMENDMENT TO THE UNITED STATES CONSTITUTION

97.     Plaintiffs reallege and incorporate by reference herein paragraphs 1 through 95.

98.     The Constitution of the United States requires that Defendant United States pay just compensation for all property taken for public use.

99.     To date, Defendant United States has paid Plaintiffs nothing as compensation for Plaintiffs' automobile dealer franchises that it has taken for public use, in violation of the Constitution of the United States.

100.    As a direct, foreseeable, and proximate result of the acts of Defendant United States, Plaintiffs have been damaged in the amount of at least two hundred million dollars ($200,000,000.00) equal to the just compensation due them under the Fifth Amendment, including interest thereon at a rate to be established by this Court.

40

101.    As a further direct, foreseeable, and proximate result of the taking of their

property without just compensation, Plaintiffs have been required to retain the services of

counsel to prosecute this action.  Plaintiffs have incurred, and will incur, attorneys' fees,

appraiser and expert witness fees, and costs and expenses of litigation in an amount as

yet unascertained.

## SECOND CLAIM FOR RELIEF

### REGULATORY TAKING OF STATE STATUTORY
### DEALER RIGHTS IN VIOLATION OF THE
### FIFTH AMENDMENT TO THE UNITED STATES CONSTITUTION

102.    Plaintiffs reallege and incorporate by reference herein paragraphs 1

through 100.

103.    In addition to the Chrysler franchises, each of the Plaintiffs possessed a property

right under the state motor vehicle dealer laws ("State Dealer Laws") enacted by the legislatures

of the States in which Plaintiffs were operating their Chrysler dealerships—Alabama, Arizona,

Arkansas, California, Florida, Georgia, Illinois, Iowa, Kansas, Kentucky, Maine, Maryland,

Massachusetts, Michigan, Minnesota, Missouri, Nevada, New Jersey, New Mexico, New York,

Ohio, Oregon, Pennsylvania, Rhode Island, South Carolina, Tennessee, Texas, Utah, Vermont,

Washington, and West Virginia. The applicable State Dealer Laws are compiled in the attached

Appendix I.

104.    The State Dealer Laws were enacted in recognition of the disparity of

bargaining power between automobile manufacturers and their dealers and specifically prohibit

manufacturers from terminating, canceling, or failing to renew a dealer's franchise without good

cause or its equivalent.  In the States of Kentucky, Maine, Maryland, Massachusetts, Minnesota,

New Jersey, New Mexico, New York, Oregon, Tennessee, and Vermont, good cause or the

equivalent for a franchise termination, expressly requires proof of the dealer's failure to comply with a provision of the dealer agreement.  In Alabama, Arizona, Arkansas, California, Florida, Georgia, Illinois, Iowa, Kansas, Missouri, Nevada, Ohio, Pennsylvania, Rhode Island, South Carolina, Texas, Utah, Washington, and West Virginia, good cause or its equivalent is determined by the applicable agency or judicial fact-finder based on a consideration of the existing circumstances, which may include, but are not limited to, whether the dealer has failed to comply with the provisions of the franchise.

105.    The Constitution of the United States requires that Defendant United States pay just compensation for all property taken for public use.

106.    To date, Defendant United States has paid Plaintiffs nothing as compensation for the state statutory dealer rights it has taken for public use, in violation of the Constitution of the United States.

107.    As a direct, foreseeable, and proximate result of the acts of Defendant United States, Plaintiffs have been damaged in the amount of at least two hundred million dollars ($200,000,000.00), equal to the just compensation due them under the Fifth Amendment, including interest thereon at a rate to be established by this Court.

108.    As a further direct, foreseeable, and proximate result of the taking of their property without just compensation, Plaintiffs have been required to retain the services of counsel to prosecute this action.  Plaintiffs have incurred, and will incur, attorneys' fees, appraiser and expert witness fees, and costs and expenses of litigation in an amount as yet unascertained.

## RELIEF REQUESTED

WHEREFORE, Plaintiffs demand judgment against Defendant United States as follows:

1.      A money judgment equal to the just compensation owing to each Plaintiff for the permanent taking of its property for public use, together with interest thereon at the legal rate from the date of taking;

2.      Reasonable attorneys' fees and costs incurred in the prosecution of this action;

3.      The expenses of appraisers and other experts reasonably required to prosecute this action, together with other costs of this suit; and

4.      Such other and further relief as the Court may deem to be just and proper.

Respectfully submitted,


 s/ Nancie G. Marzulla
Nancie G. Marzulla
Roger J. Marzulla
MARZULLA LAW, LLC
1150 Connecticut Avenue, NW
Suite 1050
Washington, DC 20036
(202) 822-6760 (telephone)
(202) 822-6774 (facsimile)

Dated: June 3, 2011                     Counsel for Plaintiffs


Of Counsel:

Thomas A. Holman, Esq.
HOLMAN LAW, P.C.
475 Park Avenue South
Twelfth Floor
New York, New York 10016
(212) 481-1336 (telephone)
(212) 481-1333 (facsimile)

Leonard A. Bellavia, Esq.
BELLAVIA GENTILE & ASSOCIATES, LLP
200 Old Country Road
Mineola, New York 11501
(516) 873-3000 (telephone)
(516) 873-9032 (facsimile)