# IN THE UNITED STATES COURT OF FEDERAL CLAIMS

_____

ALLEY'S OF KINGSPORT, INC., et al.,

                Plaintiffs,

v.

THE UNITED STATES,

                Defendant.

_____

No. 11-100 (RHH)
Hon. Robert H. Hodges, Jr.

## PLAINTIFFS' OPPOSITION TO DEFENDANT'S MOTION TO DISMISS

Nancie G. Marzulla
Roger J. Marzulla
MARZULLA LAW, LLC
1150 Connecticut Avenue, NW
Suite 1050
Washington, DC 20036
(202) 822-6760 (telephone)
(202) 822-6774 (facsimile)
Counsel for Plaintiffs

Dated: October 3, 2011

Of counsel:

Thomas A. Holman
HOLMAN LAW, P.C.
475 Park Avenue South
Twelfth Floor
New York, NY 10016
(212) 481-1336 (telephone)
(212) 481-1333 (facsimile)

Leonard A. Bellavia
BELLAVIA GENTILE & ASSOCIATES, LLP
200 Old Country Road
Mineola, NY 11501
(516) 873-3000 (telephone)
(516) 873-9032 (facsimile)

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................... iii

ISSUES ....................................................................................................... 2

SUMMARY OF ARGUMENT ..................................................................... 3

FACTUAL BACKGROUND ........................................................................ 8

ARGUMENT ............................................................................................. 15

    Standard of Review ............................................................................. 15

    I.     The Government Misrepresents the Terminated Dealers' Claims........... 16

          A.    The Terminated Dealers Are Not Asking for Review of the Decision of the Bankruptcy Court ................................................... 17

          B.    The Terminated Dealers Have Not Alleged a Judicial Taking ........ 25

          C.    The Terminated Dealers Claim That the Government Categorically Took Their Property When the Government Required Chrysler to Terminate Their Franchises ................................................... 27

               1.    The Terminated Dealers' Franchise Contracts Are Property Protected by the Fifth Amendment ....................................... 27

               2.    The Government Took the Terminated Dealers' Property When It Made Chrysler File for Bankruptcy ........................ 30

                    a.    The Terminated Dealers Have Suffered the Loss of All Economic Use of Their property ................................ 31

                    b.    The *Penn Central* Analysis Does Not Apply in This Total Wipeout Case ...................................................... 32

                    c.    The Government Exercised Its Sovereign Authority to Take the Terminated Dealers' Property and the Government Owes Just Compensation ...................... 35

    II.    The Government's Res Judicata and Collateral Estoppel Arguments Are Without Merit ............................................................................... 38

          A.    The Terminated Dealers' Claims Are Not Precluded by Res Judicata or Collateral Estoppel ............................................................ 38

          B.    The Terminated Dealers Did Not Waive Their Just Compensation Claim ............................................................. 42

          C.    The Bankruptcy Court Ordered That Its Decision Would Have No Preclusive Effect ............................................................. 42

          D.    Issue Preclusion Does Not Bar the Terminated Dealers' Just Compensation Claims ........................................................... 43

    III.    The Government Cannot Win This Rule 12(b)(6) Motion to Dismiss by Disputing the Allegations of the Complaint ................................... 46

CONCLUSION ......................................................................................... 50

EXHIBITS

# TABLE OF AUTHORITIES

**Cases**

*Allustiarte v. United States*, 256 F.3d 1349 (Fed. Cir.) ..................................................... 18

*American Airlines, Inc. v. United States*, 77 Fed.Cl. 672 (2007) ...................................... 42

*Ammex, Inc. v. United States*, 334 F.3d 1052 (Fed. Cir. 2003) ......................................... 39

*Bagford v. Ephraim City*, 904 P.2d 1095 (Utah 1995) ...................................................... 28

*Bair v. United States*, 515 F.3d 1323 (Fed. Cir.) ............................................................... 33

*Boise Cascade Corp. v. United States*, 296 F.3d 1339 (Fed. Cir. 2002) ............. 2–4, 23–26

*Bright Power Sports LLC v. BRP US Inc.*, 2009 U.S. Dist. LEXIS 110134
(E.D. Mich. Nov. 25, 2009) ................................................................................................ 30

*C.A. May Marine Supply Co. v. Brunswick Corp.*, 649 F.2d 1049 (5th Cir. 1981) .......... 29

*Chapman Law Firm Co. v. Greenleaf Constr. Co.*, 490 F.3d 934 (Fed. Cir. 2007) ........ 47

*Cienega Gardens v. United States*, 331 F.3d 1319 (Fed. Cir. 2003) ................... 3, 7, 27, 28

*Community Bank & Trust v. United States*, 54 Fed. Cl. 352 (2002) ................................. 15

*Del Rio Drilling, Inc. v. United States*, 146 F.3d 1358 (Fed. Cir. 1998). .......................... 2

*Eastern Enterprises. v. Apfel*, 524 U.S. 498 (1998) ......................................................... 17

*Estacio v. U.S. Postal Serv.*, 34 Fed. Appx. 677 (Fed. Cir. 2002) .................................... 43

*In re Chrysler LLC,* 405 B.R. 84 (S.D.N.Y. Bankr. 2009) .......................... 7, 11, 35, 36, 44

*In re George Ruggiere Chrysler-Plymouth, Inc.*, 727 F.2d 1017 (11th Cir. 1984) .......... 40

*In re Old Carco LLC*, 406 B.R. 180 (Bankr. S.D.N.Y. 2009) ............................... 14, 40, 41

*New Motor Vehicle Bd. v. Fox*, 439 U.S. 96 (1978) ...................................................... 9, 30

*Lippo v. Mobil Oil Corp.*, 776 F.2d 706 (7th Cir. 1985) ................................................... 30

*Louisville Joint Stock Land Bank v. Radford*, 295 U.S. 555 (1935) ............................ 5, 33

*Love Terminal Partners v. United States*, 97 Fed. Cl. 355 (2011) ............................ 15, 46

*Lucas v. South Carolina Coastal Council*, 505 U.S. 1003 (1992) ........... 26, 31, 32, 34, 35

*Mayer/Berkshire Corp. v. Berkshire Fashions, Inc.,* 424 F.3d 1229 (Fed. Cir. 2005) .... 39

*Marrese v. Amer. Academy of Orthopaedic Surgeons*, 470 U.S. 373 (1985) ................. 39

*McGuire v. United States*, 550 F.3d 903 (9th Cir. 1998) .................................................. 38

*Metromedia Co. v. Fugazy*, 983 F.2d 350 (2d Cir. 1992) ......................................... 43, 44

*Palmyra Pacific Seafoods, L.L.C. v. United States*,
561 F.3d 1361 (Fed. Cir. 2009) ................................................................................. 28, 29

*Patton v. United States*, 64 Fed. Cl. 768 (2005)............................................................... 15

*Penn Central Transportation Co. v. New York City,* 438 U.S. 104 (1978) ..................... 32

*Precision Pine & Timber, Inc. v. United States*, 596 F.3d 817 (Fed. Cir. 2010) ............. 29

*P&W Power Supply Co. v. E.I. Du Pont de Nemours & Co.*, 747 F. Supp. 1262
(N.D. Ill. 1990) .................................................................................................................. 30

*Resource Investments, Inc. v. United States*, 85 Fed. Cl. 447 (2009) ........................ 30, 31

*Schooner Harbor Ventures, Inc. v. United States*, 569 F.3d 1359 (Fed. Cir. 2009) ... 27, 34

*Sommers Oil Co. v. United States*, 241 F.3d 1375 (Fed. Cir. 2001) ................................ 46

*Ultimate Sportsbar, Inc. v. United States*, 48 Fed. Cl. 540 (2001) ..... 20, 21, 22, 32–34, 36

*Vereda Ltda. v. United States*, 271 F.3d 1367 (Fed. Cir. 2001)........................................ 23

*Vincent Schickler Tmd U.S.A. v. United States*, 54 Fed. Cl. 264 (2002)........................... 39

**Orders**

Order, Pursuant To Sections 105 and 365 of The Bankruptcy Code And Bankruptcy Rule 6006, (A) Authorizing The Rejection Of Executory Contracts And Unexpired Leases With Certain Domestic Dealers And (B) Granting Certain Related Relief ("Rejection Order"), *In re Old Carco LLC (f/k/a Chrysler LLC)*, Doc. No. 3802, June 9, 2009 (Attached as Exhibit I) ............................................................................ 4, 8, 38, 42, 47

**Statutes**

Pub. L. No. 110-343, 122 Stat. 3765 (Oct. 3, 2008)
(codified at 12 U.S.C. §§ 5201 to 5261) ....................................................... 4, 10

16 U.S.C. §§ 1531-1544 ..................................................................................... 23

28 U.S.C. § 1346 ................................................................................................. 17

28 U.S.C. § 1491 ................................................................................................. 17

**Constitutional Provisions**

U.S. Const. art. I, § 10 ...................................................................................... 19

U.S. Const. amend. V ........................................................................................... 1

**Secondary Authority**

President Barack Obama, Remarks by the President on the American Automotive Industry (March 30, 2009) (Attached as Exhibit IV) ........................... 13, 19, 25

BLACKS LAW DICTIONARY (9th ed., Bryan A. Garner, ed. (2009)) ................. 38

Carla Wong McMilian, *What Will it Take to Get You in a New Car Today?: A Proposal for a New Federal Automobile Dealer Act*, 45 GONZ. L. REV. 67 (2010) ....................... 30

E-mail message from Matt Feldman to Robert Manzo dated Apr. 30, 2009
(Attached as Exhibit VI) ............................................................................ 14, 37

John Martinez, *Government Takings* § 12:3 (Westlaw 2010) .......................... 28

Paul Ingrassia, CRASH COURSE (2011) (Excerpts Attached as Exhibit V) ...................... 14

RESTATEMENT (SECOND) OF CONTRACTS § 205 .............................................................. 29

Statement of Neil Barofsky, Special Inspector General to the Trouble Assets Relief
Program, before the Senate Committee on Finance, July 21, 2010
(Attached as Exhibit II) ....................................................................................................... 6

Steven Rattner, *The auto bailout: How we did it*,
FORTUNE MAGAZINE, Nov. 23, 2009 .................................................................... 6, 13, 19

Steven Rattner, OVERHAUL:  AN INSIDER'S ACCOUNT OF THE OBAMA ADMINISTRATION'S
EMERGENCY RESCUE OF THE AUTO INDUSTRY (2010)
(Excerpts Attached as Exhibit III) .................................................................. 6, 19, 20, 25

U.C.C. § 1-304................................................................................................................... 29

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

_____
                                        )
ALLEY'S OF KINGSPORT, INC., et al.,     )
                                        )
                    Plaintiffs,         )
                                        )
v.                                      )     No. 11-100 (RHH)
                                        )     Hon. Robert H. Hodges, Jr.
THE UNITED STATES,                      )
                                        )
                    Defendant.          )
_____ )

**PLAINTIFFS' OPPOSITION TO DEFENDANT'S MOTION TO DISMISS**

This is a claim for just compensation under the Just Compensation Clause of the

Fifth Amendment[1] by 75 former owners of franchised-Chrysler auto dealerships

(collectively the "Terminated Dealers").  The Terminated Dealers seek compensation for

the taking of their property rights (including their statutorily protected franchise contract

rights and valuable dealerships) resulting from the Government's decision that

Chrysler—through restructuring by the mechanism of bankruptcy—must terminate

approximately 25% of its existing franchised dealers.

Defendant, the United States ("the Government"), has moved to dismiss the

Terminated Dealers' First Amended Complaint for Just Compensation under RCFC

12(b)(1) for lack of jurisdiction, and 12(b)(6) for failure to state a claim upon which relief

may be granted.  But the Government's argument to dismiss is fatally flawed because it

---

[1]The Fifth Amendment provides, in pertinent part, that "private property [shall not] be taken for public use, without just compensation."  U.S. Const. amend. V.

1

depends entirely on its misrepresentation of the Terminated Dealers' claims.  Contrary to

the Government's assertion, the Terminated Dealers do not seek review of any part of the

bankruptcy proceedings—they accept the validity of those proceedings, as they must to

maintain this just compensation case.[2]  And because the bankruptcy court did not have

jurisdiction to determine just compensation claims (and did not purport to do so), the

Government's arguments that Terminated Dealers' claims are barred by res judicata or

collateral estoppel are wholly without merit.

What the Terminated Dealers do allege is that the Government's requirement that

Chrysler terminate a quarter of its dealership agreements, using the bankruptcy process as

a tool, was a categorical taking of the Terminated Dealers' contract rights and valuable

business interests (both forms of property protected by the Fifth Amendment).  Indeed,

the Government was advised that requiring the termination of 25% of the Chrysler

dealership would likely result in takings liability.  But the Government nevertheless

chose to terminate those franchises.

Accordingly, and for all the reasons stated here, the Court should deny the

Government's motion.

## Issues

1.      In *Boise Cascade Corp. v. United States*,[3] the Federal Circuit confirmed that if the
Government uses the judicial system to take private property for public use, the
Government must still pay compensation.  Here, the federal Auto Task Force decided that

---

[2] *Del Rio Drilling, Inc. v. United States*, 146 F.3d 1358, 1364 (Fed. Cir. 1998).
[3] *Boise Cascade Corp. v. United States*, 296 F.3d 1339 (Fed. Cir. 2002), *cert. denied*, 538 U.S.
906 (2003).

25% of Chrysler dealerships must be terminated through a bankruptcy proceeding.  Is the Government shielded from takings liability because the Government engineered Bankruptcy Court proceeding led to the taking in this case?

2.      The bankruptcy judge's order states that (presumably in light of the summary nature of the proceeding) no collateral estoppel should attach to the order. The Government nevertheless argues that the Terminated Dealers are collaterally estopped from bringing their takings claims by virtue of the bankruptcy proceeding.  Are the Terminated Dealers collaterally estopped from bringing these claims?

3.      The Federal Circuit held in *Cienega Gardens v. United States*[4] that contracts are property protected against uncompensated taking by the Fifth Amendment. Prior to the Government's actions in this case, the Terminated Dealers had valuable franchise agreements with Chrysler and operated valuable dealership businesses  by virtue of those agreements.  Should this Court reject the Government's argument that the Terminated Dealers have not alleged the taking of constitutionally protected property rights?

**SUMMARY OF ARGUMENT**

The Government's Motion to Dismiss should be rejected for three independent

reasons.  First, the Government mischaracterizes the allegations of Terminated Dealers'

Complaint as seeking review of the decision of the Bankruptcy Court, which it does not.

Second, the Government ignores controlling Federal Circuit authorities—notably *Boise*

*Cascade Corp. v. United States*[5]—holding that the Government is liable under the Fifth

Amendment where it uses a judicial process to accomplish the taking.  And finally, the

Government fails to disclose that the decision of the Bankruptcy Court on which it relies

for its res judicata and collateral estoppel arguments states that it should not be relied for

this purpose: "None of the evidence provided by the Debtors, Affected Dealers or any

other party in interest that was admitted into evidence in connection with the Motion, the

---

[4] 331 F.3d 1319 (Fed. Cir. 2003).
[5] 296 F.3d 1339 (Fed. Cir. 2002).

Objections, the Hearing and this Order shall be treated as *res judicata* or collateral estoppel . . . ."[6]

## The Bankruptcy Rulings Are Not at Issue Here

The Government's Rule 12(b)(1) motion to dismiss for lack of jurisdiction is based on the false premise that the Terminated Dealers are asking this Court to review the actions of a bankruptcy court.  But, as the Complaint alleges,[7] the action agency in this case was the President's Auto Task Force, a Department of the Treasury instrumentality acting under the authority of the Troubled Assets Relief Program (TARP).[8]  As the Federal Circuit held in *Boise Cascade*,[9] that a federal agency chooses to effectuate its mandate through a court proceeding rather than an executive order (for example) does not insulate the United States from its duty to pay just compensation under the Fifth Amendment:  "That the [Fish and Wildlife] Service chose to effectuate its mandate to enforce the ESA through a court action . . . cannot insulate the United States from its duty to pay compensation that may be required by the Fifth Amendment."[10]  That the Auto Task Force decided to put Chrysler through bankruptcy in order to terminate one

---

[6] Order, Pursuant To Sections 105 and 365 of The Bankruptcy Code And Bankruptcy Rule 6006, (A) Authorizing The Rejection Of Executory Contracts And Unexpired Leases With Certain Domestic Dealers And (B) Granting Certain Related Relief ("Rejection Order"), *In re Old Carco LLC (f/k/a Chrysler LLC)*, Doc. No. 3802, June 9, 2009 (Attached as Exhibit I).
[7] Plaintiffs' "First Amended Complaint For Just Compensation" (the "Complaint") ¶¶ 90–93, 98, 99, 103–106.
[8] *See* Pub. L. No. 110-343, 122 Stat. 3765 (Oct. 3, 2008) (codified at 12 U.S.C. §§ 5201 to 5261).
[9] 296 F.3d at 1345 (Fed. Cir. 2002).
[10] *Id.*

quarter of Chrysler's franchises does not insulate the Government from its duty to pay for taking those franchises.

As the Supreme Court has long held, "[t]he bankruptcy power, like the other great substantive powers of Congress, is subject to the Fifth Amendment."[11]  The Terminated Dealers are now properly seeking that compensation, and the Government's argument that they are challenging any decision made by the bankruptcy court is false and misleading.

**A Bankruptcy Proceeding Can Result in an Unconstitutional Taking**

The Government's assertion under Rule 12(b)(6) that the Complaint fails to state a claim for relief because "plaintiffs' complaint amounts to an unprecedented and implausible judicial taking claim . . ."[12] also finds no basis at all in the Complaint.  What the Terminated Dealers actually allege is that the Auto Task Force rejected Chrysler's proposed restructuring plan and instead required Chrysler to terminate their existing dealer franchises using Section 363 of the Bankruptcy Code.[13]  As the Special Inspector General for the Trouble Assets Relief Program reported to Congress, the Bankruptcy Code was simply the tool the Task Force chose to use in order to quickly terminate the franchises:

> [T]he Auto Team felt the companies' best chance of success required "utilizing the bankruptcy code in a quick and surgical way"

---

[11] *Louisville Jt. Stock Land Bank v. Radford*, 295 U.S. 555, 581 (1935) (*superseded on other grounds by Wright v. Vinton Branch of Mountain Trust Bank*, 300 U.S. 440 (1937)).
[12] Def.'s Mot. to Dismiss at 2.
[13] Complaint, ¶¶ 91, 93.

and noted further that it would have been a "waste of taxpayer resources" for the auto manufacturers to exit bankruptcy without reducing their networks.[14]

Steven Rattner, Head of the Auto Task Force, made several statements after he resigned from the Government supporting these allegations. In a magazine article, Rattner observed that the Government would have to resort to the bankruptcy process to trim the dealer network: "I had doubted whether fundamental restructurings could be accomplished outside of bankruptcy."[15]

Rattner further observed that the Government's "best idea was to employ a little-used part of the bankruptcy code, Section 363, which greatly streamlines the process by allowing a newly formed company to buy the operating assets from the bankrupt entity."[16] Then in his book Rattner states that the Government chose Bankruptcy Court over legislation after being advised that shortcutting the bankruptcy process might lead to takings liability: "Finally we were advised that efforts to shortcut bankruptcy procedures could well run afoul of the 'takings clause' of the U.S. Constitution . . . ."[17] The decision of the Auto Task Force to terminate the Terminated Dealers' franchises is forms the basis of the Terminated Dealers' claim.

**Contract Rights and Business Interests Are Constitutionally Protected Property**

---

[14] Statement of Neil Barofsky, Special Inspector General to the Trouble Assets Relief Program, before the Senate Committee on Finance, July 21, 2010 (Attached as Exhibit II).

[15] Steven Rattner, *The auto bailout: How we did it*, FORTUNE MAGAZINE, Nov. 23, 2009 *available at* http://money.cnn.com/2009/10/21/ autos/auto_bailout_ rattner.fortune.

[16] *Id.*

[17] Steven Rattner, OVERHAUL: AN INSIDER'S ACCOUNT OF THE OBAMA ADMINISTRATION'S EMERGENCY RESCUE OF THE AUTO INDUSTRY 107 (2010) (Excerpts Attached as Exhibit III).

The Government's assertion that Terminated Dealers' franchise contracts "never constituted 'property' the loss of which could be actionable under the Fifth Amendment"[18] is not supported by any case cited by the Government nor known to the Terminated Dealers.  As the Federal Circuit held in *Cienega Gardens v. United States*,[19] contracts are property protected against uncompensated takings by the Fifth Amendment:

> [T]here is also ample precedent for acknowledging a property interest in contract rights under the Fifth Amendment.  *See, e.g., . . . United States Trust Co. of N.Y. v. New Jersey,* 431 U.S. 1, 19 n. 16 (1977) ("Contract rights are a form of property and as such may be taken for a public purpose provided that just compensation is paid.").[20]

The Bankruptcy Court further noted that the Government's actions to restructure Chrysler was for an important public purpose:

> The Governmental Entities have made the determination that it is in their respective national interests to save the automobile industry, in the same way that the U.S. Treasury concluded that it was in the national interest to protect financial institutions.[21]

There is therefore no basis for the Government's assertion that the Terminated Dealers' franchise contracts were not private property taken for public use.

**The Terminated Dealers Are Not Estopped From Bringing Their Takings Claims**

Finally, in arguing that this Court should give res judicata effect to the decision of the bankruptcy judge, the Government inexcusably omits to inform this Court that the

---

[18] Def.'s Mot. to Dismiss at 2.
[19] 331 F.3d 1319 (Fed. Cir. 2003).
[20] *Id.* at 1329–1330 (parallel citations omitted).
[21] *In re Chrysler LLC,* 405 B.R. 84, 107 (S.D.N.Y. Bankr. 2009), *aff'd*, 576 F.3d 108 (2d Cir. 2009), *vacated by Indiana State Police Pension Trust v. Chrysler LLC*, 130 S.Ct. 1015 (2009).

bankruptcy judge's order states that (presumably in light of the summary nature of the

proceeding) no issue preclusive effect should attach to it:

> None of the evidence provided by the Debtors, Affected Dealers or any other party in interest that was admitted into evidence in connection with the Motion, the Objections, the Hearing and this Order shall be treated as *res judicata* or collateral estoppel . . . . All such evidence, to the extent admitted, was admitted for the purposes of the Hearing to consider the Motion.[22]

For all the reasons discussed, Defendant's Motion to Dismiss should be denied and the

Government should be required to file its Answer.

## FACTUAL BACKGROUND

### Chrysler's Dealership Franchises

Chrysler, in various forms, has been manufacturing automobiles since 1925.[23]

Throughout its history, Chrysler has never sold its automobiles directly to consumers, but

rather has sold them exclusively through authorized retail auto dealers.[24]  The Terminated

Dealers are 75 automotive dealerships formerly engaged in the sale and service of

Chrysler automobiles under a franchise with Chrysler.[25]  At all times, the rights and

obligations of the Terminated Dealers and Chrysler were governed by franchise

agreements that imposed numerous obligations on dealers, including the dealer's

obligation to establish facilities, sell Chrysler's vehicles, provide service to owners of

---

[22] Rejection Order, Doc. No. 3802, June 9, 2009 (Exhibit I).
[23] Complaint, ¶ 77.
[24]*Id.* ¶ 79.
[25]*Id.* ¶¶ 1-75.

Chrysler's vehicles, and maintain a substantial inventory of parts to fulfill their service obligations.[26]

Over the years, each of the Terminated Dealers spent substantial amounts of money in reliance on its Chrysler franchise to construct showrooms and shop facilities; purchase and finance inventory; train and employ sales, service, and accounting staff; purchase parts and repair equipment; and, advertise the dealership.[27]  Each of the Terminated Dealers' franchise contracts was protected by statutes enacted in the various states in which the Terminated Dealers operated their dealerships.[28]  Those protected contracts gave the Terminated Dealers security in the face of the automobile industry's superior bargaining power.[29]

**The Global Credit Crisis**

In the fall of 2008, a global credit crisis dried up the financial liquidity markets.[30] What had begun as the United States subprime mortgage crisis spread to the primary and secondary credit market globally and to the banking system as a whole.[31]  By October 2008, this unprecedented global credit crisis had effectively frozen the secondary asset-backed securities credit market worldwide and caused several major financial institutions to fail.  Other major financial institutions became dependent upon substantial emergency

---

[26]*Id.* ¶ 79.
[27]*Id.* ¶ 80.
[28]*Id.* ¶¶ 1-75, 103, 104, App. I.
[29] *See New Motor Vehicle Bd. v. Fox*, 439 U.S. 96, 102 n.4 (1978).
[30] Complaint, ¶ 81.
[31]*Id.*

government financing or were forced into liquidation or sales to other entities.[32]  In this global economic downturn, there was little, if any, credit available to most businesses, including the automotive industry.[33]  As a result, the sales of all automobiles, including Chrysler autos, plummeted as securitizations of wholesale loans (i.e., loans to auto dealers) and retail loans (i.e., loans to consumers) came to an abrupt halt in the fall of 2008.[34]  The global credit crisis also eroded consumer confidence, such that in the second half of 2008 and the beginning of 2009, consumers and small businesses dramatically reduced their spending, leading to a collapse in demand for light-duty vehicles and the lowest United States automobile sales in decades.[35]

In response to the global financial crisis, on October 3, 2008, Congress enacted the Emergency Economic Stabilization Act of 2008 ("EESA")[36] to "restore liquidity and stability to the financial system of the United States."[37]  Under the EESA, Congress created the Troubled Asset Relief Program ("TARP"), which granted the Secretary of the Treasury broad authority to "purchase, and to make and fund commitments to purchase, troubled assets from any financial institution, on such terms and conditions as are determined by the Secretary, and in accordance with [the EESA] and the policies and

---

[32]*Id.*

[33]*Id.* ¶¶ 81-82.

[34]*Id.* ¶ 82.

[35]*Id.* ¶ 83.  Automobile sales in 2009 were 9.8 million units compared to a 2008 figure of 15.6 million units, representing a more than 37% decrease, the lowest level in 26 years.  *Id.*

[36]Pub. L. No. 110-343, 122 Stat. 3765 (Oct. 3, 2008) (codified at 12 U.S.C. §§ 5201 to 5261).

[37]12 U.S.C. § 5201(1).

procedures developed and published by the Secretary."[38]  Congress funded TARP with approximately $787 billion in federal funds, and invested the President with broad powers to disburse these funds.[39]

**The Government Steps in to Protect the Automakers**

Although TARP was, by its terms, aimed at purchasing troubled assets from financial institutions, the then-Secretary of the Treasury, Henry Paulson, determined that TARP funds could also be used to aid automobile manufacturers that (like Chrysler) provided credit to car buyers.[40]  In particular, Secretary Paulson, on December 19, 2008, determined that companies engaged in the manufacturing of automotive vehicles and the provision of credit and financing in connection with the manufacturing and purchase of such vehicles qualified as "financial institutions" for purposes of the EESA, and that "the obligations of such financial institutions are financial instruments the purchase of which is necessary to promote stability to the financial system of the United States[.]"[41]  This was a purely "political decision" by the U.S. Treasury, which had determined that it was in the "national interest[] to save the automobile industry."[42]

To carry out this political decision, Secretary Paulson created the Automotive Industry Financing Program to permit Treasury to invest in the automakers and their

---

[38] 12 U.S.C. § 5211(a)(1).
[39] Complaint, ¶ 84.
[40] *Id.* ¶ 85.
[41] *Id.*
[42] *In re Chrysler LLC*, 405 B.R. 84, 104; *see also id.* at 104 ("The decision of the U.S. Treasury . . . is a political issue that is motivated, in part, by non-economic considerations."); 108 (the U.S. Treasury "had determined that the auto industry should be preserved in furtherance of [the] nation's economic interest").

financing arms.[43]  The program's stated goal was to prevent a significant disruption of the American automotive industry that would pose a systemic risk to financial market stability and have a negative effect on the national economy.[44]  The urgency of the Government's position on this political issue was further demonstrated by President Bush's announcement, also on December 19, 2008, that the United States would invest $4 billion of TARP funds in Chrysler.[45]

Over the ensuing months, the Government continued to pour TARP funds into the automobile industry, with $12.5 billion ultimately being committed to Chrysler and $49.5 billion to General Motors, in addition to $1.5 billion for Chrysler's financing arm and $17.2 billion for General Motors' financing arm, for a total Government commitment to the auto industry of $80.7 billion.[46]

**The President's Auto Task Force Decides to Terminate the Dealerships**

In February 2009, President Obama established the President's Auto Task Force to oversee the restructuring of Chrysler.[47]  Co-chaired by Treasury Secretary Timothy Geithner and National Economic Council Director Lawrence Summers, the Auto Task Force included as its members other cabinet and cabinet-level officials, including the Secretary of Transportation, the Secretary of Commerce, the Secretary of Labor, the Secretary of Energy, the Chair of the President's Council of Economic Advisers, the

---

[43]Complaint, ¶ 86.
[44]*Id.*
[45]*Id.* ¶ 87.
[46]*Id.* ¶ 88.
[47]*Id.* ¶ 90.

Director of the Office of Management and Budget, the Environmental Protection Agency

Administrator, and the Director of the White House Office of Energy and

Climate Change.[48]

On February 17, 2009, as required by the Government, Chrysler submitted to the

Auto Task Force its proposed restructuring plan.  That plan did not call for the immediate

cancellation of Terminated Dealers' dealer franchises or the filing of bankruptcy.[49]  But

the Task Force rejected Chrysler's plan and instead required Chrysler to "rationalize" its

dealer network by terminating a substantial number of dealer franchises as part of a

bankruptcy proceeding.[50]  The Task Force had decided to use the bankruptcy court as an

instrument to effect restructuring, freeing Chrysler from its contractual obligations to the

Terminated Dealers.[51]  As President Obama put it in a nationally televised address, the

Government's management of Chrysler "may mean using our bankruptcy code as a

mechanism to help [Chrysler] restructure quickly and emerge stronger. . . . What I am

talking about is using our existing legal structure as a tool that, with the backing of the

U.S. government, can make it easier for . . . Chrysler to quickly clear away

old debts . . . ."[52]

The Auto Task Force, and not Chrysler executives, was "calling the shots"

throughout this process:

---

[48]*Id.*
[49]*Id.* ¶ 91.
[50]*Id.* ¶ 93.
[51] Rattner, *The auto bailout: How we did it.*
[52] President Barack Obama, Remarks by the President on the American Automotive Industry (March 30, 2009) (Attached as Exhibit IV).

Meanwhile, as it became clear that the task force was calling the shots, Chrysler executives chafed at being relegated to glorified observers to decisions about their company's fate. One Chrysler executive, in an e-mail to colleagues, referred to the Treasury Department as "God." In another, [Chrysler CEO] Nardelli himself wrote, "I guess the UST is running it!"[53]

Rejecting Chrysler's plea for more time to work out its affairs without bankruptcy, Matthew Feldman, the Chief Legal Advisor to the President's Task Force told Chrysler adviser Robert Manzo[54] the night before the Government-set deadline for filing bankruptcy: "It's over.  The President doesn't negotiate second rounds."[55]  And so the Chrysler bankruptcy was filed the next day in the Southern District of New York.

Then, just two weeks later, the Bankruptcy Court was asked to reject 789 Chrysler dealers franchise agreements, including the Terminated Dealers.[56]  On June 9, 2009, the Bankruptcy Court approved the Government's plan to terminate the franchise agreements, thereby terminating the Plaintiffs' rights to act as Chrysler dealers.[57]  By July 1, 2009, the Terminated Dealers had ceased doing business as franchised Chrysler dealers.[58]  The Terminated Dealers then filed this action seeking damages in the amount of at least $200 million for the taking of their property by the Government for public use,

---

[53] Paul Ingrassia, CRASH COURSE 248 (2011) (Excerpts Attached as Exhibit V).
[54] Robert Manzo was the Executive Director of the Capstone Advisory Group, and served as an adviser to Chrysler.
[55] *See* e-mail message from Matt Feldman to Robert Manzo dated Apr. 30, 2009, *available at* http://online.wsj.com/public/resources/documents/retro-EXHIBIT0905.html. (Attached as Exhibit VI).
[56]*Id.* ¶ 95.
[57]*Id.*  The Bankruptcy Court's opinion explaining its decision is reported at *In re Old Carco LLC*, 406 B.R. 180 (Bankr. S.D.N.Y. 2009).
[58]Complaint, ¶ 96.

without payment of just compensation.[59]   In response, the Government has filed this

motion to dismiss.

## ARGUMENT

## Standard of Review

Under RCFC 12(b)(1), subject-matter jurisdiction is a threshold issue.[60]   "'The

issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled

to offer evidence to support the claims.'"[61]   On a motion to dismiss for lack of

jurisdiction, "[t]he court must accept as true the facts alleged in the complaint and must

construe such facts in the light most favorable to the pleader."[62]   If the facts alleged in the

complaint "reveal any possible basis on which the non-moving party might prevail, the

court must deny the motion."[63]

A motion to dismiss under RCFC 12(b)(6) for failure to state a claim tests the

sufficiency of the complaint.[64]   To survive a motion to dismiss under RCFC 12(b)(6), the

complaint must contain "'enough facts to state a claim to relief that is plausible on its

face.'"[65]   It is enough "'when the plaintiff pleads factual content that allows the court to

draw the reasonable inference that the defendant is liable for the misconduct alleged.'"[66]

---

[59]*Id.* ¶¶ 98-100, 103-107.
[60]*Patton v. United States*, 64 Fed. Cl. 768, 773 (2005).
[61]*Id.* (quoting *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974), *overruled on other grounds by Davis v. Scherer*, 468 U.S. 183 (1984)).
[62]*Patton*, 64 Fed. Cl. at 773.
[63]*Cmty. Bank & Trust v. United States*, 54 Fed. Cl. 352, 354 (2002).
[64]*Love Terminal Partners v. United States*, 97 Fed. Cl. 355, 378 (2011).
[65]*Id.* (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).
[66]*Id.* (quoting *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009)).

When reviewing a motion to dismiss under this standard, the court must assume the truth of all well-pleaded factual allegations and draw all reasonable inferences in favor of the pleader.[67]

In hearing a motion to dismiss, "materials appearing in the record of the case may also be taken into account without converting the motion into one for summary judgment."[68] The court has "complete discretion to determine whether or not to accept the submission of any material beyond the pleadings,"[69] and generally does accept the submission of such material when it is "likely to facilitate the disposition of the action."[70]

## I.      The Government Misrepresents the Terminated Dealers' Claims.

The Government mischaracterizes these claims as requesting "review of the decisions of a district bankruptcy court," and as a "judicial taking."[71] But Terminated Dealers have alleged a takings claim, caused by the Treasury Department acting under its TARP authority, and nothing else.

What the Terminated Dealers seek to recover in this suit is just compensation for the taking of their property (dealer franchises) by the Government for public use without just compensation in violation of the Fifth Amendment.[72] The Terminated Dealers' taking claims are claims against the United States founded upon the Constitution for

---

[67]*Id.*
[68] *Love Terminal Partners*, 97 Fed. Cl. at 378.
[69] *Id.* at 379 (*citing* Charles A. Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1366 (3d ed. 2004)).
[70] *Id.*
[71] Def.'s Mot. to Dismiss at 3.
[72]Complaint, ¶¶ 98-100, 105-107.

which the Tucker Act grants jurisdiction in this Court.[73]  Indeed, because the value of the

Terminated Dealers' claims exceeds $10,000, jurisdiction over these claims rests only in

this Court.[74]  Likewise, and contrary to the Government's assertions, the Terminated

Dealers' takings claims do not require judicial review of any part of the bankruptcy

proceedings or order.  The Terminated Dealers thus have not stated a "judicial takings"

claim, but a categorical regulatory taking of their property.  So, for the reasons that

follow, the Government's motion must be denied.

### A.    The Terminated Dealers Are Not Asking for Review of the Decision of the Bankruptcy Court

Misconstruing the Complaint in this case, the Government erroneously asserts that

the Amended Complaint should be dismissed for lack of jurisdiction because, "although

couched in the language of takings law," it purportedly seeks the Court's review of

earlier bankruptcy court decisions involving Chrysler.[75]  But the Government is wrong.

A takings claim that arises out of a bankruptcy proceeding is not a review of that

proceeding or a review of bankruptcy court decisions, and this Court—and here, only this

Court—has jurisdiction to hear the claim.

---

[73]*See* 28 U.S.C. § 1491(a)(1).
[74]*See* 28 U.S.C. § 1346(a)(2) (the district courts have concurrent jurisdiction with the Court of Federal Claims over claims against the United States not exceeding $10,000 in amount founded upon the Constitution); *Eastern Enters. v. Apfel*, 524 U.S. 498, 520 (1998) ("Under the Tucker Act, 28 U.S.C. § 1491(a)(1), the Court of Federal Claims has exclusive jurisdiction to render judgment upon any claim against the United States for money damages exceeding $10,000 that is founded . . . upon the Constitution.").
[75]*See* Def.'s Mot. to Dismiss at 11-12.

The Government bases its argument on the completely inapposite case of *Allustiarte v. United States*.[76] But that case alleged unlawful acts by the bankruptcy court itself, and has nothing to do with the case brought by the Terminated Dealers here. The plaintiffs in *Allustiarte* were debtors who had filed bankruptcy petitions and gone through bankruptcy proceedings in the Ninth Circuit. The debtors then sued the United States in this Court alleging that errors by the bankruptcy court had taken their property in violation of the Just Compensation Clause.[77] Specifically, the debtors alleged that the court appointed bankruptcy trustees sold assets for less than they were worth, wrongfully included one debtor's property in another's, and did not award the correct interest.[78] Because the plaintiffs' claim was based directly on the alleged errors under bankruptcy law allegedly made by the bankruptcy court, the Federal Circuit understandably held that this Court "lack[ed] jurisdiction over [plaintiffs'] challenges to the actions of the Ninth Circuit bankruptcy courts."[79]

But here the Terminated Dealers are in no way challenging the actions of the bankruptcy court.[80] While the Government persistently misrepresents the nature of the Terminated Dealers' claims,[81] it points to nowhere in the Complaint where the

---

[76]*Allustiarte v. United States*, 256 F.3d 1349 (Fed. Cir.), *cert. denied*, 534 U.S. 1042 (2001).

[77]*Id.* at 1350; *see also id.* at 1351 ("[Plaintiffs] assert that the losses they suffered as a result of the bankruptcy courts' approval of the actions of the bankruptcy trustees constitute takings for which they are entitled to just compensation.").

[78] *Id.* at 1350–51.

[79]*Id.* at 1351.

[80]*See id.* at 1352.

[81]*See, e.g.,* Def.'s Mot. at 13 ("The Court should dismiss plaintiffs' claims, which depend implicitly upon a challenge to whether they properly were rejected[.]").

18

Terminated Dealers allege that there was any impropriety in the bankruptcy court's proceedings.  There are no such allegations.  That is because the Terminated Dealers do not contend that the bankruptcy court erred in any way.  Instead, as their Complaint says, they contend that the Government made a political decision to aid the faltering economy by "saving" the automobile industry, including Chrysler.

And as part of that effort, the Government required Chrysler to terminate about one-quarter of its franchised dealers, including the Terminated Dealers, using Section 363 of the Bankruptcy Code.[82]  The Government could have terminated these contracts legislatively.[83]  Then there would be no doubt that a taking occurred.  But the Government chose to make Chrysler "use[ the] bankruptcy code as a mechanism"[84] to terminate the franchise agreements.  The Terminated Dealers complain not of the mechanism chosen by the Government, but of the end result—the complete destruction of their franchises without just compensation.  So the basis for the Terminated Dealers' taking claims is not the actions of the bankruptcy court but of the executive branch, particularly the Treasury Department's Auto Task Force, that decided to end the Terminated Dealers' franchises for the good of the national economy.[85]

---

[82] Rattner, *The auto bailout: How we did it*.

[83] The Government, unlike States, is not prohibited from "pass[ing] any . . . Law impairing the Obligation of Contracts[.]"  U.S. Const. art. I, § 10.

[84] President Barack Obama, Remarks by the President on the American Automotive Industry (March 30, 2009) (Exhibit IV).

[85] The Government also took the action it did to save the auto industry, Chrysler in particular, and the remaining 2,400 Chrysler dealers it did not terminate. *See* Rattner, OVERHAUL:  AN INSIDER'S ACCOUNT OF THE OBAMA ADMINISTRATION'S EMERGENCY RESCUE OF THE AUTO INDUSTRY 248 ("absent our intervention, they all would have gone out of business.") (Exhibit III).

Contrary to the Government's assertion, this Court does have jurisdiction over a just compensation claim that the Government took property through the "mechanism"[86] of the bankruptcy code.  And this Court has held so.[87]  In *Ultimate Sportsbar, Inc. v. United States*, a tenant sued the United States Environmental Protection Agency, claiming that the Agency had taken the tenant's leasehold interest by compelling the landlord to sell all of the landlord's assets through bankruptcy.  Although the Court decided against Ultimate on the merits, it made clear that this kind of claim is not a review of the bankruptcy court, but a claim for just compensation well within this Court's Tucker Act jurisdiction.

In *Ultimate Sportsbar*, the United States EPA first sued Sugarhouse Realty, Inc. ("Sugarhouse") in the Eastern District of Pennsylvania to compel cleanup of hazardous materials from properties surrounding, but not including, some of the property owned by Sugarhouse and its affiliates.  The parties eventually stipulated that Sugarhouse would remove the hazardous materials by February 1986, or suffer a $1 million penalty.   In 1990, Ultimate Sportsbar, Inc. ("Ultimate") entered into a written lease agreement with Sugarhouse.  Three years later, Sugarhouse began bankruptcy proceedings under Chapter 11 of the bankruptcy code.  In response EPA had the district court reopen the cleanup case and enter judgment against Sugarhouse for the $1 million penalty.  That judgment allowed EPA to participate in the bankruptcy proceeding as a creditor of Sugarhouse.

---

[86] *Id.*
[87] *Ultimate Sportsbar, Inc. v. United States*, 48 Fed. Cl. 540 (2001).

In the bankruptcy proceeding EPA sponsored a plan of reorganization that contemplated a sale of virtually all of Sugarhouse's assets.  The plan and related disclosure documents all proposed rejection of the Ultimate lease.  Ultimate nevertheless voted to approve the plan, believing that its leasehold interest would be protected under section 365(h) of the Bankruptcy Code.  The bankruptcy court confirmed the plan allowing the rejection of Sugarhouse contracts and authorizing Sugarhouse to sell its assets free and clear of adverse interests, including, to Ultimate's surprise, Ultimate's leasehold interest.  After the Third Circuit affirmed, Ultimate brought a claim for just compensation in this Court, asserting that EPA had, "as a litigant in the United States Bankruptcy Court for the Eastern District of Pennsylvania, effected a taking of [Ultimate's] possessory interest" in the property.[88]

This Court held that it had "jurisdiction to hear plaintiff's Fifth Amendment claim under the Tucker Act, 28 U.S.C. § 1491(a)(1)," because "[t]his suit is different in kind from the claims adjudicated during the litigation underlying the facts of this case."[89]  In the underlying litigation resulting in the reorganization of Sugarhouse and the transfer of its assets to another entity, "other courts have conclusively spoken on bankruptcy matters."[90]  But in hearing Ultimate's Tucker Act claim, "[t]his Court is not conducting

---

[88]*Id.* at 541.
[89]*Id.* at 545.
[90]*Id.*

an appellate review of proceedings in the U.S. Bankruptcy Court, the U.S. District Court, or the U.S. Court of Appeals for the Third Circuit."[91]

Although the bankruptcy courts apply the Bankruptcy Code, including section 363, to determine "whether the property interests of third parties are adequately protected through consent or compensation," the "Bankruptcy Code . . . does not preclude a Tucker Act remedy should its own property rights protections prove inadequate."[92]  Accordingly, this Court held that the fact of prior bankruptcy litigation does not deprive this Court of jurisdiction over claims for just compensation:

> Congress did not intend to close for plaintiff the door to this Court, but simply wanted [Ultimate] to litigate in the tribunals authorized to apply the protections of the Bankruptcy Code prior to seeking just compensation under the Fifth Amendment through the Tucker Act.  *See Ruckelshaus v. Monsanto Co.*, 467 U.S. 986, 1018, 104 S.Ct. 2862, 81 L.Ed.2d 815 (1984) ("The better interpretation, therefore, of the [Federal Insecticide, Fungicide, and Rodenticide Act's] language on forfeiture is to read FIFRA as implementing an exhaustion requirement as a precondition to a Tucker Act claim.").  The underlying bankruptcy litigation fulfills this requirement. [Ultimate] alleges that it possessed a valid interest, and that it neither consented to its deprivation in bankruptcy nor received compensation for its deprivation.  This Court's review of the underlying litigation is limited solely to the question of whether that litigation protected plaintiff's property enough to satisfy the dictates of the Fifth Amendment.[93]

Because Ultimate was not challenging the proceedings of the bankruptcy court, only seeking just compensation for the reorganization sponsored by the EPA, this Court had jurisdiction to hear Ultimate's claims.  Likewise, the Terminated Dealers in no way

---

[91] *Id.*
[92] *Id.* at 546.
[93] *Id.*

challenge the bankruptcy court's proceedings or orders.  The Terminated Dealers only claim that they are due just compensation because the Government, acting through Treasury's Auto Task Force, decided to end their franchises; accordingly, this Court has jurisdiction over the Terminated Dealers' claims.

In *Boise Cascade Corp. v. United States*,[94] the Federal Circuit confirmed that if the Government uses the judicial system to take private property for public use, the Government must still pay compensation.  In *Boise Cascade*, the district court had issued a preliminary injunction prohibiting logging on Boise Cascade's property, believed to be inhabited by a species of endangered owl,[95] unless Boise Cascade got a permit.  The district court lifted the injunction about a year later, when it determined there were not any living endangered owls in the area.  Boise Cascade then sued the Government, seeking just compensation for the temporary taking of merchantable timber that Boise was prevented from logging by the injunction.

Citing *Allustiarte* and *Vereda Ltda. v. United States*,[96] the Government argued that this Court did not have jurisdiction to hear the case because Boise was purportedly asking the Court to review the merits of a decision made by the district court.  But the Federal Circuit disagreed, and concluded that resolution of Boise's taking claim was not a review of the decision of the district court:

---

[94]*Boise Cascade Corp. v. United States*, 296 F.3d 1339.
[95] 16 U.S.C. §§ 1531-1544.
[96]*Vereda Ltda. v. United States*, 271 F.3d 1367 (Fed. Cir. 2001) (involving a claim by a mortgage holder when an airplane securing the mortgage was seized by the United States on the grounds that it was intended to be used in drug trafficking).

> [R]esolution of this case did not require the Court of Federal Claims to review the merits of the district court's order enjoining Boise from logging without a permit.  Boise has accepted the validity of the injunction, and only filed suit in the Court of Federal Claims to determine whether the Service's . . . obtaining the injunction worked a taking of its property that requires compensation under the Takings Clause.  Whether or not the government action took Boise's property was not before the district court, nor could it have been. Because Boise seeks over $10,000 in compensation for this alleged taking, the Court of Federal Claims is the sole forum available to hear Boise's claim.  *See* 28 U.S.C. § 1346(a)(2) (2000). Because the takings claim does not require the trial court to review the district court's actions, there is no constitutional defect in the Court of Federal Claims' assertion of jurisdiction over this case.[97]

The Federal Circuit expressly distinguished *Allustiarte* and *Vereda* on several grounds.  Unlike in *Allustiarte* and *Vereda*, Boise's just compensation claim was "not based on the propriety of the district court's decision, and the trial court therefore would not be called upon to review the merits of the district court's decision in order to decide the merits of Boise's claim."[98]  Likewise, the Terminated Dealers in this case have accepted, and are in no way challenging, the validity of the bankruptcy court's order terminating their franchise agreements.  As in *Boise Cascade*, deciding the merits of the Terminated Dealers claim for just compensation does not require this Court to review the bankruptcy court's decision in any way.

The Federal Circuit went on to point out that, unlike in *Allustiarte*, the Government action in *Boise Cascade* was not the decision of a bankruptcy judge or

---

[97]*Boise Cascade*, 296 F.3d at 1344 (footnote omitted).
[98]*Id.*

trustee, but an executive agency using the mechanism of the judicial system, and could

properly form the basis of a claim for just compensation:

> [T]he government here is not merely an impartial judicial arbiter whose
> actions have been improperly appealed to the Court of Federal Claims
> instead of to the appropriate district court or regional circuit court of
> appeals.  The Service, a government agency, filed a claim against Boise
> seeking to enjoin its logging activities.  That the Service chose to effectuate
> its mandate to enforce the ESA through a court action rather than through
> an agency cease and desist order, for instance, cannot insulate the United
> States from its duty to pay compensation that may be required by the
> Fifth Amendment.[99]

In this case, the Government cannot insulate itself from its duty to pay just compensation

by forcing Chrysler to terminate its franchise agreements through the "bankruptcy . . .

mechanism . . . ."[100] instead of using some other mechanism such as issuing a cease and

desist order or passing a law.[101]  So, just as in *Ultimate Sportsbar* and *Boise Cascade*, this

Court has jurisdiction over the Terminated Dealers' just compensation claims.

### B.     The Terminated Dealers Have Not Alleged a Judicial Taking

The Government also misrepresents the Terminated Dealers' claims as based on

"a rarely-applied 'judicial takings' theory . . . ."[102]  But they can point to nothing in the

Complaint to support this bald assertion—because Terminated Dealers assert no such

theory.

---

[99] *Id.* at 1345.

[100] President Barack Obama, Remarks on the American Automotive Industry (March 30, 2009)
(Exhibit IV).

[101] The head of the Auto Task Force acknowledged that the Government chose Bankruptcy Court
over legislation after being advised that passing legislation might lead to takings liability.
Rattner, OVERHAUL:  AN INSIDER'S ACCOUNT OF THE OBAMA ADMINISTRATION'S EMERGENCY
RESCUE OF THE AUTO INDUSTRY at 107 (Exhibit III).

[102] Def.'s Mot. to Dismiss at 16.

As the Complaint plainly states, the theory of this case is that Treasury's Auto Task Force rejected Chrysler's restructuring plan and instead required Chrysler to terminate them.  Certainly the mechanism of termination involved application of the Bankruptcy Code but, as the Federal Circuit made clear in *Boise Cascade*,[103]  that the Government "chose to effectuate its mandate to enforce the ESA through a court action rather than through an agency cease and desist order, for instance, cannot insulate the United States from its duty to pay compensation that may be required by the Fifth Amendment."[104]

In short, the Terminated Dealers have asserted nothing even remotely resembling a "'judicial takings' theory."[105]  Rather, the Terminated Dealers claim that the Government's actions requiring the termination of their franchises by Chrysler amount to a conventional categorical regulatory taking of their property under *Lucas v. South Carolina Coastal Council*.[106]  That claim is correctly described earlier in this brief.  But because the Terminated Dealers have not alleged a judicial takings claim, the Government motion to dismiss for failure to state a claim should be denied.

---

[103] 296 F.3d at 1345.

[104] *Id.*

[105] Def.'s Mot. at 16.

[106] 505 U.S. 1003 (1992).

**C.     The Terminated Dealers Claim That The Government Categorically Took Their Property When The Government Required Chrysler To Terminate Their Franchises**

Under the Fifth Amendment, the Government must pay just compensation when (1) "the claimant has established a property interest for purposes of the Fifth Amendment," and (2) "the governmental action at issue amounted to a compensable taking of that property interest."[107]   The Government argues that the Complaint in this case does not satisfy these requirements.   The Government is flatly wrong.

**1.     The Dealers' Franchise Contracts Are Property Protected by the Fifth Amendment**

For there to be a taking, there must be a property interest,[108] and contrary to the Government's argument, the Terminated Dealers had a property interest in their franchise contracts, property that was taken by the Government.   The Government's assertion that these franchise contracts were not property is not supported by any cases cited by the Government or known to the Terminated Dealers.   As the Federal Circuit stated in *Cienega Gardens v. United States*,[109] there is ample precedent that contracts are property protected by the Fifth Amendment:

> [T]here is also ample precedent for acknowledging a property interest in contract rights under the Fifth Amendment.   *See, e.g., Lynch v. United States,* 292 U.S. 571, 579, 54 S.Ct. 840, 78 L.Ed. 1434 (1934) ("The Fifth Amendment commands that property be not taken without making just compensation.   Valid contracts are property, whether the obligor be a

---

[107] *Schooner Harbor Ventures, Inc. v. United States*, 569 F.3d 1359, 1362 (Fed. Cir. 2009) (internal quotation marks omitted).
[108] *Schooner Harbor Ventures*, 569 F.3d at 1362.
[109] 331 F.3d 1319 (Fed. Cir. 2003).

private individual, a municipality, a State or the United States."); *United States v. Petty Motor Co.,* 327 U.S. 372, 381, 66 S.Ct. 596, 90 L.Ed. 729 (1946) (holding that plaintiff was entitled to just compensation for government's taking of option to renew a lease); *United States Trust Co. of N.Y. v. New Jersey,* 431 U.S. 1, 19 n. 16, 97 S.Ct. 1505, 52 L.Ed.2d 92 (1977) ("Contract rights are a form of property and as such may be taken for a public purpose provided that just compensation is paid.").[110]

The Government took the Terminated Dealers' Chrysler automobile dealer franchises, including their franchise contracts, ongoing auto businesses, and state statutory auto dealer rights.[111]  It is well-established that franchises "'are within the scope of [eminent domain] . . . as fully as land or other tangible property.'"[112]

The Government argues that it cannot have taken the Terminated Dealers' property rights, as those rights "arose under their agreements with Chrysler and state statutes," because "'the government does not "take" contract rights pertaining to a contract between two private parties simply by engaging in lawful action that affects the value of one of the parties' contract rights.'"[113]  But again, the Government has misrepresented what it did to the Terminated Dealers.  As the case cited by the Government makes clear, a taking does not occur when the Government only makes performance of a contract impossible, for example, by requisitioning raw materials that

---

[110] *Id.* at 1329–1330.

[111] *See* Complaint, ¶¶ 97-108.

[112] John Martinez, *Government Takings* § 12:3 (Westlaw 2010) (quoting 1 Julius L. Sackman & Patrick Rohan, *Nichols' The Law of Eminent Domain* § 2:1[2] (rev. 3d ed. 1995)); *see also Bagford v. Ephraim City*, 904 P.2d 1095, 1098–99 (Utah 1995).

[113] Def.'s Mot. 23 (quoting *Palmyra Pac. Seafoods, L.L.C. v. United States*, 561 F.3d 1361, 1365 (Fed. Cir. 2009)).

were to originally be delivered to the plaintiff.[114]  But Government action that targets the

contract itself certainly is a taking of private property.[115]  The Terminated Dealers held

franchise agreements that gave the Terminated Dealers certain contract rights.  The

Government did not simply "affect the value" of those contract rights.  The Government

actively decided to terminate these specific contract rights.

Properly described, the property that was taken in this case is not limited to the

express terms of the franchise agreements:  the contract rights were to engage in the

business of selling Chrysler automobiles as a Chrysler franchise. [116] And that property

interest is greater than just the terms of the underlying franchise contracts.  Specifically,

the property includes the Terminated Dealers' contractual right to run a franchise absent

good cause for the termination of that franchise.  It is basic contract law that every

contract contains an implied covenant of good faith and fair dealing.[117]  Just like every

party to a contract has a right to the benefit of the express terms of the contract, every

party has a right to the benefit of the implied terms of the contract.

Failure to abide by those terms—for example, by breaching the covenant of fair

dealing—is a breach of the contract.[118]  The statutes listed in Appendix I to the Plaintiffs'

First Amendment Complaint all make failure to follow certain rules an unfair trade

---

[114] *Palmyra*, 561 F.3d at 1365–66.

[115] *Id.* (*citing Omnia Commercial Co. v. United States*, 261 U.S. 502 (1923).)

[116]*See* Complaint, ¶ 79.

[117] *See* U.C.C. § 1-304; RESTATEMENT (SECOND) OF CONTRACTS § 205; *see also Precision Pine & Timber, Inc. v. United States*, 596 F.3d 817, 828 (Fed. Cir. 2010).

[118] *See, e.g., C.A. May Marine Supply Co. v. Brunswick Corp.*, 649 F.2d 1049 (5th Cir. 1981) (breach of contract claim for terminating dealership without good cause).

practice that violates the covenant of fair dealing.[119]  And although the specific list of

protections given to auto dealers and automakers varies from state to state, every state

where the plaintiff dealers did business gave the dealers a contractual right not to have

their franchise terminated without "good cause."[120]  The Complaint encompasses these

statutorily mandated contract rights above and beyond the contract rights established by

the express language of the agreements in alleging the Terminated Dealers' taking

claims.[121]  Contrary to the Government's assertions, the Terminated Dealers had a

property interest in the franchises the Government chose to terminate.

### 2.      The Government Took the Terminated Dealers Property When It Made Chrysler File for Bankruptcy

Because of the Government's decision to terminate one-quarter of Chrysler's

franchises, the Terminated Dealers have suffered a complete "wipe out" of the value of

their property.[122]  Where Government action results in such a total loss of the value of

property, this is a categorical taking of the property that requires just compensation under

---

[119] *See* state statutes cited in Complaint, Appx. I; *New Motor Vehicle Bd.*, 439 U.S. 96; *see also, e.g.*, *Lippo v. Mobil Oil Corp.*, 776 F.2d 706, 714 n.14 (7th Cir. 1985); *Bright Power Sports LLC v. BRP US Inc.*, 2009 U.S. Dist. LEXIS 110134 at *2 n.1 (E.D. Mich. Nov. 25, 2009); *P&W Power Supply Co. v. E.I. Du Pont de Nemours & Co.*, 747 F. Supp. 1262, 1267 (N.D. Ill. 1990).

[120] *See* Complaint,. Appx. I, "List of States in Which Plaintiffs Conduct Their Chrysler Dealership Franchise Business and the Statutes That Would Have Protected Them From Losing Franchise But For The Government's Actions"; *see also New Motor Vehicle Bd.*, 439 U.S. at 99 n.3 (collecting statutes); Carla Wong McMilian, *What Will it Take to Get You in a New Car Today?:  A Proposal for a New Federal Automobile Dealer Act*, 45 GONZ. L. REV. 67, 73 n.33 (2010) (also collecting statutes).

[121] *See, e.g.,* Complaint at 2 ("This is a suit under the Fifth Amendment by the [Plaintiffs] for the uncompensated taking of their property rights (including their franchise contracts, ongoing auto businesses, and state statutory auto dealer rights)[.]"), ¶ 99 (alleging that the United States took the Plaintiffs' "automobile dealer franchises," not their franchise contracts).

[122] *See Res. Invs., Inc. v. United States*, 85 Fed. Cl. 447, 474 (2009).

*Lucas v. South Carolina Coastal Council*.[123]   And where there is a categorical taking, the investment backed expectations of the property owner, the nature of the government's action, and the extent of the economic impact all do not apply.  The Government's arguments under those theories are without merit and the Government's motion should be denied.

### a.   The Terminated Dealers Have Suffered the Loss of All Economic Use of Their Property

In *Lucas*,[124] the Supreme Court described the "two discrete categories of regulatory action [that are] compensable without case-specific inquiry into the public interest advanced in support of the restraint."[125]   One of those categories is "where regulation denies all economically beneficial or productive use" of the subject property."[126]   "In essence, the Court held [in *Lucas*] that if a regulation works a complete 'wipe out' of economic value, . . . the regulation is a per se taking (also called a 'categorical' taking), because it is functionally equivalent to a taking caused by physical destruction or eminent domain."[127]

That is precisely what the Terminated Dealers have alleged in this case:  A complete "wipe out" of the economic value of their franchise properties when they "ceased doing business as franchised Chrysler dealers, having been deprived by the

---

[123] 505 U.S. 1003 (1992).
[124] *Lucas v. South Carolina Coastal Council*, 505 U.S. 1003 (1992).
[125] *Id.* at 1015.
[126] *Id.*; *see also id.* at 1026.
[127] *Res. Invs., Inc.* 85 Fed. Cl. at 474.

Government's actions of all contractual and statutory rights as Chrysler dealers."[128]   And

the categorical nature of the taking is not diminished by the lawful nature of the

Government's exercise of its authority, whether through the legislative prerogative that

could have been employed or through the bankruptcy mechanism that was actually

selected in this case.[129]   The method does not matter:  The Government took the

Terminated Dealers' property.

### b.    The *Penn Central* Analysis Does Not Apply In This Total Wipeout Case

Because the taking of the Terminated Dealers' property was total, the

Government's arguments based on the Terminated Dealers' investment backed

expectations, the economic impact on the Terminated Dealers, and the character of the

Government's action are all inapplicable and, therefore, should be rejected.[130]

First, confusing the two elements of a taking claim, the Government argues that

the Terminated Dealers "had no compensable property right because they were not

secured against market forces or the bankruptcy laws that inhered in their dealership

agreements[.]"[131]   As this Court has noted, "[t]his argument is commonly presented by

the government and this case is no exception."[132]   Investment-backed expectations do not

affect whether or not there is a property right.  They are relevant to regulatory takings

only if less than the full value of the property has been taken.  But if as in this case, "a

---

[128]Complaint, ¶ 96.

[129]*See Lucas*, 505 U.S. at 1009.

[130] These factors are all considered in a regulatory takings claim where the property still retains some value.  *See Penn Central Transp. Co. v. New York City,* 438 U.S. 104 (1978).

[131]Def.'s Mot. at 18.

[132]*Ultimate Sportsbar*, 48 Fed. Cl. at 547.

categorical regulatory taking is alleged, [the courts] ask only whether the regulatory imposition is one that 'denies all economically beneficial or productive use of [the property].'"[133]  As this Court put it in *Ultimate Sportsbar*, "[t]he [reasonable expectations] concept is useless where, as in this case, the alleged taking is 'categorical," i.e. physical or involves the denial of all economically viable uses of the property."[134]

Like this case, *Ultimate Sportsbar* also involved a bankruptcy proceeding decided before the plaintiff filed its claim for just compensation.  And, just like the Government has argued in this case, the Government made the identical argument in *Ultimate Sportsbar* that the mere existence of the Bankruptcy Code barred the claim for just compensation, contending:

> [T]he case must be dismissed because plaintiff had no compensable expectancy, or reasonable investment-backed expectation, that its possessory interest would not be liquidated during the bankruptcy proceedings.  Support for this theory hinges on the fact that federal bankruptcy legislation predated the creation of the interest in USI.  This timeline allegedly put plaintiff on notice . . . that bankruptcy law may be applied against it in a confiscatory manner.[135]

But the Supreme Court has long held that "[t]he bankruptcy power, like the other great substantive powers of Congress, is subject to the Fifth Amendment."[136]  That Congress has authorized bankruptcy proceedings does not allow the Government to use those proceedings in violation of the Constitution.

---

[133]*Bair v. United States*, 515 F.3d 1323, 1326 (Fed. Cir.) (quoting *Lucas*, 505 U.S. at 1015), *cert. denied*, 555 U.S. 1084 (2008).
[134]*Ultimate Sportsbar*, 48 Fed. Cl. at 547.
[135]*Id.* at 546.
[136]*Louisville Joint Stock Land Bank*, 295 U.S. at 589; *see also Ultimate Sportsbar*, 48 Fed. Cl. at 546.

Like the Terminated Dealers, Ultimate Sportsbar was not challenging the bankruptcy proceedings but only seeking just compensation its property that had been taken.[137]   Rejecting the Government's argument, this Court held that the mere existence of the Bankruptcy Code did "not require dismissal of plaintiff's case."[138]   Enactment of "broad general legislation" such as bankruptcy law is not the type of government action that can wipe out a plaintiff's expectations.[139]   And there was "a categorical deprivation" of Ultimate's property when its lease was terminated "through operation of the bankruptcy law."[140]

The Government advances two other arguments that it claims show there was no taking.[141]  Those arguments are concerned with the two other parts of the *Penn Central* ad hoc analysis: (1) economic impact, and (2) character of the Government's action.[142]  Neither factor supports the Government's argument.  As previously discussed, the economic impact was the total and categorical taking of the Terminated Dealers' franchises.  Because that kind of categorical taking is "the equivalent of a physical appropriation,"[143] the character of the Government's action is irrelevant.  That is why a *Lucas* style taking is categorical—if the Government deprives a property owner of all economic use of the owner's property, the Government must always pay just

---

[137]*Ultimate Sportsbar*, 48 Fed. Cl. at 546.
[138]*Id.* at 547.
[139]*Id.*
[140]*Id.* at 548.
[141]*See* Def.'s Mot. at 21-23, 27.
[142]*See Schooner Harbor Ventures*, 569 F.3d at 1362.
[143] *Lucas* , 505 U.S. at 1017.

compensation, regardless of how the Government acted.  As such, the Government's

discussion of all three of the *Penn Central* factors is irrelevant and need not be addressed

any further in this opposition.

> **c.     The Government Exercised its Sovereign Authority to Take the Terminated Dealers' Property and the Government Owes Just Compensation**

The Government would be equally wrong to be buoyed by the final result in

*Ultimate Sportsbar*, in which this Court held that there was no categorical taking by the

United States because the EPA, as a creditor and sponsor of Sugarhouse's plan of

reorganization, took no actions "through its regulatory power" overriding Ultimate's

consent to the deprivation of its property interest by voting for the plan.[144]  The

Government might be tempted to compare the language of the Court's opinion in

*Ultimate Sportsbar*, which noted a "distinction between the nature of government actions

as a regulating sovereign and a market participant on an equal footing with private

parties,"[145] with the bankruptcy court's decision in *Chrysler*, in which the court stated

that "the usual marketplace dynamics play[ed] out and the Court applie[d] the same

bankruptcy law analysis" in considering the actions of the Governmental Entities acting

as "lenders of last resort" to Chrysler.[146]

But that comparison would be misleading.  In *Ultimate Sportsbar* EPA, which had

an outstanding judgment against Sugarhouse, "did not exercise any sovereign

---

[144]*Id.* at 549.
[145]*Id.*
[146]*In re Chrysler LLC*, 405 B.R. at 106.

prerogatives" during the bankruptcy litigation, "but only the rights generally available to other litigants."[147]  As this Court noted, the "[m]ere assertion of claims to property in a judicial proceeding which is neither eminent domain nor regulatory in nature is not the kind of government action that is capable of causing a taking within the meaning of the Fifth Amendment."[148]  This Court concluded that EPA's sponsorship of the plan of reorganization "was not a taking, because under the Bankruptcy Code the process for satisfying the claims of creditors once they have presented their claims against the estate does not extend any special considerations to government units."[149]

In this case, similarly, the bankruptcy court concluded that the actions of the Governmental Entities as lenders of last resort, in dictating the terms upon which they would participate in the sale of Chrysler's assets, played out according to the "usual marketplace dynamics" *in the context of a bankruptcy*, where the lender may often "dictate many of the key terms upon which any funding will occur."[150]  Here, however, the Government most assuredly acted "as a regulating sovereign"[151] in its pre-bankruptcy activities, when it made the purely "political decision" that "the auto industry should be preserved in furtherance of [the] nation's economic interest."[152]  In making that political decision the Government rejected Chrysler's proposed restructuring plan, which "did not call for the termination of Terminated Dealers' dealer franchises or the filing of

---

[147]*Ultimate Sportsbar*, 48 Fed. Cl. at 542.
[148]*Id.* at 549.
[149]*Id.*
[150]*In re Chrysler LLC*, 405 B.R. at 106.
[151]*Ultimate Sportsbar*, 48 Fed. Cl. at 549.
[152]*In re Chrysler LLC*, 405 B.R. at 104, 108.

bankruptcy," and "instead required that Chrysler 'rationalize' its dealer network by terminating a substantial number of dealer franchises using Section 363 of the Bankruptcy Code."[153]

And when Chrysler kept trying to negotiate with its lenders, it was told to stop: "The [government] doesn't negotiate second rounds."[154]  In *Ultimate Sportsbar*, the EPA acted as a private creditor would act to secure the money Sugarhouse owed.  In this case, the Government did not act as just another private creditor.  As Ronald Kolka, Senior Vice President and Chief Financial Officer of Chrysler, put it, the Government acted as "God."[155]

The Government used its sovereign authority to terminate the Terminated Dealers' franchises.  The Government owes the Terminated Dealers Just Compensation.

## II.    The Government's Res Judicata and Collateral Estoppel Arguments Are Without Merit

The Government argues that the claims of 75 Terminated Dealers should be dismissed on the basis of claim preclusion, issue preclusion, and waiver.  But the Government has failed to prove any of the elements of either preclusion and has failed to show there was any waiver.  What is more, the bankruptcy court ordered that its decision would have no preclusive effect:

---

[153]  Complaint, ¶¶ 91, 93.
[154] *See* e-mail message from Matt Feldman to Robert Manzo dated Apr. 30, 2009, *available at* http://online.wsj.com/public/resources/documents/retro-EXHIBIT0905.html (Exhibit VI).
[155]  *See* Sale Hearing Tr., 110–111, May 29, 2009.

None of the evidence provided by the Debtors, Affected Dealers or any other party in interest that was admitted into evidence in connection with the Motion, the Objections, the Hearing and this Order shall be treated as *res judicata* or collateral estoppel as to the Debtors, their estates, Affected Dealers or any other party in interest, nor shall any such evidence have preclusive effect on the Debtors, their estates, Affected Dealers or any other party in interest in connection with any other proceeding, including in connection with the assertion of Rejection Damage Claims or other claims, rights or remedies by an Affected Dealer. All such evidence, to the extent admitted, was admitted for the purposes of the Hearing to consider the Motion.[156]

The Government nonetheless inexcusably fails to mention this part of the order.

### A.   The Terminated Dealers' Claims Are Not Precluded By Res Judicata or Collateral Estoppel

The Government's res judicata and collateral estoppel (claim preclusion and issue preclusion) arguments are unavailing because the bankruptcy court lacked jurisdiction over these takings claims—and did not decide them.  The Tucker Act vests jurisdiction in this court, not the bankruptcy court, to hear takings claims exceeding $10,000.[157]  So the bankruptcy court could not—and did not—hear or decide the takings claims that Terminated Dealers have brought to this Court.

Claim preclusion[158] is "[a]n affirmative defense barring the same parties from litigating a second lawsuit on . . . any other claim arising from the same transactions . . . and that could have been—but was not—raised in the first suit."[159]  For a claim to be precluded (1) the first suit must have resulted in a "final judgment on the merits by a

---

[156] Rejection Order, Doc. No. 3802, June 9, 2009 (Exhibit I).
[157] *McGuire v. United States*, 550 F.3d 903, 908 (9th Cir. 1998).
[158] Referred to in the Government's brief as "res judicata."
[159] BLACKS LAW DICTIONARY 1425 (9th ed., Bryan A. Garner, ed. (2009)).

court of competent jurisdiction,"[160]; (2) that suit must have been "based on the same set of transactional facts as the first:"; [161] and, (3) "the parties are identical or in privity."[162] None of these three requirements is present here.

First, there was not, and could not have been, a decision on the merits as to Terminated Dealers' claims by a court of competent jurisdiction.  If a plaintiff fails to raise a claim in the first court because the first court lacks jurisdiction over that claim, the plaintiff may still raise that claim in a court that does have jurisdiction.[163]   And even the Government concedes that the bankruptcy court did not have jurisdiction to decide these takings claims:  "The bankruptcy court's holdings on the ultimate issue of whether a taking occurred do not have res judicata effect because, in our view, the court lacked jurisdiction to consider takings claims."[164]

Second, the parties in this case and the bankruptcy case are not identical. The Government asserts only that "[w]e are aware of one dealer" who filed a "takings based"

---

[160] *Vincent Schickler Tmd U.S.A. v. United States*, 54 Fed. Cl. 264, 269 (2002) (*citing Blonder-Tongue Lab, Inc. v. University of Ill. Found.*, 402 U.S. 313, 323–24 (1971)).

[161]*Mayer/Berkshire Corp. v. Berkshire Fashions, Inc.*, 424 F.3d 1229, 1232 (Fed. Cir. 2005) (*quoting Jet, Inc. v. Sewage Aeration Sys.*, 223 F.3d 1360, 1362 (Fed. Cir.2000)); *Ammex, Inc. v. United States*, 334 F.3d 1052, 1055 (Fed. Cir. 2003).

[162] *Id.*

[163] *Marrese v. Amer. Academy of Orthopaedic Surgeons*, 470 U.S. 373, 382 (1985) ("claim preclusion generally does not apply where 'the plaintiff was unable to rely on a certain theory of the case or to seek a certain remedy because of the limitations on the subject matter jurisdiction of the courts.'") (*quoting* RESTATEMENT (SECOND) OF JUDGMENTS § 26(1)(C)).

[164] Def.'s Mot. at 20, n. 10.

objection[165] but does not name that single dealer.  The Government thus falls far short of demonstrating the identity of parties required for res judicata and collateral estoppel.

Third, the Government has not shown that the Terminated Dealers' claims for just compensation are based on the same set of facts as the bankruptcy decision.  Bankruptcy law is only concerned with takings when there is a secured interest that is threatened by the bankruptcy process.[166] That does not mean that a bankruptcy proceeding can bar a claim for just compensation if that proceeding is used to take a non-secured interest—that claim could not properly be before the bankruptcy court.

The Government is incorrect to imply otherwise.  The part of the bankruptcy decision used by the Government addressed the objection of a single dealer.  The Government has not submitted the dealer's objection as an exhibit, and has not shown by other proof that the facts alleged in the Amended Complaint are identical to the facts underlying the objection in the bankruptcy proceeding. The only proof of what the issue was is the order denying the objection.[167] That two-sentence long decision makes it clear that the Bankruptcy Court never ruled on a claim for just compensation, only an objection to the bankruptcy plan itself:

> The Objection that the rejection constitutes a violation of the Takings Clause of the Fifth Amendment is without merit because the Rejected Agreement was a contract between the Affected Dealer and the Debtors. A lien in some collateral that is property of the estate is a necessary

---

[165]Def.'s Mot. at 12, n. 4.
[166] *See In re George Ruggiere Chrysler-Plymouth, Inc.*, 727 F.2d 1017, 1019 (11th Cir. 1984).
[167] *See In re Old Carco LLC (f/k/a Chrysler LLC)*, 406 B.R. 180, at 211.

prerequisite to a Fifth Amendment Takings Clause claim in the bankruptcy context.[168]

Despite its length, that court's finding shows that the decision was made in "a bankruptcy context."  In that context, the Just Compensation Clause is only concerned with the effect of the bankruptcy proceeding itself on secured property interests.  The dealer's objection (not described by the Government) was not that the Government owed terminated franchisees for taking their franchise rights—it was that the bankruptcy plan would mean he could not sell his cars.  Because he had no lien on the cars, there was no taking of property in the context of a bankruptcy proceeding, and his objection was overruled.[169]  The decision did not involve a takings claim against the Government based on the Government's political decision, made before Chrysler filed for bankruptcy, to terminate franchises in order to save the automobile industry and, with it, the national economy.  The relevant set of facts in the bankruptcy context—whether or not there is a secured interest in property that would be affected by the bankruptcy plan—is not the same set of facts as the Terminated Dealers' claims.

### B.     The Terminated Dealers Did Not Waive Their Just Compensation Claim

For waiver to apply, the Government must show that there was an intentional relinquishment or abandonment of a known right or privilege by all seventy-five Terminated Dealers, and that they all knowingly and intelligently committed the waiver

---

[168]*Id.*
[169] 406 B.R. at 211.

with sufficient awareness of the relevant circumstances and likely consequences.[170] The

Terminated Dealers have, quite simply, never waived their right to Just Compensation for

the termination of their franchise.

### C.   The Bankruptcy Court Ordered That Its Decision Would Have No Preclusive Effect

Inexplicably, in arguing that the Bankruptcy Court's factual determinations should

be given preclusive effect, the Government fails to inform this Court that the bankruptcy

court's order expressly stated it was to be given neither res judicata nor collateral

estoppel effect.  The order states:

> None of the evidence provided by the Debtors, Affected Dealers or any other party
> in interest that was admitted into evidence in connection with the Motion, the
> Objections, the Hearing and this Order shall be treated as res judicata or collateral
> estoppel as to the Debtors, their estates, Affected Dealers or any other party in
> interest, nor shall any such evidence have preclusive effect on the Debtors, their
> estates, Affected Dealers or any other party in interest in connection with any
> other proceeding, including in connection with the assertion of Rejection Damage
> Claims or other claims, rights or remedies by an Affected Dealer. All such
> evidence, to the extent admitted, was admitted for the purposes of the Hearing to
> consider the Motion.[171]

So by the terms of the Bankruptcy Court's order itself, issue preclusion does not apply in

this case.

### D.   Issue Preclusion Does Not Bar the Terminated Dealers' Just Compensation Claims

---

[170] *American Airlines, Inc. v. United States*, 77 Fed.Cl. 672, 680 (2007), *aff'd*, 551 F.3d 1294
(Fed. Cir. 2008).
[171] *See* Rejection Order, Doc. No. 3802, June 9, 2009 (Exhibit I).

Even if the Bankruptcy Court had never decided its order would have no preclusive effect, issue preclusion still does not apply to this case.  For issue preclusion to apply, the issue not only needed to have been within the jurisdiction of the first court, as discussed above, but "[1] the issue previously adjudicated [must have been] identical with that now presented, [2] that issue was 'actually litigated' in the prior case, [3] the previous determination of that issue was necessary to the end-decision then made, and [4] the party precluded was fully represented in the prior action."[172]  None of these requirements is met, and so issue preclusion cannot apply.

First, none of the issues decided by the Bankruptcy Court is relevant to these claims, let alone identical to them.  The comparison between two issues must take into account the legal reason why the issue came up in the first place.  If the same facts are analyzed differently under two different legal theories, they are not the same issue, and a decision on one issue cannot preclude litigation of the other.[173]

The Government claims the issue decided by the bankruptcy court was whether Treasury controlled the debtors.  But that is not the issue in this case, nor is it the legal issue the bankruptcy court decided.  The Bankruptcy Court ruled that the Government's involvement with the debtors did not mean that "New Chrysler" was not a "good faith

---

[172] *Estacio v. U.S. Postal Serv.*, 34 Fed. Appx. 677, 678 (Fed. Cir. 2002) (*quoting Kroeger v. United States Postal Serv.*, 865 F.2d 235, 239 (Fed. Cir. 1988)).
[173] *Metromedia Co. v. Fugazy*, 983 F.2d 350, 365 (2d Cir. 1992).

purchaser pursuant to § 363(m) of the Bankruptcy Code."[174]  That issue is not identical to the issue of whether the Government took the Terminated Dealers' property when it decided that their dealership franchises should be terminated for the public interest and that the termination should be accomplished through bankruptcy.

As *Metromedia Co. v. Fugazy*,[175] the very case cited by the Government in support of its argument states: "Issues of fact may bear the same label without being identical. They are not identical if the legal standards governing their resolution are significantly different."[176]  And the legal standards of the Bankruptcy Code are significantly different than the legal standards of the Just Compensation Clause.

Because the issue of whether Treasury's involvement meant that New Chrysler could not be a purchaser in good faith under the Bankruptcy Code is different from the issue of whether the Government took the Terminated Dealers' property, issue preclusion does not apply.

Second, for the same reason, the issue of whether the Terminated Dealers are entitled to just compensation for the taking of their franchise agreements was never litigated before the bankruptcy court.  (Nor could it be, since this Court has exclusive jurisdiction over the Terminated Dealers' claims.)  True, the question of whether New Chrysler could be a good faith purchaser despite Treasury's involvement was litigated.

---

[174] 405 B.R. at 108.  Bankruptcy Code § 363(m) give certain protections to a good faith purchaser; if the bankruptcy proceedings are challenged on appeal, and found to be improper, a good faith purchaser's buying of the bankrupt assets is still valid.
[175] *Metromedia Co.*, 983 F.2d at 365.
[176] *Id.*

And the question of whether the parties challenging the bankruptcy plan had a lien in their security interests was litigated, if only barely.  But the Terminated Dealers are not questioning the resolution of those issues because neither is relevant to the Terminated Dealers' just compensation claim.  What is relevant is whether the Government took the Terminated Dealers' contractually and statutorily secured property, their franchise rights—entitling them to just compensation.

Because that just compensation claim was never litigated before the bankruptcy court, issue preclusion does not apply.

The Government cites to two paragraphs (¶¶ 51 and 62) of an objection filed by an ad hoc Committee of Affected Chrysler Dealers ("the Committee's Objection").[177] Neither paragraph 51 nor 62 of the Committee's Objection, however, claimed that the Government controlled the debtor, let alone that the Government owed anyone just compensation.  Paragraph 51 of Def. Ex. 1 alleges that "[t]he Chrysler Restructuring Transaction is an improper and impermissible sub rosa plan that appears to seek, under the veiled guise of an asset sale, to subvert the normal distribution scheme and procedural rights of creditors mandated by chapter 11 in contravention of the basic purposes behind chapter 11 reorganization."  Likewise Paragraph 62 of Def. Ex. 1 is unrelated to any factual issue remotely connected to Plaintiffs' claims.  That paragraph alleges facts in support of the argument that the bankruptcy plan was an invalid sub rosa plan.  Neither of

---

[177] *See* Ex. 1 attached to Def.'s Mot. to Dismiss ("Def. Ex. 1")

these is in any way related to the Terminated Dealers' claims that the Government took their franchises when the Government decided to terminate those franchises.

Finally, the Terminated Dealers were not adequately represented in the bankruptcy court.  First, many of the Terminated Dealers were not parties to the bankruptcy proceedings.  Second, the Terminated Dealers were not adequately represented:  No one claimed to represent the Dealers who did not participate, and none of the Terminated Dealers takings claims were litigated (nor could they have been litigated).  For that matter, there was no trial of any of the elements of a Fifth Amendment Taking Case, only a review of the bankruptcy plan in the context of bankruptcy law.

In short, the bankruptcy court did not and could not have tried this taking case, so issue preclusion does not bar the Terminated Dealers' just compensation claim in this court.

## III.   The Government Cannot Win This Rule 12(b)(6) Motion to Dismiss by Disputing the Allegations of the Complaint

In ruling on the Government's motion to dismiss under RCFC 12(b)(6), this Court must assume the truth of all well-pleaded factual allegations and draw all reasonable inferences in favor of the pleader.[178] This is because a motion to dismiss under RCFC 12(b)(6) for failure to state a claim tests the sufficiency of the complaint, not the ultimate merits of the case.[179]  It is therefore improper for the Government to dispute the

---

[178] *See Sommers Oil Co. v. United States*, 241 F.3d 1375, 1378 (Fed. Cir. 2001).
[179] *Love Terminal Partners*, 97 Fed. Cl. at 378; *see also Sommers Oil Co.*, 241 F.3d at 1378.

allegations of the complaint, and to ask this Court in this motion to find those allegations untrue.[180]

Yet that is precisely what the Government has done here.  First, the Government lists eighteen purported factual findings—much like those it would include in a motion for summary judgment or proposed findings of fact following trial.[181]  And, although the Government claims that these facts were established by the bankruptcy court, that court itself stated "nor shall any such evidence [proffered on review of the rejection proposal] have preclusive effect  . . . ."[182]

Second, the Government baldly disputes the truth of Dealers' allegation that the Government "required that Chrysler 'rationalize' its dealer network by terminating a substantial number of dealer franchises using Section 363 of the Bankruptcy Code."[183]  Instead of accepting this well-pleaded allegation as true (as it must do in a Rule 12(b)(6) motion to dismiss), the Government flatly asserts that this Court should not accept as true the allegations of the complaint.  The Government argues:

- The Government's action, like that of any other commercial lender, did not alter the ordinary market dynamic, or cause any dealership to be lost. Likewise, here, any alleged economic impact upon plaintiffs resulted from "marketplace dynamic[s]," not control by the Government or application of the bankruptcy laws.[184]

---

[180] *See Chapman Law Firm Co. v. Greenleaf Constr. Co.*, 490 F.3d 934, 938 (Fed. Cir. 2007) (The court "must accept as true all factual allegations in the complaint and . . . indulge all reasonable inferences in favor of the non-movant.").
[181] Def.'s Mot. to Dismiss at 4–9.
[182] Rejection Order, Doc. No. 3802, June 9, 2009 (Exhibit I).
[183] Complaint at ¶ 93.
[184] Def.'s Mot. to Dismiss at 7.

- Market conditions, rather than Government action, caused GM and Chrysler's losses and, consequently, any alleged by plaintiffs.[185]

But it is far too early in this litigation to ask this Court to rule on such disputed issues of fact—particularly since the Government has refused to provide the relevant evidence.   To prove the merits of their case, the Terminated Dealers have tried to get the Government to produce documents relevant to this case and exclusively available to the United States through a Freedom of Information Act (FOIA) request.  To date, the Government has not produced the requested documents, depriving the Terminated Dealers of potentially critical evidence required to respond to the Government's motion to dismiss this lawsuit.

On March 16, 2011, the Terminated Dealers' counsel filed a Freedom of Information Act request seeking, among other things, the communications the Auto Task Force had relating to the reduction in the Chrysler dealer network and the filing of Chrysler's Chapter 11 petition in the U.S. Bankruptcy Court.  During the April 19, 2011 conference call with the Court, Department of Justice attorney Brian A. Mizoguchi asked if the Terminated Dealers would be willing to defer their FOIA request pending anticipated motion practice before the Court.[186]  On April 21, 2011 the Terminated Dealers' counsel advised the Government that the FOIA request should be processed

---

[185] Def.'s Mot. to Dismiss at 23.

[186] In a letter to Plaintiffs' counsel on May 9, 2011, Mr. Mizoguchi wrote that "for the reasons of efficiency and judicial economy, discovery should be deferred pending resolution of motions that potentially will dispose of these cases. Courts consistently and routinely suspend discovery pending the resolution of threshold dispositive motions. [citations omitted]  Given that motions to dismiss potentially will dispose of the case, it is more economical and efficient to defer discovery until and unless it becomes necessary."

without delay. Then, on May 13, 2011 the Government informed that it had located 25,000 pages of responsive material, and would require payment of approximately $49,464.00 before turning it over. On June 13, 2011 the Terminated Dealers appealed on a number of grounds, including the excessiveness of the FOIA fee. A request was made that the appeal be decided on an expedited basis in order to avoid prejudicing the due process rights of the plaintiffs in this action. The Government did not respond to this request and the FOIA appeal remains undecided.

The Terminated Dealers have stated a claim for relief that is plausible on its face. If the Court has any concerns in that regard, the Court should not dismiss the action under these circumstances but allow the Terminated Dealers the opportunity to obtain the requested 25,000 pages of FOIA materials and the action to proceed. The Government's refusal to expedite the FOIA appeal, or simply provide the FOIA materials on reasonable terms, should be itself a sufficient basis for the Government's Motion to be denied.

## CONCLUSION

For all of these reasons, the Government's Motion to Dismiss should be denied.

Respectfully submitted,

 s/ Nancie G. Marzulla
Nancie G. Marzulla
Roger J. Marzulla
MARZULLA LAW, LLC
1150 Connecticut Avenue, NW
Suite 1050
Washington, DC 20036
(202) 822-6760 (telephone)
(202) 822-6774 (facsimile)

Dated: October 3, 2011                Counsel for Terminated Dealers


Of counsel:

Thomas A. Holman
HOLMAN LAW, P.C.
475 Park Avenue South
Twelfth Floor
New York, NY 10016
(212) 481-1336 (telephone)
(212) 481-1333 (facsimile)

Leonard A. Bellavia
BELLAVIA GENTILE & ASSOCIATES, LLP
200 Old Country Road
Mineola, NY 11501
(516) 873-3000 (telephone)
(516) 873-9032 (facsimile)