No. 11-100C
(Judge Firestone)

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

ALLEY'S OF KINGSPORT, INC., et al.,

Plaintiffs,

v.

THE UNITED STATES,

Defendant.

DEFENDANT'S MOTION TO DISMISS PLAINTIFFS' AMENDED COMPLAINT

JOYCE R. BRANDA
Acting Assistant Attorney General

ROBERT E. KIRSCHMAN, JR.
Director

OF COUNSEL:

ELIZABETH M. HOSFORD
Senior Trial Counsel

SETH W. GREENE
Trial Attorney

KENNETH M. DINTZER
Acting Deputy Director
Commercial Litigation Branch
Civil Division
Department of Justice
P.O. Box 480
Ben Franklin Station
Washington, D.C. 20044
(202) 616-0385
(202) 307-0972 fax
kenneth.dintzer@usdoj.gov

December 15, 2014

Attorneys for Defendant

# TABLE CONTENTS

**PAGE**

INTRODUCTION ................................................................................................................1

STATEMENT OF THE CASE..........................................................................................4

    I.      The Initial Proceedings And Decision In This Case.................................................4

    II.    The Federal Circuit's Decision In *A&D Auto Sales* On Interlocutory Appeal........6

STATEMENT OF FACTS ..................................................................................................7

    I.      The United States Invested In An Automaker On The Verge Of
            Bankruptcy...........................................................................................................7

    II.    The United States Provided Chrysler With Billions Of Dollars
            In Financing To Facilitate Chrysler's Deal With Fiat And To
            Support New Chrysler's Operations .....................................................................12

    III.   AOKI's Dealership Agreements Were Not Acquired By The
            Successor Automaker............................................................................................13

    IV.   AOKI's Amended Complaint On Remand ...........................................................14

ARGUMENT.....................................................................................................................14

    I.      Standard For Dismissal .......................................................................................14

    II.    AOKI's Amended Complaint Fails To State A Regulatory Taking Claim ...........16

            A.    AOKI's Complaint Fails To Allege Facts Sufficient To Support
                    A *Lucas* "Per Se" Regulatory Taking Claim .............................................17

            B.    AOKI's Complaint Fails To Allege The Economic Impact Required
                    To Establish A Regulatory Taking .........................................................18

                  1.    AOKI Cannot Establish Economic Harm By Alleging That
                            Chrysler Was Entitled To A Government Rescue On Terms
                              More Favorable To The Dealers ...................................................20

2.      AOKI Cannot Establish Economic Harm By Alleging That Its Franchises Would Have Survived As Part Of A Chrysler-Fiat Merger Financed By The Government ....................21

3.      AOKI Cannot Establish Economic Harm By Alleging That Its Dealerships Would Have Retained Value In An "Orderly Chapter 11 Liquidation" Conditioned Upon Government Financing ........................................................................................23

4.      In The Alternative, AOKI Is Barred From Claiming That Chrysler Would Have Avoided Bankruptcy But For The Government's Intervention ............................................................29

C.      Even Assuming AOKI Has Adequately Pled *Some* Form Of Economic Loss, The Complaint Should Nonetheless Be Dismissed Because AOKI Has Not Alleged Facts Showing That It Can Satisfy The Other Elements Of The *Penn Central* Regulatory Taking Test .........31

1.      AOKI Has Not Sufficiently Alleged That It Reasonably Expected Its Franchises To Survive Absent Government Action ..............................................................................................32

2.      *Penn Central's* "Character Of The Governmental Action" Prong Plainly Weighs In Favor Of The Government Because AOKI's Complaint Concedes That Chrysler Would Not Have Avoided Bankruptcy Absent Government Intervention ...............35

CONCLUSION .....................................................................................................................36

# TABLE OF AUTHORITIES

**CASES**                                                                    **PAGE(S)**

*A&D Auto Sales, Inc. v. United States*,
    748 F.3d 1142 (Fed. Cir. 2014)...................................................................*passim*

*Acceptance Ins. Cos., Inc. v. United States*,
    583 F.3d 849 (Fed. Cir. 2009)................................................................................. 14

*Advanced Cardiovascular Sys., Inc. v. SciMed Life Sys., Inc.*,
    988 F.2d 1157 (Fed. Cir. 1993)............................................................................... 15

*Alley's of Kingsport, Inc. v. United States*,
    103 Fed. Cl. 449 (2012) ..................................................................................... 4, 5

*Alley's of Kingsport, Inc. v. United States*,
    106 Fed. Cl. 762 (2012) ..................................................................................... 5, 6

*Andrus v. Allard*,
    444 U.S. 51 (1979)........................................................................................... 28, 29

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009) ........................................................................................*passim*

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007)........................................................................................*passim*

*Bradley v. Chiron Corp.*,
    136 F.3d 1317 (Fed. Cir. 1998)............................................................................... 15

*Brown v. Legal Found. of Wash.*,
    538 U.S. 216 (2003)............................................................................................... 19

*Chang v. United States*,
    859 F.2d 893 (Fed. Cir. 1988)................................................................................. 33

*Cienega Gardens v. United States*,
    331 F.3d 1319 (Fed. Cir. 2003)......................................................................... 32, 33

*Cienega Gardens v. United States*,
    503 F.3d 1266 (Fed. Cir. 2007)......................................................................... 32, 33

*Colonial Chevrolet Co., Inc. v. United States*,
    103 Fed. Cl. 570 (2012) ..................................................................................... 5, 6

*Colonial Chevrolet Co., Inc. v. United States*,
    106 Fed. Cl. 619 (2012) ........................................................................ 5

*Evans v. United States*,
    107 Fed. Cl. 442 (2012) ................................................................. 19, 22

*Figueroa v. United States*,
    57 Fed. Cl. 488 (2003) ....................................................................... 15

*Fla. Rock Indus., Inc. v. United States*,
    18 F.3d 1560 (Fed. Cir. 1994) ............................................................ 16

*Forest Props., Inc. v. United States*,
    177 F.3d 1360 (Fed. Cir. 1999) .......................................................... 33

*Golden Pac. Bancorp v. United States*,
    15 F.3d 1066 (Fed. Cir. 1994) ............................................................ 34

*Goodpaster v. City of Indianapolis*,
    736 F.3d 1060 (7th Cir. 2013) ...................................................... 28, 29

*Hendler v. United States*,
    175 F.3d 1374 (Fed. Cir. 1999) .......................................................... 16

*In re 3868-70 White Plains Rd.*,
    28 B.R. 515 (Bankr. S.D.N.Y. 1983) ................................................ 26

*In re Chrysler LLC*,
    405 B.R. 84 (Bankr. S.D.N.Y. 2009) ......................................... *passim*

*In re Old Carco LLC*,
    406 B.R. 180 (Bankr. S.D.N.Y. 2009) ....................................... *passim*

*Indiana State Police Pension Trust v. Chrysler LLC*,
    576 F.3d 108 (2d Cir. 2009), *cert granted and judgment vacated on other grounds*,
    558 U.S. 1087 (2009) ......................................................................... 28

*Int'l Fed'n of Prof'l & Tech. Eng'rs v. United States*,
    111 Fed. Cl. 175 (2013) ....................................................................... 8

*Lingle v. Chevron U.S.A. Inc.*,
    544 U.S. 528 (2005) ..................................................................... 17, 35

*Loop Corp. v. United States Trustee*,
    379 F.3d 511 (8th Cir. 2004) ............................................................. 25

*Love Terminal Partners v. United States*,
    97 Fed. Cl. 355 (2011) ........................................................................................8

*Loveladies Harbor, Inc. v. United States*,
    28 F.3d 1171 (Fed. Cir. 1994)......................................................................... 32

*Lucas v. S.C. Coastal Council*,
    505 U.S. 1003 (1992)............................................................................... *passim*

*Maritrans, Inc. v. United States*,
    342 F.3d 1344 (Fed. Cir. 2003)....................................................................... 36

*Montana v. United States*,
    440 U.S. 147 (1979)......................................................................................... 29

*Nester v. Gateway Access Solutions, Inc. (In re Gateway Access Solutions, Inc.)*,
    374 B.R. 556 (Bankr. M.D. Pa. 1983) ............................................................ 26

*Norman v. United States*,
    429 F.3d 1081 (Fed. Cir. 2005)................................................................. 16, 18

*Penn Cent. Transp. Co. v. City of New York*,
    438 U.S. 104 (1978)................................................................................. *passim*

*Postlewaite v. McGraw-Hill*,
    333 F.3d 42 (2d Cir. 2003).............................................................................. 29

*Pucciariello v. United States*,
    116 Fed. Cl. 390 (2014) .................................................................................. 15

*Rose Acre Farms, Inc. v. United States*,
    559 F.3d 1260 (Fed. Cir. 2009)................................................................. 35, 36

*Ruckelshaus v. Monsanto Co.*,
    467 U.S. 986 (1984)........................................................................................ 32

*Rutman Wine Co. v. E. & J. Gallo Winery*,
    829 F.2d 729 (9th Cir. 1987) ......................................................................... 15

*Tahoe-Sierra Preservation Council, Inc. v. Tahoe Regional Planning Agency*,
    535 U.S. 302 (2002)................................................................................... 16, 18

*Three S Consulting v. United States*,
    104 Fed. Cl. 519 (2012) .................................................................................. 24

*United States v. Stauffer Chemical Co.*,
464 U.S. 165 (1984) .............................................................................................. 31

**<u>STATUTES</u>**

Bankruptcy Act of 1898, ch. 541, 30 Stat. 544 ........................................................... 33

11 U.S.C. § 365 ......................................................................................................... *passim*

11 U.S.C. § 1112(b)(1) .............................................................................................. 25, 26

12 U.S.C. § 5201(2008) ................................................................................................. 8

12 U.S.C. § 5211(a)(1)(2008) ....................................................................................... 8

**<u>MISCELLANEOUS AUTHORITIES</u>**

2 NORTON BANKR. L & PRACT. 3d § 46:23 ................................................................. 18

Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1357
(3d ed. 2004) ......................................................................................................... 8

Chrysler Group LLC, *Chrysler Restructuring Plan for Long-Term Viability:
Executive Summary* (Feb. 17, 2009) ................................................................... 9

Chrysler Group LLC, *Chrysler Restructuring Plan for Long-Term Viability*
(Feb. 17, 2009) ................................................................................................. *passim*

FIAT GROUP, 2009 ANNUAL REPORT (Mar. 2010) ..................................................... 22

President George W. Bush, *President Bush Discusses Administration's Plan to Assist
Automakers* (Dec. 19, 2008) ............................................................................... 9

Senate Committee on Banking, Housing, and Urban Affairs, Testimony of Chrysler Chairman
and CEO Richard Nardelli, *Examining the State of the Domestic Automobile Industry:
Part II*, 110th Congress (Dec. 4, 2008) .............................................................. 8

U.S. Department of the Treasury, *Chrysler February 17 Plan: Determination of Viability*
(Mar. 30, 2009) ................................................................................................. 11

White House, *Obama Administration New Path to Viability for GM & Chrysler*
(Mar. 30, 2009) ................................................................................................. 11

White House Office of the Press Secretary, *Fact Sheet: Financing Assistance to Facilitate
the Restructuring of Auto Manufacturers to Attain Financial Viability* (Dec. 19, 2008) .. 8

ALLEY'S OF KINGSPORT, INC., et al.,    )
                           )
        Plaintiffs,          )
                           )    No. 11-100C
      v.                )    (Judge Firestone)
                           )
THE UNITED STATES,        )
                           )
        Defendant.        )

## DEFENDANT'S MOTION TO DISMISS
## PLAINTIFFS' AMENDED COMPLAINT

Pursuant to Rule 12(b)(6) of the Rules of the United States Court of Federal Claims

(RCFC), defendant, the United States, respectfully requests that the Court dismiss the amended

complaint of Alley's of Kingsport, Inc., et al. (AOKI), for failure to state a claim upon which

relief may be granted. In support of this motion, we rely on plaintiffs' amended complaint,

matters of public record, and the following brief.

## INTRODUCTION

Regulatory taking claims require, at a minimum, that a plaintiff establish that the

challenged Government action caused an economic loss that the plaintiff would not have

otherwise suffered. In its decision on interlocutory appeal in this case, the United States Court of

Appeals for the Federal Circuit held that plaintiffs had failed to state a regulatory taking claim

because their complaint contained "no allegations regarding the but-for economic loss of value

of the plaintiffs' franchises." *A&D Auto Sales, Inc. v. United States*, 748 F.3d 1142, 1158 (Fed.

Cir. 2014). In finding plaintiffs' complaint deficient, the Court reasoned:

> Absent an allegation that GM and Chrysler would have avoided
> bankruptcy *but for the government's intervention* and that the
> franchises would have had value in that scenario, or that such
> bankruptcies would have preserved some value for the plaintiffs'
> franchises, the terminations actually had no net negative economic

> impact on the plaintiffs *because their franchises would have lost*
> *all value regardless of the government action*.

*Id.* (emphasis added).

Nonetheless, the appellate court remanded the case to this Court to provide plaintiffs an opportunity to cure the deficiency by amending the complaint "to include specific allegations establishing loss of value." *Id.* at 1159. The Federal Circuit cautioned, however, that "it would not be sufficient to include conclusory loss of value allegations." *Id.* (citing *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009), and quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)).

Thus, in this remand case, AOKI must allege facts that go beyond mere speculation and show that AOKI would be able to establish loss of value as a factual matter at trial. AOKI's amended complaint fails to satisfy that burden. Instead, contrary to the Federal Circuit's directive, AOKI depicts a "but for" world in which (1) the Government provided financing to Chrysler on terms that plaintiffs would have preferred; (2) Chrysler pursued a merger with Fiat that was conditioned upon Government funding; or (3) Chrysler filed for bankruptcy and plaintiffs' dealerships retained their value as part of an "orderly" chapter 11 "wind down" (or liquidation) that was conditioned upon Chrysler obtaining billions of dollars in debtor-in-possession financing from the Government. AOKI has fundamentally erred in depicting a "but for" world *with Government action*. Each of AOKI's three hypothetical scenarios improperly assume Government intervention and cannot form the basis for proving the economic loss necessary for a regulatory taking claim.

Even assuming, however, that AOKI's amended complaint proposes a "but for" world *without Government assistance to Chrysler*, AOKI's allegations still fail to meet the basic pleading standards. AOKI does not identify a single private sector lender that was allegedly willing and able to provide Chrysler with the financing required to save it from immediate

liquidation.  Moreover, AOKI alleges no factual basis for its assumption that "potential bidders" would "likely" have purchased Chrysler's assets, without any Government funding, as part of an "orderly Chapter 11 liquidation."  Because AOKI's conclusory and speculative allegations fail to cross "the line from conceivable to plausible," AOKI's amended complaint falls far short of satisfying the minimum pleading standards required by the Supreme Court's *Iqbal* and *Twombly* decisions.  *See Ashcroft v. Iqbal*, 556 U.S. 662 (2009); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007).  Accordingly, the Court should dismiss the complaint.  *Id.*

The implausibility of AOKI's allegations is illuminated by the court decision approving Chrysler's bankruptcy.  The bankruptcy court held that Chrysler *would have faced immediate liquidation absent Government funding*.  In so holding, the court found that there were no investors willing and able to purchase Chrysler's assets or to provide it with the financing required for an "orderly" chapter 11 bankruptcy.  AOKI's attempt to reframe issues that were fully considered by the bankruptcy court in 2009, with dealer participation, only confirms the implausibility of AOKI's amended complaint.

The deficiencies in AOKI's complaint are not confined to its failure to meet the threshold "economic impact" requirement.  Even assuming that AOKI has alleged *some* economic loss (which it has not), the complaint falls far short of adequately pleading facts required to support the other elements of either the *Penn Central* or the *Lucas* regulatory taking tests.  AOKI has not adequately alleged, as required by *Penn Central*, interference with investment-backed expectations or that the character of the Governmental action supports a regulatory taking claim. Nor has AOKI adequately pled a complete deprivation of all value of the property allegedly taken, as required by *Lucas*.

Because AOKI proffers nothing more than speculation and conclusions in support of its claim that plaintiffs' dealership agreements would have retained value absent a Government rescue of Chrysler, AOKI should not be permitted to waste the Court's or the taxpayers' resources in pursuing a claim that is certain to fail. Moreover, even if AOKI could allege facts showing *some* limited value in its dealership agreements notwithstanding the global financial crisis and the collapse of the domestic automotive industry in 2008, the amended complaint is nonetheless deficient for failure to adequately plead the other elements of a regulatory taking claim. Consequently, the complaint should be dismissed.

## STATEMENT OF THE CASE

### I.      The Initial Proceedings And Decision In This Case

AOKI filed suit in February 2011. In a complaint filed on behalf of 64 plaintiffs,[1] AOKI alleged that the Government had taken, without just compensation, property interests in plaintiffs' dealership agreements with Chrysler LLC (Chrysler). Specifically, AOKI contended that the taking occurred when the Government required Chrysler, as a condition of financing, to reduce the size of its dealer network and to choose which dealers would be discontinued. *See Alley's of Kingsport, Inc. v. United States*, 103 Fed. Cl. 449, 451 (2012). According to AOKI, the Government required Chrysler to reject some dealership agreements in bankruptcy proceedings as a condition of providing financial assistance to the automaker and/or to its successor company. *See id.*; *see also A&D Auto Sales*, 748 F.3d at 1147.

---

[1] In the original action, the number of plaintiffs increased to 148 through the filing of the third amended complaint. *See* Am. Compl. ¶¶ 1-148, No. 11-100C (Dkt. No. 60-1) (Aug. 17, 2012). AOKI's fourth amended complaint on remand was filed on behalf of 168 plaintiffs. *See* Am. Compl. at 2, No. 11-100C (Dkt. No. 95) (Sept. 15, 2014).

Shortly after AOKI amended its complaint, the Government moved pursuant to RCFC 12(b)(6) to dismiss the complaint for failure to state a claim. *See Alley's of Kingsport*, 103 Fed. Cl. at 451. We contended that plaintiffs had failed to state a plausible claim for relief because they failed to plead facts sufficient to show either that they possessed protected property interests or that Government action caused the deprivation of any such interests.

On February 27, 2012, the Court issued an order denying the Government's motion to dismiss. *Alley's of Kingsport*, 103 Fed. Cl. at 451, 454.[2] The Court identified several takings theories and acknowledged that it was "not aware of a takings theory that resembles the legal and factual theories offered so far . . . [and] [c]ounsel have advised us of none." *Id.* at 453. Nevertheless, the Court declined to dismiss the case, concluding that "[p]laintiffs should have the opportunity" through discovery "to develop a case that may turn out to be unique." *Id.* at 454.

On May 29, 2012, the Government filed a motion to certify the order denying the motion to dismiss for interlocutory appeal. *See Alley's of Kingsport, Inc. v. United States*, 106 Fed. Cl. 762, 763 (2012); *see also Colonial Chevrolet Co., Inc. v. United States*, 106 Fed. Cl. 619, 620 (2012). We sought certification of two questions: (1) whether the trial court erred in finding that plaintiffs stated a Fifth Amendment taking claim; and (2) whether the bankruptcy court's findings barred plaintiffs' claims. The trial court certified the first question for appeal. *Alley's of Kingsport*, 106 Fed. Cl. at 765; *see also Colonial Chevrolet Co.*, 106 Fed. Cl. at 622. The United States Court of Appeals for the Federal Circuit granted our petitions for interlocutory appeal on

---

[2] The Court issued a virtually identical order on the same day in the companion case to this matter, *Colonial Chevrolet Co., Inc. v. United States*, No. 10-647C (Fed. Cl.). *Colonial Chevrolet Co., Inc. v. United States*, 103 Fed. Cl. 570 (2012). In *Colonial*, the plaintiffs owned either Chrysler or General Motors Company (GM) dealerships, *id.* at 571; the plaintiffs in this case are former owners of Chrysler dealerships. *Alley's of Kingsport*, 103 Fed. Cl. at 451. The plaintiffs' complaints, however, were largely identical in substance. *See A&D Auto Sales*, 748 F.3d at 1149.

November 30, 2012.  *See Alley's of Kingsport, Inc., et al. v. United States*, No. 13-5019 (Dkt. No. 2-3) (Fed. Cir. Nov. 30, 2012); *Colonial Chevrolet Co., Inc., et al. v. United States*, No. 13-5020 (Dkt. No. 1-3) (Fed. Cir. Nov. 30, 2012).

## II.     The Federal Circuit's Decision In *A&D Auto Sales* On Interlocutory Appeal

On April 7, 2014, the Federal Circuit issued its decision on interlocutory appeal from this Court's denial of the Government's motions to dismiss in *Alley's* and *Colonial*.  *A&D Auto Sales, Inc. v. United States*, 748 F.3d 1142 (Fed. Cir. 2014) (*A&D Auto Sales*).[3]  Although the Federal Circuit affirmed this Court's decision declining to dismiss the complaints, the appellate court held that plaintiffs' complaints were deficient and remanded the cases to this Court to permit plaintiffs to attempt to cure the deficiencies through amendment.  *Id.* at 1159.

Specifically, the Federal Circuit held that plaintiffs had failed to state a taking claim because "[t]he complaints contain no allegations regarding the but-for economic loss of value of the plaintiffs' franchises."  *Id.* at 1158.  The appellate court acknowledged that, "to establish a regulatory taking, a plaintiff must show that his property suffered a diminution in value or a deprivation of economically beneficial use," and noted that this requirement applies regardless of whether a court applies the categorical test of *Lucas v. South Carolina Coastal Council*, or the *Penn Central* balancing test.  *Id*. at 1157 (citing *Lucas v. S.C. Coastal Council*, 505 U.S. 1003, 1015 (1992), *Penn Cent. Transp. Co. v. City of New York*, 438 U.S. 104, 124 (1978)).  In finding the complaints deficient, the Court reasoned:

> Absent an allegation that GM and Chrysler would have avoided bankruptcy *but for the government's intervention* and that the franchises would have had value in that scenario, or that such

---

[3]  Before the Federal Circuit issued its decision on April 7, 2014, the court changed the official case caption from *Alley's of Kingsport, Inc., et al. v. United States*, No. 2013-5019, to *A&D Auto Sales, Inc., et al. v. United States*, No. 2013-5019, based upon an alphabetical reordering of the plaintiffs in this action.

> bankruptcies would have preserved some value for the plaintiffs'
> franchises, the terminations actually had no net negative economic
> impact on the plaintiffs *because their franchises would have lost
> all value regardless of the government action*.

*Id.* at 1158 (emphasis added). The Federal Circuit thus concluded that plaintiffs had failed to

plead any economic loss. *Id.*

The appellate court then remanded the cases to this Court to grant plaintiffs leave to

amend their complaints "to include specific allegations establishing loss of value." *Id.* at 1159.

The Federal Circuit cautioned, however, that "it would not be sufficient to include conclusory

loss of value allegations." *Id.* (citing *Iqbal*, 556 U.S. at 678, and quoting *Twombly*, 550 U.S. at

555).

Pursuant to the Court's order dated July 18, 2014, AOKI filed its amended complaint on

September 15, 2014.

## STATEMENT OF FACTS

## I. The United States Invested In An Automaker On The Verge Of Bankruptcy

As the Great Recession of 2008 broke, Chrysler faced serious financial difficulty, and

bankruptcy loomed. *See* Am. Compl. ¶¶ 174-76, 179. In the fall of 2008, a global credit crisis

dried up the financial liquidity markets. *Id.* at ¶ 174. Major financial institutions became

dependent upon emergency Government financing or were forced into liquidation or sales to

other entities. *Id.* In this tightened credit market, "little, if any, credit [was] available to most

businesses," including the auto industry. *Id.*; *see also id.* at ¶ 175. Automobile sales

"plummeted" to a 26-year low as the credit markets froze, bringing loans to auto dealers and

consumers to an "abrupt halt." *Id.* at ¶¶ 174-76. Without billions in financial assistance,

Chrysler faced collapse. *See id.* at ¶ 179.

In early December 2008, Chrysler's then-Chairman and CEO Robert Nardelli appeared before Congress and appealed for a $7 billion emergency loan, which he said was necessary "to bridge the current financial crisis."[4]  Shortly thereafter, President Bush announced that the United States Department of the Treasury (Treasury) would make loans available to Chrysler from the Troubled Asset Relief Program (TARP).[5]  Am. Compl. ¶ 180; 12 U.S.C. § 5211(a)(1) (2008).  Congress had enacted TARP as part of the Emergency Economic Stabilization Act (EESA) of 2008.  Am. Compl. ¶ 177; 12 U.S.C. § 5201 (2008).  In a major public speech delivered on December 19, 2008, President Bush expressed concern that "[i]f we were to allow

---

[4]  Senate Committee on Banking, Housing, and Urban Affairs, Testimony of Chrysler Chairman and CEO Richard Nardelli, *Examining the State of the Domestic Automobile Industry: Part II*, 110th Congress, at 2 (Dec. 4, 2008) (available at http://www.banking.senate.gov/public/index.cfm?FuseAction=Files.View&FileStore_id=c41857b2-7253-4253-95e3-5cfd7ea81393).

As the Federal Circuit recognized in *A&D Auto Sales*, while the Court primarily considers the allegations in the complaint when deciding a motion to dismiss, the Court "may also look to 'matters incorporated by reference or integral to the claim, items subject to judicial notice, [and] matters of public record.'"  748 F.3d at 1147 (quoting 5B Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1357 (3d ed. 2004)); *see also Int'l Fed'n of Prof'l & Tech. Eng'rs v. United States*, 111 Fed. Cl. 175, 183 (2013) (noting that courts may consider "matters of public record when deciding a motion to dismiss") (internal quotations and citations omitted).  The Court, therefore, "has discretion to consider materials beyond the pleadings and 'is not limited to the four corners of the complaint' when ruling upon an RCFC 12(b)(6) motion."  *Love Terminal Partners v. United States*, 97 Fed. Cl. 355, 385 (2011) (quoting 5B Wright & Miller, *Federal Practice and Procedure* § 1357).  All documents cited herein are either public records or concern matters incorporated by reference or integral to AOKI's claim.

[5]  White House Office of the Press Secretary, *Fact Sheet: Financing Assistance to Facilitate the Restructuring of Auto Manufacturers to Attain Financial Viability* (Dec. 19, 2008) (available at http://georgewbush-whitehouse.archives.gov/news/releases/2008/12/20081219-6.html).

the free market to take its course now, it would almost certainly lead to disorderly bankruptcy and liquidation for the automakers."[6]

On the same day, Treasury Secretary Henry Paulson created the Automotive Industry Financing Program (AIFP), through which Treasury could make loans to Chrysler using TARP funds. *See* Am. Compl. ¶¶ 178-79. The program's stated goal was to avoid the disorderly bankruptcy and liquidation of the domestic automakers and the financial collapse of the American automotive industry. *Id.* at ¶ 179; *see also A&D Auto Sales*, 748 F.3d at 1147-48.

On December 31, 2008, Chrysler voluntarily entered into a loan and security agreement with Treasury, setting forth the terms and conditions of the Government's short-term assistance. Am. Compl. ¶ 181. As a condition of the Government's agreement to provide financing, Chrysler was required to submit a restructuring plan that demonstrated that the assistance would allow it to achieve long-term viability, international competiveness, and energy efficiency.[7] *See id.*; *see also A&D Auto Sales*, 748 F.3d at 1148.

In early January 2009, Treasury invested $4 billion in TARP funds in Chrysler in the form of a bridge loan to permit the company to keep operating while it developed a restructuring plan for long-term viability. *See* Am. Compl. ¶ 180; *see also A&D Auto Sales*, 748 F.3d at 1148; Chrysler Restructuring Plan (Executive Summary) at 2. Treasury also provided Chrysler

---

[6] President George W. Bush, *President Bush Discusses Administration's Plan to Assist Automakers* (Dec. 19, 2008) (transcript available at http://georgewbush-whitehouse.archives.gov/news/releases/2008/12/20081219.html) (quoted in *A&D Auto Sales*, 748 F.3d at 1147).

[7] Chrysler Group LLC, *Chrysler Restructuring Plan for Long-Term Viability: Executive Summary*, at 2 (Feb. 17, 2009) (available at http://www.media.chrysler.com/dcxms/assets/attachments/Chrysler_Restructuring_Plan_Summary.pdf) (Chrysler Restructuring Plan (Executive Summary))

Financial, the company's retail financing division, with an additional $1.5 billion in TARP funds to provide automobile loans to purchasers of its cars.  Am. Compl. ¶ 182.

On February 15, 2009, President Obama announced the creation of the Presidential Task Force on the Auto Industry (Task Force) to review Chrysler's viability plan.  *See id.* at ¶ 185.  In addition, the Obama Administration created a Treasury Auto Team (Auto Team), which reported to the Task Force and was responsible for evaluating Chrysler's viability plan and negotiating the terms of any further assistance.  *See id.* at ¶ 186.

Chrysler submitted its Restructuring Plan for Long-Term Viability on February 17, 2009.[8]  *Id.* at ¶ 187.  Chrysler's plan presented three scenarios for the company's future:

1.  Chrysler could continue as a stand-alone company in the short/mid-term with targeted concessions obtained from all constituents and an additional $11 billion in funding from the Government.

2.  Chrysler could pursue a non-binding letter of intent with the Italian Automaker Fiat S.p.A. (Fiat) conditioned upon obtaining concessions from all constituents, receiving additional Government funding, and Chrysler meeting all restructuring targets set forth in its 2008 loan agreement with Treasury.

3.  Chrysler could file for bankruptcy and plan for an orderly wind down of the company's operations.  In this scenario, Chrysler would seek approximately $24 billion in debtor-in-possession financing over a two-year period from both the Government and private sector lenders.

Chrysler Restructuring Plan at 11; Chrysler Restructuring Plan (Executive Summary) at 3-4; *see* Am. Compl. ¶ 200.  Chrysler informed Treasury that an "orderly wind down" would result in "300,000 jobs lost at Chrysler and its suppliers and over 3,300 dealers failing."  Chrysler Restructuring Plan at 11.  Chrysler also had pre-existing plans, assuming it survived, to reduce its dealership network from 3,181 in 2009 to about 2,000 dealerships by 2014.  Am. Compl. ¶ 187.

---

[8]  Chrysler Group LLC, *Chrysler Restructuring Plan for Long-Term Viability* (Feb. 17, 2009) (available at http://bigthreeimplode.com/ChryslerRestructuringPlan.pdf) (Chrysler Restructuring Plan).

In addition, in its February 17, 2009 submission, Chrysler requested an additional $5 billion by March 31, 2009, for working capital and other operating expenses, bringing its total request to $9 billion. Chrysler Restructuring Plan (Executive Summary) at 2-3, 5, 18; Chrysler Restructuring Plan at 11, 21, 39, 177.

On March 30, 2009, President Obama announced the results of the Auto Team's review of Chrysler's restructuring plan.[9] The Auto Team concluded that Chrysler's plan was not viable as currently structured.[10] *See* Am. Compl. ¶ 188; *see also* New Path to Viability for GM & Chrysler at 1. Specifically, the Auto Team concluded that Chrysler's plan would not lead to viability as a stand-alone company. Chrysler Viability Determination at 1, 5; *see also* New Path to Viability for GM & Chrysler at 1, 3. The Auto Team informed Chrysler that it would provide additional financing to Chrysler only if Chrysler formed a partnership with another automotive company, such as Fiat. New Path to Viability for GM & Chrysler at 1, 4. Subject to Chrysler meeting certain other aspects of its viability plan, Treasury agreed to provide Chrysler with working capital for 30 days while it sought a definitive agreement with Fiat. *Id.* at 1.[11] If

---

[9] White House, *Obama Administration New Path to Viability for GM & Chrysler* (Mar. 30, 2009) (available at http://www.whitehouse.gov/assets/documents/Fact_Sheet_GM_Chrysler.pdf.) (New Path to Viability for GM & Chrysler).

[10] U.S. Department of the Treasury, *Chrysler February 17 Plan: Determination of Viability*, at 1, 3 (Mar. 30, 2009) (available at http://www.whitehouse.gov/assets/documents/Chrysler_Viability_Assessment.pdf) (Chrysler Viability Determination).

[11] In addition to the requirements noted above, a number of additional conditions needed to be met, including, but not limited to, a restructuring of Chrysler's balance sheet to a sustainable debt burden, which would require extinguishing the vast majority of Chrysler's outstanding secured debt and all of its unsecured debt and equity (other than trade creditors providing normal trade terms), and an agreement with the United Auto Workers union that entailed greater concessions than outlined in the loan agreement. New Path to Viability for GM & Chrysler at 4.

successful, Treasury indicated that it would then "consider investing up to the additional $6 billion requested by Chrysler to help this partnership succeed." *Id.*

Treasury ultimately committed $14 billion in TARP funds to Chrysler and Chrysler Financial, subject to conditions on financing, including the rejection of a minority of dealership agreements in bankruptcy. *See* Am. Compl. ¶¶ 180-83. No private sector lenders emerged to offer financing to Chrysler – much less financing that would have preserved Chrysler's entire pre-bankruptcy dealer network, and AOKI does not allege anything to the contrary.

## II. The United States Provided Chrysler With Billions Of Dollars In Financing To Facilitate Chrysler's Deal With Fiat And To Support New Chrysler's Operations

Ultimately, Chrysler accepted the Government's offer of financing and sought bankruptcy protection, looking to sell most of its operating assets to a newly created corporation, "New Chrysler." *See A&D Auto Sales*, 748 F.3d at 1148.

On April 30, 2009, Chrysler filed a petition for a structured bankruptcy in the United States District Court for the Southern District of New York. *See* Am. Compl. ¶ 193; *In re Chrysler LLC*, 405 B.R. 84, 87-88 (Bankr. S.D.N.Y. 2009) (*Chrysler Sale Op'n*), *aff'd*, 576 F.3d 108 (2d Cir. 2009), *vacated with instructions to dismiss appeal as moot*, 130 S. Ct. 1015 (2009). The same day, Chrysler, Fiat, and New Chrysler tentatively entered into an agreement pursuant to which (1) Chrysler would sell substantially all of its operating assets to New Chrysler; and (2) Fiat would provide New Chrysler with access to certain technology and fuel-efficient vehicle platforms (the "Fiat Transaction"). *Chrysler Sale Op'n*, 405 B.R. at 92. In connection with this sale agreement, the United States and Canada agreed to provide debtor-in-possession financing for 60 days in the amount of $4.96 billion, and $6 billion in financing to support New Chrysler's operations after the sale. *Id.* Treasury, in particular, provided $8.5 billion in working capital and financing to facilitate Chrysler's deal with Fiat. *See A&D Auto Sales*, 748 F.3d at 1148. The

bankruptcy court approved this financing package and concluded that no more favorable financing terms could be obtained.  *See Chrysler Sale Op'n*, 405 B.R. at 96-97, 104-08, 113.

On May 14, 2009, Chrysler filed a motion seeking to reject 789 dealership agreements (or 25 percent of its network of nearly 3,200 United States dealerships), including the former Chrysler dealers that are parties to this action.  Am. Compl. ¶ 194; *see Chrysler Sale Op'n*, 405 B.R. at 88.  The bankruptcy court held an evidentiary hearing on June 4, 2009, and legal arguments were presented to the court on June 9, 2009.  *In re Old Carco LLC*, 406 B.R. 180, 187 (Bankr. S.D.N.Y. 2009) (*Chrysler Rejection Op'n*), *recon. denied*, 423 B.R. 40 (Bankr. S.D.N.Y. 2010), *aff'd*, 2010 WL 3566908 (S.D.N.Y. 2010).  During these proceedings, the Committee of Chrysler Affected Dealers and other parties designated evidence into the record.  *Chrysler Rejection Op'n*, 406 B.R. at 187.  Moreover, in advance of these proceedings, Chrysler "produced nearly 350,000 pages of documents and made 13 witnesses available for deposition," many of whom were deposed and cross-examined by the Affected Dealers.  *Id.* at 208.  Ultimately, the bankruptcy court issued an order granting Chrysler's motion.  Am. Compl. ¶ 194; *see Chrysler Rejection Op'n*, 406 B.R. at 186-87.  The vast majority of Chrysler's dealership agreements – approximately 75 percent – were not rejected in bankruptcy.  *See* Am. Compl. ¶ 194; *Chrysler Sale Op'n*, 405 B.R. at 88.  Instead, they were assumed by New Chrysler as part of the sale.  *See Chrysler Sale Op'n*, 405 B.R. at 87-88, 98-99.

### III.     AOKI's Dealership Agreements Were Not Acquired By The Successor Automaker

Plaintiffs comprise 168 former owners of Chrysler automobile dealerships.  Am. Compl. at 2.  In bankruptcy, New Chrysler chose not to assume plaintiffs' dealership agreements.  *Chrysler Sale Op'n*, 405 B.R. at 98-99.  Accordingly, the plaintiffs maintained their agreements with their original counterparty, Old Chrysler.  Ultimately, because Old Chrysler no longer

manufactured cars, these dealership agreements were rejected with court approval. *See Chrysler Rejection Op'n*, 406 B.R. at 190, 196, 199 n.24; 11 U.S.C. § 365(g); *see also A&D Auto Sales*, 748 F.3d at 1149. In place of the dealership agreements, plaintiffs now have potential claims under 11 U.S.C. § 365 – similar to breach claims – that could have been brought in bankruptcy against their original counterparty, Old Chrysler. *See id.*

## IV. AOKI's Amended Complaint On Remand

In its amended complaint on remand, AOKI alleges that "but for" the Government requiring Chrysler to reject some dealership agreements in bankruptcy as a condition of financing, AOKI's dealerships would have retained "significantly more value" under any of the three scenarios presented in Chrysler's restructuring plan dated February 17, 2009, each of which was conditioned upon additional Government assistance. *See* Am. Compl. ¶ 200; *see also* Chrysler Restructuring Plan at 11; Chrysler Restructuring Plan (Executive Summary) at 2-3.

AOKI also asserts that the Government's conditional financing offering to Chrysler damaged the plaintiffs in the amount of at least $500 million. *See* Am. Compl. ¶ 210.

## ARGUMENT

## I. Standard For Dismissal

The Court must dismiss a complaint that does not plausibly give rise to an entitlement to relief. RCFC 12(b)(6). To avoid dismissal for failure to state a claim under RCFC 12(b)(6), "a complaint must allege facts 'plausibly suggesting (not merely consistent with)' a showing of entitlement to relief." *Acceptance Ins. Cos., Inc. v. United States*, 583 F.3d 849, 853 (Fed. Cir. 2009) (quoting *Twombly*, 550 U.S. at 557). Although a complaint need not contain "detailed" factual allegations, the "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555 (citation omitted). A complaint that "tenders

'naked assertion[s]' devoid of 'further factual enhancement'" will not suffice. *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 557); *see also Bradley v. Chiron Corp.*, 136 F.3d 1317, 1322 (Fed. Cir. 1998) ("Conclusory allegations of law and unwarranted inferences of fact do not suffice to support a claim."). In other words, the complaint must contain "enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570. "Determining whether a complaint states a plausible claim for relief is a 'context-specific task that requires the reviewing court to draw on its judicial experience and common sense.'" *Pucciariello v. United States*, 116 Fed. Cl. 390, 400 (2014) (quoting *Iqbal*, 556 U.S. at 679).

A claim is facially implausible if it does not permit the Court "to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 556). Allegations "that are 'merely consistent with' a defendant's liability" and "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* Moreover, "[l]egal conclusions, deductions, or opinions couched as factual allegations are not given a presumption of truthfulness." *Figueroa v. United States*, 57 Fed. Cl. 488, 497 (2003) (citation omitted).

RCFC 12(b)(6) "allow[s] the court to eliminate actions that are fatally flawed in their legal premises and destined to fail, and thus to spare litigants the burdens of unnecessary pretrial and trial activity." *Advanced Cardiovascular Sys., Inc. v. SciMed Life Sys., Inc.*, 988 F.2d 1157, 1160 (Fed. Cir. 1993) (citation omitted). RCFC 12(b)(6) thus "enable[s] defendants to challenge the legal sufficiency of complaints without subjecting themselves to discovery." *Rutman Wine Co. v. E. & J. Gallo Winery*, 829 F.2d 729, 738 (9th Cir. 1987) (citation omitted).

**II.** **AOKI's Amended Complaint Fails To State A Regulatory Taking Claim**

The Court should dismiss AOKI's amended complaint for failure to state a regulatory taking claim under either the *Lucas* or the *Penn Central* regulatory taking tests. The *Penn Central* analysis should apply here, however, because AOKI's complaint fails to allege that it lost *all* of the value in the property allegedly taken. *See* Am. Compl. ¶¶ 196, 206.

The *Lucas* "per se" rule applies only in the "extraordinary case" where three prerequisites are met: the regulation must (1) permanently deprive, (2) the whole property, (3) of all its value. *Tahoe-Sierra Preservation Council, Inc. v. Tahoe Regional Planning Agency*, 535 U.S. 302, 330, 332 (2002). Only a complete deprivation will constitute a "per se" taking. *Norman v. United States*, 429 F.3d 1081, 1090-91 (Fed. Cir. 2005) (citing *Lucas v. S.C. Coastal Council*, 505 U.S. 1003, 1019 n.8 (1992), and *Tahoe-Sierra Preservation Council*, 535 U.S. at 324, 330). The *Penn Central* balancing test, on the other hand, requires the Court to weigh the following factors: (1) "[t]he economic impact of the regulation on the claimant;" (2) "the extent to which the regulation has interfered with distinct investment-backed expectations;" and (3) "the character of the governmental action." *Id.* at 1091-92 (citing *Penn Cent. Transp. Co. v. City of New York*, 438 U.S. 104, 124 (1978)).

Both types of regulatory takings require, at a minimum, that a plaintiff establish an economic loss or reduction in value of its property. *A&D Auto Sales*, 748 F.3d at 1157. "A pivotal criterion governing whether a regulatory taking has occurred is the impact the regulatory imposition has had on the economic use, and hence value, of the property." *Hendler v. United States*, 175 F.3d 1374, 1385 (Fed. Cir. 1999); *see also Fla. Rock Indus., Inc. v. United States*, 18 F.3d 1560, 1564-65 (Fed. Cir. 1994). Thus, "if the regulatory action is not shown to have had a

negative economic impact on the property, there is no regulatory taking." *Hendler*, 175 F.3d at 1385.

Here, AOKI's regulatory taking claim fails for the same reason on remand that it did in the original action: plaintiffs have again failed to sufficiently plead economic loss. *See A&D Auto Sales*, 748 F.3d at 1158. Notwithstanding the Federal Circuit's admonition, AOKI's amended complaint continues to offer only "conclusory loss of value allegations." *See id.* at 1159 (citing *Iqbal*, 556 U.S. at 678, and quoting *Twombly*, 550 U.S. at 555).

Even if AOKI could show *some* economic loss (which it cannot), the complaint falls far short of adequately pleading facts that could support the second and third elements of the *Penn Central* test: interference with reasonable investment-backed expectations, and character of the Governmental action. *See Penn Central*, 438 U.S. at 124. The complaint fails to identify any regulatory action that is "functionally equivalent to the classic taking in which government directly appropriates private property or ousts the owner from his domain." *See Lingle v. Chevron U.S.A. Inc.*, 544 U.S. 528, 539 (2005). In any event, the Court should consider the three factors of the *Penn Central* balancing test together to conclude that AOKI has failed to allege facts that could establish a regulatory taking, and dismiss the complaint.

### A. AOKI's Complaint Fails To Allege Facts Sufficient To Support A *Lucas* "Per Se" Regulatory Taking Claim

Although the *Penn Central* analysis should apply here, even if the Court were to apply the *Lucas* test, AOKI's taking claim still fails. First, the *Lucas* analysis has never before been applied in this Circuit to cases involving an alleged taking of intangible property such as contract rights, and every other circuit has rejected such an expansion. *See, e.g.*, *A&D Auto Sales*, 748 F.3d at 1151-52 (citations omitted). Second, even assuming AOKI has sufficiently alleged *some* economic loss (which it has not), it nonetheless cannot meet the *Lucas* test, which requires a

complete deprivation of *all* value of the property allegedly taken. *Tahoe-Sierra Preservation Council*, 535 U.S. at 330; *Norman*, 429 F.3d at 1090 (citing *Lucas v. S.C. Coastal Council*, 505 U.S. 1003 (1992)). In other words, a *Lucas* taking requires proof that the Government's conduct caused a "complete elimination of value." *Tahoe-Sierra Preservation Council*, 535 U.S. at 330 (quoting *Lucas*, 505 U.S. at 1019-20 n.8).

Here, after the Government's investment and Chrysler's rejection of the dealership agreements pursuant to the Bankruptcy Code, the former dealers retained rights to make claims against the automaker's bankruptcy estate. *Chrysler Rejection Op'n*, 406 B.R. at 190, 196, 199 n.24; 11 U.S.C. § 365(g); *see also A&D Auto Sales*, 748 F.3d at 1149. "Rejection of a contract or unexpired lease, while constituting a breach of contract, does not terminate the contract or lease." *Chrysler Rejection Op'n*, 406 B.R. at 199 n.24 (quoting 2 NORTON BANKR. L & PRACT. 3d § 46:23). Further, AOKI retained its vehicle and parts inventory, physical plants, and other assets, and affirmatively alleges that it was permitted to sell the inventory, albeit at "fire-sale" prices. Am. Compl. ¶¶ 196, 206. Consequently, AOKI's complaint fails to allege the complete elimination of value required to support a *Lucas* regulatory taking.

## B. AOKI's Complaint Fails To Allege The Economic Impact Required To Establish A Regulatory Taking

In *A&D Auto Sales*, the Federal Circuit held that, to avoid dismissal for failure to properly allege economic loss, AOKI needed to amend its complaint to sufficiently allege either: (1) that Chrysler would have avoided bankruptcy, with plaintiffs' franchises retaining value, "but for" the Government's intervention; or (2) that bankruptcy would have preserved some value for the franchises. 748 F.3d at 1158. AOKI's amended complaint fails to sufficiently allege facts that could satisfy either option.

As noted in *A&D Auto Sales*, a plaintiff is entitled to just compensation for a taking only when it has suffered economic loss. 748 F.3d at 1157-58. That is, "just compensation for a net loss of zero is zero." *Brown v. Legal Found. of Wash.*, 538 U.S. 216, 240 n.11 (2003); *A&D Auto Sales*, 748 F.3d at 1157 (same). AOKI's amended complaint attempts to demonstrate loss by offering three alternative scenarios presented in Chrysler's February 17, 2009 restructuring plan in which plaintiffs' franchises would have maintained economic value. Am. Compl. ¶ 200. As demonstrated below, each of the three scenarios identified in Chrysler's restructuring plan were contingent upon the company receiving billions of dollars in additional Government funding. *See* Chrysler Restructuring Plan at 11. In setting forth these scenarios, AOKI has misplaced its reliance on a "but for" world *with Government action*, contrary to the Federal Circuit's direction that plaintiffs must allege facts sufficient to show what value their franchises would have had in a "but for" world *without Government intervention*. *See A&D Auto Sales*, 748 F.3d at 1157-58.

In any event, AOKI fails to allege facts sufficient to indicate that any of these scenarios were plausible absent Government funding. As this Court has recognized, "the facts alleged in the complaint must be plausible and not merely naked assertions devoid of a factual basis." *Evans v. United States*, 107 Fed. Cl. 442, 456 (2012) (citing *Iqbal*, 556 U.S. at 678).

Because AOKI's amended complaint does not "contain sufficient factual matter . . . to state a claim to relief that is plausible on its face," *see Iqbal*, 556 U.S. at 678 (internal quotation marks and citation omitted), the Court should dismiss the complaint.

**1.**     **AOKI Cannot Establish Economic Harm By Alleging That Chrysler Was Entitled To A Government Rescue On Terms More Favorable To The Dealers**

In a misguided attempt to establish economic loss, AOKI alleges that Chrysler would have pursued the first alternative scenario identified in the restructuring plan that was submitted to the Government, and rejected, in February 2009.  Am. Compl. ¶¶ 196, 200-01.  In this scenario, "Chrysler accepts government financial assistance but would not be required to terminate the Plaintiffs' franchises."  *Id*. at ¶ 201.

AOKI has fundamentally erred in depicting a "but for" world *with Government action*, completely ignoring the Federal Circuit's directive.  In *A&D Auto Sales*, the Federal Circuit plainly held that, to establish the negative economic impact necessary for a regulatory taking, AOKI must allege sufficient facts to show what value its dealership agreements would have had "but for the government's intervention."  748 F.3d at 1157-58.  The appropriate "but for" world, therefore, examines the value of plaintiffs' franchises *without any Government assistance to Chrysler.  Id.* at 1158.  Thus, contrary to AOKI's suggestion, the "but for" world does not examine the value of plaintiffs' franchises if the Government had intervened in a different manner or offered financing without certain conditions.

In any event, AOKI's allegations fail to meet the basic pleading standards.  At a minimum, they are speculative in that AOKI merely predicts what it believes would have happened had Chrysler "accepted" Government assistance but retained all of its dealers.  *See* Am. Compl. ¶ 201.  Absent any facts to support such speculation, the allegation falls far short of satisfying the *Iqbal* and *Twombly* pleading standards.  AOKI's bare assertion that, in a "but for" world, alternative Government financing would have been available to save its franchises does not raise AOKI's "right to relief above the speculative level."  *See Twombly*, 550 U.S. at 555.

Because AOKI's "but for" world improperly assumes a right to a Government rescue on terms that plaintiffs would have preferred, AOKI has failed to sufficiently plead economic loss. The Court, therefore, should dismiss the complaint.

**2.  AOKI Cannot Establish Economic Harm By Alleging That Its Franchises Would Have Survived As Part Of A Chrysler-Fiat Merger Financed By The Government**

As an alternative, AOKI offers a competing scenario in which plaintiffs' franchises would have survived as part of a Chrysler-Fiat merger.  Am. Compl. ¶¶ 200, 202.  In this scenario, AOKI contends, Chrysler would have pursued the "non-binding" merger agreement it had signed with Fiat on January 20, 2009.  *Id.* at ¶ 200.  Thus, according to AOKI, Chrysler would have entered in a formal merger agreement with Fiat, retaining all of Chrysler's existing dealers, including plaintiffs.  *Id.* at ¶ 202.

AOKI fails to mention, however, that Chrysler's non-binding letter of intent with Fiat *was conditioned upon additional Government assistance and Chrysler meeting all restructuring targets set forth in its December 2008 loan agreement with Treasury.  See* Chrysler Restructuring Plan at 11; Chrysler Restructuring Plan (Executive Summary) at 3.  Specifically, Chrysler informed Treasury that its proposal to form a "strategic partnership" with Fiat "is contingent upon Chrysler LLC restructuring its debt, obtaining concessions [from its constituents], and *receiving adequate Government funding*."  Chrysler Restructuring Plan at 11 (emphasis added); *see also id.* at 12 (same).  Thus, this scenario, like AOKI's first scenario, improperly assumes Government intervention and cannot form the basis for establishing economic loss.  *See A&D Auto Sales*, 748 F.3d at 1157-58.

Even assuming, however, that AOKI is proposing a "but for" world in which Chrysler merged with Fiat without substantial Government funding, AOKI has not alleged any facts that

could support a finding that Fiat was interested in funding such a merger with Chrysler. In the actual world, Fiat did not contribute *any* funds to consummate the transaction with Chrysler. *See Chrysler Sale Op'n*, 405 B.R. at 93.[12] Instead, as part of the transaction, Fiat agreed to "contribute to New Chrysler access to competitive fuel-efficient vehicle platforms, certain technology, distribution capabilities in key growth markets[,] and substantial cost saving opportunities." *Chrysler Sale Op'n*, 405 B.R. at 92; *see id.* at 96 (noting that Fiat "provide[d] the smaller car technology, and the access to certain international markets"); *id.* at 99 (Fiat "contribut[ed] technology and expertise" to the transaction); *see also* Chrysler Restructuring Plan (Executive Summary) at 10, 12 (same). The United States and Canada were "the funding sources" for the transaction, "contributing billions of dollars in funding." *Chrysler Sale Op'n*, 405 B.R. at 96, 99. In particular, the United States and Canada provided a "$6.2 billion loan to New Chrysler to fund the purchase of Old Chrysler's business and its ongoing operations," *id.* at 100, and they "loaned [Chrysler] at least $4 billion prepetition, and nearly $5 billion postpetition." *Id.* at 108.

In sum, AOKI's assumption that Fiat would have spent billions of dollars to merge with Chrysler in the "but for" world is patent speculation, contrary to Fiat's initial term sheet, and accordingly "devoid of a factual basis." *See Evans*, 107 Fed. Cl. at 456 (citing *Iqbal*, 556 U.S. at 678). Nor has AOKI alleged any facts that could support the inference that Fiat would have been willing to acquire Chrysler on terms that would have allowed the plaintiffs' franchises to continue.

---

[12] *See also* FIAT GROUP, 2009 ANNUAL REPORT, at 89 (Mar. 2010) ("The agreement [with Chrysler] does not contemplate any cash investment in Chrysler by Fiat or commitment to fund Chrysler in the future.") (available at http://www.fcagroup.com/en-US/investor_relations/financial_reports/FiatDocuments/Bilanci/2009/Annual_report_totUK_2009.pdf.)

### 3. AOKI Cannot Establish Economic Harm By Alleging That Its Dealerships Would Have Retained Value In An "Orderly Chapter 11 Liquidation" Conditioned Upon Government Financing

AOKI also alleges that its dealerships would have retained value in the "third[,] worst-case scenario" presented in Chrysler's February 17, 2009 restructuring plan. Am. Compl. ¶ 203; *see also id.* at ¶ 200. Under this version of events, AOKI's dealerships would have fared better in an "orderly wind down of [Chrysler]." *Id.* at ¶ 200. "In an orderly liquidation in Chapter 11," AOKI contends, "the valuable brands and assets of Chrysler would *very likely* have been auctioned off through Bankruptcy Code Section 363 asset sales," and "[i]f Chrysler vehicle brands were sold, then some (or potentially all) of the dealers would have been able to continue as going concerns." *Id.* at ¶ 203 (emphasis added); *see also id.* at ¶ 198. According to AOKI, "there would *likely* have been potential bidders, in addition to Fiat." *Id.* ¶ 203 (emphasis added); *see also id.* at ¶ 198. Alternatively, "an orderly Chapter 11 liquidation still would have allowed the Plaintiffs to continue operating their dealerships for an *estimated* period, e.g., twenty-four to thirty months." *Id.* at ¶ 203 (emphasis added).

AOKI's complaint, however, ignores that the "orderly wind down" scenario presented in Chrysler's restructuring plan was conditioned upon Chrysler obtaining approximately *$24 billion* in debtor-in-possession financing over a two-year period from both the Government and private sector lenders. Chrysler Restructuring Plan at 11. Thus, even AOKI's "worst-case scenario" improperly assumes Government assistance. *See* Am. Compl. ¶ 203. Consequently, this allegation, like the allegations in AOKI's first two scenarios, cannot form the basis for establishing economic loss. *See A&D Auto Sales*, 748 F.3d at 1157-58.

Even assuming, however, that AOKI is proposing a "but for" world in which Chrysler pursued an "orderly wind down" without debtor-in-possession financing from the Government,

both of the "orderly liquidation" scenarios alleged by AOKI are conclusory and do not give rise to a reasonable inference of plausibility. *See Iqbal*, 556 U.S. at 681. First, AOKI's assertion that there would "*likely*" have been "potential bidders" for Chrysler's assets in an "orderly Chapter 11 liquidation" is completely unsupported and speculative. *See* Am. Compl. ¶ 203 (emphasis added). AOKI offers no facts or assertions that render this scenario plausible. Because AOKI's reference to "potential bidders" fails to "cross 'the line from conceivable to plausible,'" the Court should dismiss the complaint. *Three S Consulting v. United States*, 104 Fed. Cl. 519, 523 (2012) (quoting *Twombly*, 550 U.S. at 555).

Moreover, the implausibility of AOKI's assumption that Chrysler would have been able to sell its assets to "potential bidders" without Government financing is further reinforced by the bankruptcy court's factual findings. First, the bankruptcy court found that "[t]he economic reality is that no one was willing to lend [to Chrysler] other than the [United States and Canada]." *Chrysler Sale Op'n*, 405 B.R. at 104. The United States and Canada were the "lenders of last resort" because they were the "sole source[s] of any debt or equity funding" for Chrysler. *Id.* at 105; *see also id.* at 106. Ultimately, the court concluded that, absent Government funding, Chrysler would have faced "immediate liquidation." *Chrysler Sale Op'n*, 405 B.R. at 96, 104, 108; *see also id.* at 105, 107-08.

The bankruptcy court also determined that the United States and Canada were the only entities willing and able to provide financing for the purchase of Chrysler's assets, in the form of the Fiat Transaction. *Id.* at 108. As the court noted:

> [T]here had been extensive marketing of [Chrysler] and [its] assets for approximately two years in a highly publicized setting. Any entity that had the resources and interest in either acquiring [Chrysler's assets] or engaging in a strategic partnership with [Chrysler] had the opportunity to perform due diligence. [Chrysler] discussed and negotiated with other [Original

Equipment Manufacturers] concerning the potential for a strategic partnership for the benefit of both parties to any such alliance. The Fiat Transaction was the only alternative available, and better option, to liquidation.

*Id.* at 107; *see also id.* at 96, 105, 108.

The bankruptcy court's factual findings highlight the implausibility of AOKI's allegation that certain unidentified "bidders" would "*likely*" have purchased Chrysler's assets, including plaintiffs' dealership agreements, as part of an "orderly" chapter 11 asset sale. *See* Am. Compl. ¶ 203 (emphasis added). Thus, AOKI has provided no basis on which the Court could reasonably infer that, absent Government funding, Chrysler would have continued to operate, and plaintiffs' dealerships would have maintained their economic value, in an "orderly Chapter 11 liquidation." *See id.*

Furthermore, AOKI's conclusory allegation that plaintiffs' dealerships would have retained "significantly more value" in an "orderly wind down" cannot be squared with Chrysler's February 17, 2009 submission to Treasury. *See id.* at ¶¶ 200, 206. There, Chrysler informed Treasury that an "orderly wind down" would result in "over 3,300 dealers failing." Chrysler Restructuring Plan at 11.

Second, AOKI has failed to allege facts that could support a finding that Chrysler could have liquidated over an "estimated period" of 24 to 30 months absent debtor-in-possession financing from the Government. *See* Am. Compl. ¶ 203. If the Government had not intervened and Chrysler had determined to pursue an "orderly Chapter 11 liquidation," Chrysler would have needed to demonstrate to the bankruptcy court that it had sufficient funds to pay the ongoing, postpetition expenses necessary to administer such a lengthy liquidation. If Chrysler could not show that it had the funding necessary to pay these expenses, Chrysler would have faced prompt dismissal or conversion to chapter 7 under 11 U.S.C. § 1112(b)(1). *See, e.g.*, *Loop Corp. v.*

*United States Trustee*, 379 F.3d 511, 516-17 (8th Cir. 2004) (affirming conversion of liquidating chapter 11 debtors' cases to chapter 7 for cause under section 1112(b)(1) when debtors lacked funds to pay the ongoing expenses of administering the cases); *Nester v. Gateway Access Solutions, Inc. (In re Gateway Access Solutions, Inc.)*, 374 B.R. 556, 564 (Bankr. M.D. Pa. 1983) (converting case to chapter 7 based upon finding of negative cash flow and inability to pay current expenses); *In re 3868-70 White Plains Rd.*, 28 B.R. 515, 518-19 (Bankr. S.D.N.Y. 1983) (dismissing chapter 11 petition on the ground that reorganization was impossible because the debtor's assets were fully collateralized, there was a continuing negative cash flow, and there was no possibility for an infusion of third-party funds). Bankruptcy is not a cost-free scenario, especially for a massive company like Chrysler. *See* Chrysler Restructuring Plan at 167 (identifying billions of dollars in "wind down expenses" and "liquidation costs" that Chrysler would be required to pay as part of an "orderly" chapter 11 "wind down"). Even a debtor in an "orderly" chapter 11 liquidation must pay professional fees and expenses, rents, plant maintenance and security costs, utilities, insurance, employee salaries and benefits, environmental compliance costs, and auction fees and expenses. *See id.*

Here, AOKI has not alleged that Chrysler had the funds necessary to pay these required expenses in a prolonged chapter 11 liquidation. Instead, AOKI alleges that "it is *likely* that Chrysler's secured lenders would have provided *some* Debtor in Possession financing or permitted the use of cash collateral (cash collateral balance at April 30, 2009 filing date was $407 million) to ensure an orderly liquidation." Am. Compl. ¶ 204 (emphasis added).

AOKI's allegation that Chrysler's secured lenders would "likely" have provided debtor-in-possession financing to Chrysler is contradicted by the facts alleged in AOKI's amended complaint. AOKI concedes that, in late 2008, a "global credit crisis dried up the financial

liquidity markets" such that "the credit market was not functioning." *Id.* at ¶¶ 174-75.

Consequently, "there was little, if any, credit available to most businesses," including the auto

industry. *Id.* at ¶ 174; *see also id.* at ¶ 175. Thus, contrary to AOKI's allegation, the debtor-in-

possession financing required for an "orderly Chapter 11 liquidation" simply was not available

from the credit markets. *See id.* at ¶¶ 203-04.

      Furthermore, AOKI's apparent assumption that $407 million was sufficient to fund

Chrysler's operations for an additional 24 to 30 months is inconsistent with Chrysler's February

17, 2009 restructuring plan. *See id.* at ¶ 204. As noted above, Chrysler informed Treasury that,

if the Government rejected Chrysler's funding request and the company decided to pursue an

"orderly" chapter 11 "wind down" (or liquidation), Chrysler would then seek to obtain

approximately *$24 billion* in debtor-in-possession financing over a two-year period from both the

Government and private sector lenders. Chrysler Restructuring Plan at 11. In any event, AOKI

has pled no facts to support its assumptions that (1) Chrysler's secured lenders would "likely"

have provided debtor-in-possession financing – much less *$24 billion* – to Chrysler; or (2) $407

million was sufficient to fund Chrysler's operations for an additional 24 to 30 months. *See* Am.

Compl. ¶ 204.

      The bankruptcy court's findings provide further context for the implausibility of AOKI's

allegations. Although Chrysler had $407 million in cash collateral at the time it filed its petition

for bankruptcy in late April 2009, all of that money had been spent by the time the bankruptcy

court held the sale hearing in late May 2009. *See Chrysler Sale Op'n*, 405 B.R. at 93, 97.

Consequently, the cash collateral could not have sustained Chrysler's operations for an

additional 24 to 30 months. As the Second Circuit noted in its opinion affirming the bankruptcy

court's sale opinion, by the spring of 2009, "Chrysler factories had been shuttered, and the

business was hemorrhaging cash." *Indiana State Police Pension Trust v. Chrysler LLC (In re Chrysler LLC)*, 576 F.3d 108, 119 (2d Cir. 2009) (citation omitted), *cert. granted and judgment vacated on other grounds*, 558 U.S. 1087 (2009); *see also Chrysler Sale Op'n*, 405 B.R. at 96 (noting that Chrysler was "forced to cease operations in order to conserve resources"). Indeed, "Chrysler was losing going concern value of nearly $100 million each day" as the company "produced no cars, yet was obligated to pay rents, overheads, and salaries." *In re Chrysler LLC*, 576 F.3d at 119 (citation omitted). "With its revenues sinking, its factories dark, and its massive debts growing, Chrysler fit the paradigm of the melting ice cube." *Id.* Thus, absent Government funding, Chrysler faced "immediate liquidation." *Chrysler Sale Op'n*, 405 B.R. at 96, 104, 108. Moreover, Chrysler's secured lenders consented to the Government-financed Fiat Transaction notwithstanding an opportunity to provide a competing bid, thus demonstrating that debtor-in-possession financing by secured lenders was not a plausible option. *Id.* at 98.

In any event, AOKI concedes that such an extended liquidation would not have saved plaintiffs' franchises. Instead, AOKI merely alleges that such a liquidation would have permitted plaintiffs to avoid selling their inventory at "fire-sale" prices. Am. Compl. ¶¶ 196, 204. Such an allegation does not rise to the level of a taking. As the Seventh Circuit has recognized, the "loss of future profits is a 'slender reed' upon which to rest a takings claim." *Goodpaster v. City of Indianapolis*, 736 F.3d 1060, 1074 (7th Cir. 2013) (quoting *Andrus v. Allard*, 444 U.S. 51, 66 (1979)). This is particularly true where, as here, a "weak economy supplies an obvious confounding factor." *See id.*

In *Goodpaster*, bar owners alleged a taking of their businesses when a local government prohibited smoking in public places, including bars. 736 F.3d at 1066. In rejecting the taking claim, the Seventh Circuit acknowledged that the bar owners had "demonstrated a decrease in

28

sales since the smoking ordinance went into effect." *Id*. at 1074. Nonetheless, the court, quoting *Andrus v. Allard*, 44 U.S. at 66, held that the "mere loss of future profits is a 'slender reed' upon which to rest a takings claim . . . when an otherwise weak economy supplies an obvious confounding factor." *Goodpaster*, 736 F.3d at 1074. Like the bar owners, AOKI attempts to blame the alleged sale of its inventory at "fire-sale" prices on the Government's conditional financing offering to Chrysler, Am. Compl. ¶¶ 196, 204, notwithstanding AOKI's acknowledgment that, in the midst of an "unprecedented global credit crisis," automobile sales "plummeted" to a 26-year low as loans to auto dealers and consumers came to an "abrupt halt." *Id.* at ¶¶ 174-76. Such an attempt does not give rise to allegations sufficient to establish that the Government's investment in Chrysler had a negative economic impact on the value of plaintiffs' franchises. The Court, therefore, should dismiss the complaint.

> **4.** **In The Alternative, AOKI Is Barred From Claiming That Chrysler Would Have Avoided Bankruptcy But For The Government's Intervention**

In the alternative, the Court should reject AOKI's invitation to relitigate in this Court issues that were conclusively determined by a Federal judge in a prior action in which the former dealers fully participated. *See Chrysler Sale Op'n*, 405 B.R. at 87-88, 109-110; *Chrysler Rejection Op'n*, 406 B.R. at 186-87, 208. Collateral estoppel, even in cases where the cause of action is not identical to that of the previous action, "bars the relitigation of an issue that was raised, litigated, and actually decided by a judgment in a prior proceeding, *regardless of whether the two suits are based on the same cause of action*." *Postlewaite v. McGraw-Hill*, 333 F.3d 42, 48 (2d Cir. 2003) (emphasis added); *see also Montana v. United States*, 440 U.S. 147, 153 (1979) ("Under collateral estoppel, once an issue is actually and necessarily determined by a

court of competent jurisdiction, that determination is conclusive in subsequent suits based on a different cause of action involving a party to the prior litigation.").

The Federal Circuit's holding in *A&D Auto Sales* is fully consistent with applying collateral estoppel to issues actually litigated in the bankruptcy proceeding where "the issue . . . is *identical* to the one decided in the first action." 748 F.3d at 1156 (emphasis in original). Certainly the Federal Circuit's decision on interlocutory appeal in this case did not hold that AOKI may relitigate on remand issues that were conclusively determined in the prior bankruptcy action. Instead, the Federal Circuit held that the bankruptcy court's "*findings on good faith* are not collateral estoppel *on the issue of coercion*." *Id.* (emphasis added). In so holding, the Federal Circuit explained that "[t]he issue before the bankruptcy court was whether New GM and New Chrysler purchased the assets of Old GM and Old Chrysler 'in good faith.'" *Id.* (citations omitted). Thus, the Federal Circuit held, "the bankruptcy court's findings do no estop the plaintiffs *from arguing that the government coerced the automakers into action.*" *Id.* (emphasis added).

The Federal Circuit remanded this case to permit AOKI to amend its complaint with respect to one issue: the alleged economic impact of the Government action. *Id.* at 1158-59. The Federal Circuit held that AOKI had failed to adequately allege that the Government's intervention had any economic impact on the former dealers, and remanded to permit AOKI to attempt to show that "Chrysler would have avoided bankruptcy but for the government's intervention and that the franchises would have had value in that scenario, or that such [a] bankruptc[y] would have preserved some value for the plaintiffs' franchises." *Id.* at 1158. In doing so, the Federal Circuit expressly required AOKI to amend its complaint with respect to the issue of alternatives to a bankruptcy sale transaction financed by the Government – an issue that

has already been decided by the bankruptcy court that presided over Chrysler's bankruptcy. The bankruptcy court, upon considering testimony from numerous witnesses and hundreds of thousands of pages of evidence, unequivocally found that "[t]he only other alternative [to the Government-financed Fiat Transaction] is the *immediate liquidation of the company*." *Chrysler Sale Op'n*, 405 B.R. at 96 (emphasis added); *see also id.* at 104 ("in the current economic climate, the only alternative [to the Fiat Transaction] would be an *immediate liquidation*") (emphasis added); *id.* at 108 ("The only other available alternative [to the Fiat Transaction] was *immediate liquidation*.") (emphasis added). In such a scenario, all of the dealers' contracts would have been automatically rejected within 60 days after filing of the bankruptcy petition. 11 U.S.C. § 365(d)(1).

Accordingly, AOKI is now barred from claiming that Chrysler would have avoided an "immediate liquidation" absent Government intervention. *See, e.g.*, *United States v. Stauffer Chemical Co.*, 464 U.S. 165, 170-71 (1984) ("[T]he doctrine of collateral estoppel can apply to preclude relitigation of both issues of law and issues of fact if those issues were conclusively determined in a prior action.").

**C.    Even Assuming AOKI Has Adequately Pled *Some* Form Of Economic Loss, The Complaint Should Nonetheless Be Dismissed Because AOKI Has Not Alleged Facts Showing That It Can Satisfy The Other Elements Of The *Penn Central* Regulatory Taking Test**

As demonstrated above, AOKI has again failed to adequately plead the economic loss required to establish a regulatory taking. Thus, AOKI has not cured the deficiency expressly identified by the Federal Circuit in its decision on interlocutory appeal, and the amended complaint should be dismissed. *See A&D Auto Sales*, 748 F.3d at 1158-59.

Even assuming, however, that AOKI has pled facts sufficient to show that the former dealers would have retained *some* economic value absent Government intervention (which it has

not), the complaint should nonetheless be dismissed because AOKI has failed to allege facts showing that it can satisfy the other two elements of the *Penn Central* regulatory taking test – interference with investment-backed expectations, and character of the Governmental action. Thus, even if the Court were to conclude that AOKI's failure to adequately plead the "economic impact" factor of the *Penn Central* analysis is not independently sufficient to require dismissal of the complaint, AOKI's inadequate showing on each of the three factors of the *Penn Central* balancing test requires dismissal.

### 1. AOKI Has Not Sufficiently Alleged That It Reasonably Expected Its Franchises To Survive Absent Government Action

AOKI has failed to allege facts sufficient to demonstrate that it can satisfy the second prong of the *Penn Central* balancing test – interference with reasonable investment-backed expectations.

A regulatory taking analysis requires consideration of "the extent to which the regulation has interfered with distinct investment-backed expectations." *Penn Central*, 438 U.S. at 124. A "taking does not lie where the restriction 'did not interfere with interests that were sufficiently bound up with the reasonable expectations of the claimant.'" *Cienega Gardens v. United States*, 503 F.3d 1266, 1289 (Fed. Cir. 2007) (quoting *Penn Central*, 438 U.S. at 124). "The purpose of consideration of plaintiffs' investment-backed expectations is to limit recoveries to property owners who can demonstrate that 'they bought their property in reliance on a state of affairs that did not include the challenged regulatory regime.'" *Cienega Gardens v. United States*, 331 F.3d 1319, 1345-46 (Fed. Cir. 2003) (quoting *Loveladies Harbor, Inc. v. United States*, 28 F.3d 1171, 1177 (Fed. Cir. 1994)).

To support a regulatory taking claim, the plaintiff's "investment-backed expectation must be 'reasonable.'" *Id.* at 1346 (quoting *Ruckelshaus v. Monsanto Co.*, 467 U.S. 986, 1005

(1984)).  That is, the plaintiff's expectation "must be more than a 'unilateral expectation or an abstract need.'"  *Monsanto*, 467 U.S. at 1005-06 (internal citation omitted).  The plaintiff has the burden "to establish a reasonable investment-backed expectation in the property at the time it made the investment."  *Cienega Gardens*, 503 F.3d at 1288 (citing *Forest Props., Inc. v. United States*, 177 F.3d 1360, 1367 (Fed. Cir. 1999)).  Thus, the Court examines "what, under all the circumstances, the [plaintiff] should have anticipated."  *A&D Auto Sales*, 748 F.3d at 1159 (quoting *Cienega Gardens*, 331 F.3d at 1346).

The Government's investment in Chrysler did not interfere with plaintiffs' investment-backed expectations because at the time they executed their dealership agreements, they were aware (or should have been aware) that if Chrysler later sought bankruptcy protection, their agreements would be subject to termination or a loss in value, including potentially all of their value.  Federal bankruptcy laws, which allow debtors like Chrysler to reject executory contracts, have existed since the nineteenth century, long before Chrysler was incorporated, and long before AOKI's dealership agreements were signed.  *See* Bankruptcy Act of 1898, ch. 541, 30 Stat. 544 (formerly codified throughout 11 U.S.C.) (bankruptcy statute passed pursuant to authority to enact "uniform Laws on the subject of Bankruptcies" under Article I, § 8 of the U.S. Constitution); Am. Compl. ¶ 170 (Chrysler was founded in 1925).  Thus, AOKI's ability to perform its dealer contracts was always contingent upon the continued viability of Chrysler and its ability to avoid bankruptcy.  *See Chang v. United States*, 859 F.2d 893, 897 (Fed. Cir. 1988) (rejecting plaintiffs' claim that the Libyan Sanction Regulations interfered with distinct investment-backed expectations because plaintiffs' ability to perform their employment contracts with a Libyan oil company was "contingent upon the continuation of friendly relations between" the United States and Libya).

Accordingly, AOKI has not alleged, and cannot allege, facts demonstrating that it reasonably expected to continue operating its dealerships or to retain the dealership agreements' value when Chrysler faced collapse and sought bankruptcy protection. Indeed, if the Government had not intervened, Chrysler would have faced "immediate liquidation." *Chrysler Sale Op'n*, 405 B.R. at 96, 104, 108; *see also id.* at 105, 107-08. Thus, in that scenario, AOKI could not have expected to receive the full value of its executory contracts. Instead, AOKI could only have expected (1) that its dealer contracts would be automatically rejected within 60 days after filing of the bankruptcy petition, 11 U.S.C. § 365(d)(1); and (2) to receive what it ultimately obtained: potential claims under 11 U.S.C. § 365 – similar to breach claims – that could have been brought in bankruptcy against its original counterparty, Old Chrysler. *See Chrysler Rejection Op'n*, 406 B.R. at 190, 196, 199 n.24; 11 U.S.C. § 365(g); *see also A&D Auto Sales*, 748 F.3d at 1149.

Because AOKI could not have had a reasonable investment-backed expectation that its dealership agreements would be continued absent Government action, *see A&D Auto Sales*, 748 F.3d at 1159, the Court may dispose of AOKI's regulatory taking claim on this basis alone. *See, e.g.*, *Monsanto*, 467 U.S. at 1005-06 (finding that "the force of [the reasonable expectations] factor is so overwhelming . . . that it disposes of the taking question," where the plaintiff "could not have had a reasonable, investment-backed expectation"); *Golden Pac. Bancorp v. United States*, 15 F.3d 1066, 1074 (Fed. Cir. 1994) (concluding that the absence of reasonable investment-backed expectations was dispositive of a taking claim).

**2. *Penn Central's* "Character Of The Governmental Action" Prong Plainly Weighs In Favor Of The Government Because AOKI's Complaint Concedes That Chrysler Would Not Have Avoided Bankruptcy Absent Government Intervention**

The third prong of the *Penn Central* balancing test requires the Court to analyze the character of the Governmental action by considering "'the actual burden imposed on property rights, or how that burden is allocated.'" *Rose Acre Farms, Inc. v. United States*, 559 F.3d 1260, 1278 (Fed. Cir. 2009) (quoting *Lingle*, 544 U.S. at 543). In this case, AOKI concedes that, in 2008, the United States was part of a "global economic downturn" and "unprecedented global credit crisis." Am. Compl. ¶ 174. As a result, the credit markets were not functioning, and auto sales "plummeted" to the lowest level in 26 years. *Id.* at ¶¶ 175-76. AOKI also acknowledges that the Government committed $80.7 billion to "avoid a disorderly bankruptcy of one or more automotive companies.'" *Id.* at ¶ 179; *see also id.* at ¶ 183. Consistent with this admission, the bankruptcy court held that the only alternative to a Government-financed bankruptcy was "the immediate liquidation of [Chrysler]." *Chrysler Sale Op'n*, 405 B.R. at 96; *see also id.* at 104, 108. The United States and Canada were the "lenders of last resort" because they were the "sole source of any debt or equity funding" for Chrysler. *Id.* at 105. Similarly, the bankruptcy court acknowledged that unsecured creditors, a category that included the dealers, were better off under the bankruptcy plan that was actually implemented than they would have been had Chrysler liquidated. *Id.* at 109-110. Thus, to the extent a burden was imposed on AOKI, it was a product of the economy and Chrysler's condition – not the result of Government action. The character of the Government's actions – as rescue lender – cannot support a taking claim.

Accordingly, AOKI has failed to allege any facts that would permit the Court to conclude that the character of the Governmental action weighs in favor of plaintiffs in this case. To the contrary, AOKI acknowledges that the Government invested more than $80 billion in the

domestic automotive industry, including $14 billion in Chrysler and its financing arm, to "avoid a disorderly bankruptcy." Am. Compl. ¶¶ 179, 183. Thus, absent Government intervention, Chrysler would have declared bankruptcy, as AOKI acknowledges. Consequently, AOKI's amended complaint affirmatively recognizes that the Government, in rescuing the auto industry, did not allocate any additional burden, much less an undue burden, to the dealers. Indeed, were the Court to find otherwise, it "would have the effect of creating a disincentive for the government" to take "publicly beneficial" actions. *See Rose Acre Farms*, 559 F.3d at 1283 (quoting *Maritrans, Inc. v. United States*, 342 F.3d 1344, 1357 (Fed. Cir. 2003)).

## CONCLUSION

For these reasons, the Court should dismiss AOKI's amended complaint for failure to state a claim upon which relief may be granted.

Respectfully submitted,

JOYCE R. BRANDA
Acting Assistant Attorney General

s/ Robert E. Kirschman, Jr.
ROBERT E. KIRSCHMAN, JR.
Director

s/ Kenneth M. Dintzer
KENNETH M. DINTZER
Acting Deputy Director
Commercial Litigation Branch
Civil Division
Department of Justice
P.O. Box 480
Ben Franklin Station
Washington, D.C. 20044
(202) 616-0385
(202) 307-0972 fax
kenneth.dintzer@usdoj.gov

OF COUNSEL:

ELIZABETH M. HOSFORD
Senior Trial Counsel

SETH W. GREENE
Trial Attorney

December 15, 2014

Attorneys for Defendant