## IN THE UNITED STATES COURT OF FEDERAL CLAIMS

|  |  |  |
|---|---|---|
| Alley's of Kingsport, Inc., et al., | ) | |
| | ) | |
| Plaintiffs, | ) | Case No. 11-100 |
| | ) | Hon. Nancy B. Firestone |
| v. | ) | |
| | ) | |
| United States, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## PLAINTIFFS' OPPOSITION TO DEFENDANT'S MOTION TO DISMISS

Nancie G. Marzulla
Roger J. Marzulla
MARZULLA LAW LLC
1150 Connecticut Avenue, NW
Suite 1050
Washington, DC 20036
(202) 822-6760 (telephone)
(202) 822-6774 (facsimile)

Counsel for Plaintiffs

February 17, 2015

Of counsel:

Thomas A. Holman
HOLMAN LAW, P.C.
99 Park Avenue
Suite 2600
New York, NY 10016
(212) 481-1336 (telephone)
(212) 481-1333 (facsimile)

Leonard A. Bellavia
BELLAVIA BLATT &
CROSSETT P.C.
200 Old Country Road
Mineola, NY 11501
(516) 873-3000 (telephone)
(516) 873-9032 (facsimile)

## Table of Contents

Table of Authorities ........................................................................................................ iii

Plaintiffs' Opposition to Defendant's Motion to Dismiss ................................................1

Issues Presented for Review ............................................................................................2

Summary of argument .....................................................................................................2

Factual background ..........................................................................................................7

    1.     To protect the national economy during the 2008-2009 credit crisis, the President gave Chrysler a three-month loan to either restructure or file an orderly bankruptcy ................................................................................................7

    2.     Chrysler never planned to terminate any Dealers because dealerships were a profit center for the company ...........................................................................9

    3.     The Government requires Chrysler to shut down 25% of its Dealers .................10

    4.     Chrysler dealers continued to sell cars until the day the Government required that they be shut down .............................................................................10

Procedural History .........................................................................................................12

ARGUMENT

I.     Except for the new allegations on economic impact, to the extent that this motion addresses allegations in the original complaint, this motion is barred by the Federal Circuit's holding, which is law of the case ......................................................13

II.    In its Rule 12(b)(6) motion the Government asks this Court to make factual findings that impermissibly contradict the allegations of the Complaint ...............................15

    A.    Standard of Review ................................................................................15

    B.    Allegations in the Complaint .................................................................16

    C.    As this Court previously held, Dealers' allegations in this taking case are not barred by collateral estoppel ...............................................................20

III.   The Complaint adequately and plausibly alleges substantial economic loss caused by the Government's termination requirement ...........................................................23

    A.    The Government ignores the Complaint's allegations that the Dealers' businesses

were profitable in 2009 .......................................................................................24

B.      Chrysler's restructuring plan identified three alternatives to save the company
        without terminating any Dealers' franchises..........................................................25

C.      The Complaint alleges that after the Government forced Chrysler to abruptly
        terminate 25% of its dealerships, these Dealers' businesses were destroyed,
        depriving the Dealers of all economically beneficial or productive use of their
        businesses...............................................................................................................30

D.      The Federal Circuit did not prohibit Dealers from alleging economic loss..........32

IV.   The Government incorrectly analyzes the reasonable expectations and character of the
      government action elements of the *Penn Central* test ......................................................34

A.      When they acquired their franchises, Dealers should not have reasonably expected
        that the Government would shut them down ..........................................................35

B.      The character of the Government's action—shutting down Dealers' auto sales and
        service businesses—weighs in favor of a taking ...................................................38

Conclusion ....................................................................................................................................40

Table of Authorities

**Cases**

*A & D Auto Sales, Inc. v. United States*,
748 F.3d 1142 (Fed. Cir. 2014) ................................................................ passim

*Appolo Fuels, Inc. v. United States*,
381 F.3d 1338 (Fed. Cir. 2004) ............................................................ 35, 36

*Armstrong v. United States*,
364 U.S. 40 (1960) ............................................................................... 38

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) ............................................................................. 16

*Banks v. United States*,
741 F.3d 1268 (Fed. Cir. 2014) .......................................................... 2, 14

*Bell Atlantic Corp. v. Twombly*,
550 U.S. 544 (2007) ........................................................................ 15, 16

*Banks v. United States*,
98 Fed. Cl. 123 (2011) .......................................................................... 2

*Boeing Co. v. United States*,
31 Fed. Cl. 289 (1994) .......................................................................... 6

*Boise Cascade Corp. v. United States*,
296 F.3d 1339 (Fed. Cir. 2002) ........................................................... 31

*Briggs v. Pa. R. Co.*,
334 U.S. 304 (1948) .......................................................................... 2, 14

*Brown v. Legal Found. of Washington*,
538 U.S. 216 (2003) ............................................................................. 33

*Cambridge v. United States*,
558 F.3d 1331 (Fed. Cir. 2009) ........................................................... 15

*Cedars-Sinai Med. Ctr. v. Watkins*,
11 F.3d 1573 (Fed. Cir. 1993) ............................................................. 26

*Cienega Gardens v. United States*,
331 F.3d 1319 (Fed. Cir. 2003) ........................................................ 6, 35

*Collins v. United States*,
101 Fed. Cl. 435 (2011) ................................................................ 4, 5, 15

*Copeland v. Merrill Lynch & Co.*,
  47 F.3d 1415 (5th Cir. 1995) ........................................................ 21

*Dewsnup v. Timm*,
  502 U.S. 510 (1992) .................................................................... 32

*Edgar v. United States*,
  145 Ct. Cl. 9 (1959) .................................................................... 22

*Forest Props., Inc. v. United States*,
  177 F.3d 1360 (Fed. Cir. 1999) ................................................. 32, 33

*Gould, Inc. v. United States*,
  67 F.3d 925 (Fed. Cir. 1995) ...................................................... 2, 13

*Gould, Inc. v. United States*,
  935 F.2d 1271 (Fed. Cir. 1991) ..................................................... 15

*Hendler v. United States*,
  175 F.3d 1374 (Fed. Cir. 1999) ..................................................... 32

*In re Chrysler LLC*,
  405 B.R. 84 (Bankr. S.D.N.Y. 2009) .............................................. 39

*In re Sanford Fork & Tool Co.*,
  160 U.S. 247 (1895) .................................................................... 14

*In Re: OLD CARCO LLC.*,
  2009 WL 5131557 (Bankr. S.D.N.Y 2009) .............................. passim

*Ind. State Police Pension Trust v. Chrysler, LLC*,
  556 U.S. 960 (2009) .................................................................... 23

*Int'l Paper Co. v. United States*,
  282 U.S. 399 (1931) .................................................................... 39

*Resource Investments, Inc. v. United States*,
  85 Fed. Cl. 447 (2009) ............................................................... 6, 7

*Kimball Laundry Co. v. United States*,
  338 U.S. 1 (1949) ..................................................................... 7, 31

*Lerner v. Fleet Bank, N.A.*,
  318 F.3d 113 (2d Cir. 2003) ......................................................... 15

*Liquidation Trust v. Daimler AG (In re Old CarCo LLC),*,
  509 Fed. Appx. 77 (2d Cir. 2013) .................................................. 32

v

*Louisville Jt. Stock Land Bank v. Radford*,
    295 U.S. 555 (1935) ........................................................................... 37, 39

*Love Terminal Partners v. United States*,
    97 Fed. Cl. 355 (2011) ............................................................................. 15

*Loveladies Harbor, Inc. v. United States*,
    28 F.3d 1171 (Fed. Cir. 1994) ................................................................. 35

*Lucas v. S.C. Coastal Council*,
    505 U.S. 1003 (1992) .............................................................................. 4, 34

*Lynch v. United States*,
    292 U.S. 571 (1934) ................................................................................. 39

*Maritrans, Inc. v. United States*,
    342 F.3d 1344 (Fed. Cir. 2003) ............................................................... 35

*McGuire v. United States*,
    707 F.3d 1351 (Fed. Cir. 2013) ............................................................... 22

*Mehaffy v. United States*,
    499 F. App'x 18 (Fed. Cir. 2012) .............................................................. 6

*Norman v. United States*,
    63 Fed. Cl. 231 (2004) ............................................................................. 35

*Papasan v. Allain*,
    478 U.S. 265 (1986) ................................................................................. 15

*Penn Cent. Transp. Co. v. City of New York*,
    438 U.S. 104 (1978) ............................................................................... 6, 34

*Petro-Hunt, L.L.C. v. United States*,
    90 Fed. Cl. 51 (2009) ............................................................................... 16

*Rose Acre Farms, Inc. v. United States*,
    373 F.3d 1177 .......................................................................................... 35

*Rose Acre Farms, Inc. v. United States*,
    559 F.3d 1260 (Fed. Cir. 2009) ............................................................... 38

*Ruckelshaus v. Monsanto Co.*,
    467 U.S. 986 (1984) ................................................................................. 40

*Scheuer v. Rhodes*,
    416 U.S. 232 (1974) ................................................................................... 3

*Seiber v. United States*,
    364 F.3d 1356 (Fed. Cir. 2004) ........................................................................... 33

*Shelden v. United States*,
    7 F.3d 1022 (Fed. Cir. 1993) ........................................................................ 31, 39

*United States v. Gen. Motors Corp.*,
    323 U.S. 373 (1945) ..................................................................................... 7, 40

*Vaher v. Town of Orangetown*,
    916 F. Supp. 2d 404 (S.D.N.Y. 2013) .................................................................. 3

**Statutory Authority**

28 U.S.C. § 1491 .......................................................................................... 21

Bankruptcy Code Section 363 ............................................................... 19, 28

**Other Authority**

Carla Wong McMilian, *What Will it Take to Get You in a New Car Today?:  A Proposal for a New Federal Automobile Dealer Act*,
    45 Gonz. L. Rev. 67 (2010) ............................................................................. 6, 36

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

|  |  |  |
|---|---|---|
| Alley's of Kingsport, Inc., et al., | ) | |
| | ) | |
| Plaintiffs, | ) | Case No. 11-100 |
| | ) | Hon. Nancy B. Firestone |
| v. | ) | |
| | ) | |
| United States, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

**PLAINTIFFS' OPPOSITION TO DEFENDANT'S MOTION TO DISMISS**

In the Complaint,[1] as amended, tested in this motion to dismiss, Plaintiffs, 170 terminated Chrysler franchisees (collectively, "the Dealers"), have added 10 paragraphs concerning only one topic—economic impact.  The rest of the Complaint is unchanged.  Yet the Government directs its motion to dismiss the entire Complaint, making the same arguments it made in its original motion to dismiss, arguments that this Court has denied, and denied again on a motion for reconsideration.  The Federal Circuit affirmed these rulings on appeal (except as to economic impact).  These rulings are now law-of-the-case, and the Government is not free to relitigate over and over again issues previously ruled on.  The Government's motion to dismiss also ignores the standard of review for Rule 12(b)(6) motions, which only tests the legal sufficiency of the Dealers' claims but does not require this Court to decide the truthfulness or the merits of factual issues.

---

[1] Except as noted, this brief refers to the current amended complaint, which has been amended five times, as the Complaint.  Fifth Amended Complaint (February 5, 2015) (Doc. 106-1) ("Amend. Compl.").

**Issues Presented for Review**

1.       Most of the arguments raised by the Government in this motion were rejected by this Court, and the Federal Circuit.  The only new allegations in the amended complaint concern whether "the economic value of the plaintiffs' franchises was reduced or eliminated as a result of the government's actions."[2]  Is the Government barred by law-of-the-case from rearguing issues already ruled on—other than the new allegations of economic impact of the Government action?

2.       Under Rule 12(b)(6), resolving all reasonable doubts and inferences in the pleader's favor, a claim may be dismissed because it asserts a legal theory that is not cognizable as a matter of law or because the factual allegations do not plausibly establish a claim. These Dealers have plausibly alleged that the Government's requirement that Chrysler terminate their dealerships destroyed their profitable businesses that had value even without federal intervention.  Should this motion be denied?

**SUMMARY OF ARGUMENT**

"The law of the case is a judicially created doctrine, the purposes of which are to prevent the relitigation of issues that have been decided and to ensure that trial courts follow the decisions of appellate courts."[3]  Under the doctrine of law of the case,

> [w]hen a case has been once decided by [a superior court,] . . . [t]he [lower court] is bound by the decree as the law of the case, and must carry it into execution according to the mandate. That court cannot vary it, or examine it for any other purpose than execution; or give any other or further relief; or review it, even for apparent error, upon any matter decided on appeal; or intermeddle with it . . . .[4]

Likewise, the Federal Circuit has also held that the mandate rule, which is "encompassed by the broader law-of-the-case doctrine, dictates that 'an inferior court has no power or authority to deviate from the mandate issued by an appellate court.'"[5]

---

[2] *A & D Auto Sales, Inc. v. United States*, 748 F.3d 1142, 1147 (Fed. Cir. 2014).
[3] *Gould, Inc. v. United States*, 67 F.3d 925, 930 (Fed. Cir. 1995).
[4] *Banks v. United States*, 98 Fed. Cl. 123, 125–126 (2011).
[5] *Banks v. United States*, 741 F.3d 1268, 1276 (Fed. Cir. 2014) *(quoting Briggs v. Pa. R. Co.*, 334 U.S. 304, 306 (1948))

This Court's ruling that the Dealers' Complaint—which is identical to the complaint at issue in the earlier motion to dismiss except for the additional allegations on economic impact—does state a claim for relief (except as to economic impact) is the law-of-the-case and under the mandate rule.  The Government is therefore not free to relitigate these issues again.

Yet by this motion, the Government attempts to do just that—to relitigate issues previously ruled on by the court in denying an earlier motion to dismiss and a motion for reconsideration.[6]  Those rulings were affirmed by the Federal Circuit on appeal:

> [W]e reject the government's arguments for dismissal. While we hold that the complaints are deficient because they do not sufficiently allege that the economic value of the plaintiffs' franchises was reduced or eliminated as a result of the government's actions, we nonetheless affirm the Claims Court's decision to deny dismissal at this point in the proceedings. The proper remedy is to grant the plaintiffs leave to amend their complaints to include the necessary allegations, and on remand the Claims Court shall do so.[7]

This Court should therefore deny the Government's motion as barred by the law-of-the-case doctrine and the mandate rule, except for the economic impact issue.

As for the economic impact allegations in the Amended Complaint, the Government misconstrues the *Twombly* and *Iqbal* decisions as a license to challenge the truth or merits of Dealers' allegations, ignoring the proper standard of review.  But "the question on a Rule 12(b)(6) motion is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims."[8]  When considering a Rule 12(b)(6) motion to dismiss, the court must "accept as true all factual allegations in the complaint, and indulge all

---

[6] Order and Opinion (April 12, 2012) (Doc. 44).
[7] *A & D Auto Sales, Inc.*, 748 F.3d at 1157.
[8] *Vaher v. Town of Orangetown,* 916 F. Supp. 2d 404, 423 (S.D.N.Y. 2013) (quoting *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974)).

reasonable inferences in favor of the non-movant to evaluate whether plaintiff has stated a claim upon which relief can be granted."[9]

The Complaint plausibly alleges that the Dealers' franchises were valuable before the Government shut them down, as reflected in the restructuring plan Chrysler prepared and filed with the Government, which called for all of its authorized dealers to stay in business.[10] The Complaint also alleges that the Dealers were selling and servicing thousands of Chrysler autos every day, and that their franchises were profitable—up to the date that their businesses were order to shut down. Finally, the Complaint alleges that Chrysler had signed a memorandum of understanding with Fiat for merger,[11] under which Chrysler would have avoided bankruptcy. Alternatively, the Complaint alleges that Chrysler could have still maintained its full complement of dealerships to service the 31 million Chrysler vehicles on the road, under the Suzuki model (discontinuing manufacture but continuing dealers' authorized service of existing vehicles, approved by the bankruptcy court).

Finally, the Complaint alleges a per se regulatory taking under *Lucas v. South Carolina Coastal Council*.[12] The facts alleged show that the Government's requirement that Chrysler terminate 25% of its dealerships left these Plaintiff Chrysler Dealers' auto sales and service businesses with no economically beneficial or productive use. Throughout 2009 and during the time the Government made the decision to impose the termination requirement on Chrysler as a condition of obtaining the federal bail-out funds, these Dealers were selling and servicing

---

[9] *Collins v. United States*, 101 Fed. Cl. 435, 443 (2011).

[10] The restructuring plan is available at http://www.treasury.gov/initiatives/financial-stability/TARP-Programs/automotive-programs/Documents/chryslerRestCoverSum.pdf.

[11] Amend. Compl. ¶202.

[12] *Lucas v. S.C. Coastal Council*, 505 U.S. 1003 (1992).

thousands of vehicles per day throughout 2009, generating significant cash flow that made their dealerships far from worthless.[13]  Resolving all reasonable doubts and inferences in the Dealers' favor, these facts, must be taken as true in deciding this motion.[14]  The Government's disagreement with the truthfulness of these allegations, and its attempts to convince the Court that the Dealers' claims may not prevail on the merits, have no place in the context of a Rule 12(b)(6) motion.

The Government is wrong in its contention that the Federal Circuit's opinion prohibits Dealers from alleging that their businesses had economic value before the Government shut them down, whether or not the Government gave financial assistance to Chrysler.  The Government, notably, points to no language in the Federal Circuit's decision so stating.  Likewise, there is nothing in the Federal Circuit's decision holding that a loan arrangement between the Government and Chrysler relieved the Government of its Fifth Amendment duty to pay just compensation to the Dealers for the taking of their property rights.  The Dealers were not parties to the loan agreement and received no benefit from it.

Finally, the Dealers believe that the applicability of the *Penn Central* test is not before this Court on this motion to dismiss because the Court rejected this argument in the first motion to dismiss, and the Federal Circuit has affirmed that decision.[15]  The Government cites no

---

[13] FCA (Fiat Chrysler Automobiles), 2009 Chrysler Group LLC U.S. Sales Archive (Dec. 1, 2009), available at
http://media.chrysler.com/newsrelease.do;jsessionid=87A70E2714E000E0A322C8A7E0422FB6
?&id=8480&mid=1; FCA (Fiat Chrysler Automobiles), Award-winning Month Drives Chrysler Group LLC's December U.S. Sales (Jan. 5, 2010), available at
http://media.chrysler.com/newsrelease.do?id=9330&mid=&searchresult.
[14] *Collins*, 101 Fed. Cl. at 443.
[15] *A & D Auto Sales*, 748 F.3d at 1156–1158.

extraordinary circumstances that would allow it to file a second motion to dismiss on the same grounds.[16]

The Government also misconstrues the *Penn Central* factors (reasonable, investment-backed expectations and character of the Government's action), arguing incorrectly that the reasonableness of the Dealers' investments in their businesses should be tested at the time of the taking—which would be nonsensical.[17]  The correct rule is that "reasonable investment-backed expectations are measured at the time the claimant acquires the property."[18]  The Government offers no reason why the Dealers, at the time they acquired their franchises (in some cases decades ago), should have reasonably expected that the Government would one day require Chrysler to terminate 25% of its franchises—particularly in light of the heightened protection given their franchises by state statutes protecting auto dealerships.[19]

The Government further misunderstands the character of the Government action test.  As this Court has observed, the Government may act with an entirely legitimate purpose, but still be required to pay just compensation:  "Congress' purpose in enacting the statutes may have been entirely legitimate but the government has not shown that the actions Congress took . . . were within its powers to exercise without also granting compensation."[20]  "Thus, this court recognizes that the mere purpose of the government action being beneficial or deriving from a[n]

---

[16] *See The Boeing Co. v. United States*, 31 Fed. Cl. 289, 292 (1994).

[17] *Penn Cent. Transp. Co. v. City of New York*, 438 U.S. 104, 107 (1978).

[18] *Mehaffy v. United States,* 499 F. App'x 18, 22 (Fed. Cir. 2012).

[19] *See* Third Amend. Compl. Appx. I (Aug. 17, 2012)(Doc. 60-1); Carla Wong McMilian, *What Will it Take to Get You in a New Car Today?:  A Proposal for a New Federal Automobile Dealer Act*, 45 Gonz. L. Rev. 67, 73 n.33 (2010) (collecting statutes).

[20] *Res. Investments, Inc. v. United States*, 85 Fed. Cl. 447, 517 (2009) (quoting *Cienega Gardens v. United States*, 331 F.3d 1319, 1338–1339 (Fed. Cir. 2003).

intent to help the public does not immunize the government's actions under this prong of *Penn Central*."[21]  In assessing the character of the Government's action, the Court "must consider the nexus between the regulation and its effects, looking at 'the relative benefits and burdens associated with the regulatory activity.'"[22]

Therefore, even if this Court did conclude that it should review the Government's *Penn Central* argument again—which the Dealers do not concede it should—this Court should hold that the Government's contentions are without merit.  The allegations in the Complaint confirm that the character of the Government's action is regulatory, and per se confiscatory—the destruction of the Dealers' auto sales and service businesses—which the Federal Circuit, this Court, and the Supreme Court, have held in a variety of contexts constitutes a taking.[23]

For all of these reasons, this Court should deny the Government's motion to dismiss.

**FACTUAL BACKGROUND**

1.  **To protect the national economy during the 2008-2009 credit crisis, the President gave Chrysler a three-month loan to either restructure or file an orderly bankruptcy**

The economic slowdown of 2008–2009 was a national credit crisis affecting the entire U.S. economy.[24]  Banks were unwilling or unable to loan money, so consumers were unable to purchase cars, homes, appliances and other items they would generally finance (including credit

---

[21] *Res. Investments, Inc.*, 85 Fed. Cl. at 517.

[22] *Id.*

[23] *United States v. Gen. Motors Corp.*, 323 U.S. 373, 378 (1945) ("The constitutional provision [of the just compensation clause] is addressed to every sort of interest the citizen may possess."); *see, e.g.*, *Kimball Laundry Co. v. United States*, 338 U.S. 1, 16 (1949) (finding the displacement of a laundry company's profitable trade routes to be a compensable taking).

[24] *See* U.S. Department of the Treasury, *Why TARP was Necessary*, available at http://www.treasury.gov/initiatives/financial-stability/about-tarp/Pages/Why-TARP-was-Necessary.aspx.

card purchases).[25]  The economic crisis was not just a single-industry crisis, nor a Chrysler/GM

crisis—it affected all kinds of businesses and industries that depended on credit, as the

Government admitted in its Answer:[26]

> A global financial crisis occurred in the fall of 2008.  The crisis involved the
> failure of several major financial institutions, including Lehman Brothers.  The
> crisis also included and/or resulted in a dramatic reduction in the availability of
> private-sector capital and credit.  The commercial paper market, a vital source of
> funding for many businesses, was severely disrupted.  Virtually all instruments
> backed by consumer loans, such as auto loans, credit card receivables, and
> home-equity lines of credit collapsed.  In addition, banks tightened standards
> and sharply curtailed the issuance of new loans.[27]

On December 19, 2008, President Bush announced that the Government would extend

short-term financial aid to the auto industry, stating that collapse of that industry

> would deal an unacceptably painful blow to hardworking Americans far beyond
> the auto industry,  it would worsen a weak job market and exacerbate the
> financial crisis.  It could send our suffering economy into a deeper and longer
> recession.[28]

Stating his belief that this short-term loan would give the auto companies an incentive to

restructure outside of bankruptcy—and a brief window in which to do it—the President

explained:

> These loans will provide help in two ways. First, they will give automakers three
> months to put in place plans to restructure into viable companies—which we
> believe they are capable of doing. Second, if restructuring cannot be
> accomplished outside of bankruptcy, the loans will provide time for companies
> to make the legal and financial preparations necessary for an orderly Chapter 11

---

[25] *Id.*

[26] Def.'s Answer to Pls.' Amend. Compl. ¶81 (Doc. 45) (April 27, 2012).

[27] *Id.*

[28] President George W. Bush, Remarks on the United States Auto Industry (Dec. 19, 2008),
available at http://www.gpo.gov/fdsys/pkg/PPP-2008-book2/html/PPP-2008-book2-doc-
pg1499.htm.

process that offers a better prospect of long-term success—and gives consumers confidence that they can continue to buy American cars.[29]

The federal government's loan program did not provide anything to Plaintiff Dealers, nor did it include a requirement that Chrysler terminate any of its franchised dealerships.

**2.      Chrysler never planned to terminate any Dealers because dealerships were a profit center for the company**

In 2007 Chrysler had begun a voluntary program of Dealer consolidation, named Project Genesis.[30]  The program was necessarily voluntary because statutes in all states prohibited Chrysler from terminating its Dealers' franchises without good cause.  And since Dealers are the only customers Chrysler has (purchasing vehicles from Chrysler to sell to the public), Chrysler had no interest in terminating any Dealer:

> Chrysler officials themselves told SIGTARP [the Special Inspector General for TARP] that closing dealerships too quickly would have an adverse effect on sales. Chrysler officials said that they expected that their rapid terminations would result in lost sales in the short term, that Chrysler will take several years to recover lost sales, and that future increases in market share will depend on penetrating new markets.[31]

And that is why when, two months after President Bush announced that the Government would extend TARP aid to the auto industry, Chrysler filed its proposed restructuring plan with the Treasury Department[32] as its loan agreement required.  That plan "did not call for the

---

[29] President George W. Bush, Remarks on the United States Auto Industry (Dec. 19, 2008), available at http://www.gpo.gov/fdsys/pkg/PPP-2008-book2/html/PPP-2008-book2-doc-pg1499.htm.

[30] Chrysler's Project Genesis: *Trim Models, Consolidate Dealers* (Feb. 7, 2008) available at http://www.autoblog.com/2008/02/07/chryslers-project-genesis-trim-models-consolidate-dealers/

[31] Amend. Compl. ¶201.

[32] The restructuring plan is available at http://www.treasury.gov/initiatives/financial-stability/TARP-Programs/automotive-programs/Documents/chryslerRestCoverSum.pdf.

termination of any of Plaintiffs' dealer franchises."[33]

### 3.    The Government requires Chrysler to shut down 25% of its Dealers

But on March 30, 2009, the Government "rejected the Chrysler Restructuring Plan . . . and commanded Chrysler to 'rationalize' its dealer network by terminating a substantial number of dealer franchises using Section 365 of the Bankruptcy Code."[34]  So on May 14, 2009, in compliance with the Government's restructuring plan, Chrysler moved the Bankruptcy Court for rejection (termination) of the franchise agreements it had with 789 Chrysler dealers including Plaintiffs—about 25% of all Chrysler dealer franchises—and on June 9, 2009, the U.S. Bankruptcy Court issued the Rejection Order.[35]  That order destroyed Dealers' franchise rights to sell and service vehicles as an authorized Chrysler dealer as of June 9, 2009, stating:  "[E]ach Affected Dealer shall have no further rights (direct, indirect, contractual or otherwise) to act as an Authorized Dealer of" Chrysler."[36]

### 4.    Chrysler dealers continued to sell cars until the day the Government required that they be shut down

Even in the midst of the credit crunch, Chrysler dealers continued to sell thousands of cars per day throughout 2009.[37]  In fact, March 2009—the month before the Government

---

[33] Amend. Compl. ¶187.

[34] Amend. Compl. ¶188.

[35] Amend. Compl. ¶194.

[36] Chrysler dealers sold approximately 15.6 million cars in 2008 and 9.8 million in 2009.  *In Re: OLD CARCO LLC.*, 2009 WL 5131557 (Bankr. S.D.N.Y 2009).

[37] FCA (Fiat Chrysler Automobiles), 2009 Chrysler Group LLC U.S. Sales Archive (Dec. 1, 2009), available at http://media.chrysler.com/newsrelease.do;jsessionid=87A70E2714E000E0A322C8A7E0422FB6?&id=8480&mid=1; FCA (Fiat Chrysler Automobiles), Award-winning Month Drives Chrysler Group LLC's December U.S. Sales (Jan. 5, 2010), available at http://media.chrysler.com/newsrelease.do?id=9330&mid=&searchresult.

announced its Dealer shutdown plan—was the highest month for Chrysler new car sales in 2009:[38]



Chrysler Dealers also continued servicing the 31 million existing Chrysler vehicles, performing both warranty work (paid for by Chrysler) and non-warranty work (paid for by the auto owner) as an authorized Chrysler dealer.[39]  Many Chrysler Dealers, including Plaintiffs, "derived a large portion of revenue from used cars, service and parts, not from new vehicle sales."[40]

Chrysler did interrupt car production at various times throughout 2009 as the inventory

---

[38] FCA (Fiat Chrysler Automobiles), 2009 Chrysler Group LLC U.S. Sales Archive (Dec. 1, 2009), available at http://media.chrysler.com/newsrelease.do;jsessionid=87A70E2714E000E0A322C8A7E0422FB6?&id=8480&mid=1; FCA (Fiat Chrysler Automobiles), Award-winning Month Drives Chrysler Group LLC's December U.S. Sales (Jan. 5, 2010), available at http://media.chrysler.com/newsrelease.do?id=9330&mid=&searchresult.
[39] *See In re Chrysler LLC, et al.*, Case No. 09-50002, Declaration of T. Lasorda ¶7 (Doc. 51) (April 30, 2009).
[40] Amend. Compl. ¶204.

grew too large.[41]   But the Dealers continued to stay open, reducing that inventory from 151 days-worth on January 2009 to 71 days' worth by June 9, 2009, when the Government's mandate that 25% of the Dealers be rationalized (read: terminated) was implemented.

**Procedural History**

On February 17, 2011, the Dealers filed suit alleging a taking of their Chrysler auto sales and service franchises and their state-protected rights to continue selling and servicing Chrysler automobiles.[42]   On February 27, 2012, this Court denied the Government's motion to dismiss for failure to state a claim and for lack of jurisdiction,[43] and on April 12, 2012 also denied the Government's motion for reconsideration of that denial.[44]

On August 20, 2012, this Court certified to the Federal Circuit the question "whether the complaints failed to state a claim upon which relief could be granted,"[45] and on April 7, 2014 the Federal Circuit issued its decision affirming the trial court's denial of the Government's motion to dismiss, with leave to amend as to the single deficiency in the complaint (economic impact allegations):

> We conclude that the Claims Court properly declined to dismiss the plaintiffs' complaints at this preliminary stage. While the plaintiffs' allegations of economic loss are deficient in their present form, the deficiencies may be cured, and the Claims Court is instructed to grant the plaintiffs leave to make such curative amendments as may be necessary. Further proceedings must be consistent with this opinion.[46]

---

[41] *See* FCA (Fiat Chrysler Automobiles), Chrysler LLC Posts Best Retail Month of the Year; Reports May 2009 Sales (June 2, 2009), available at http://media.chrysler.com/newsrelease.do?id=8480&fIId=8764&mid=1.

[42] Doc. 1.

[43] Order and Opinion (Feb. 27, 2012) (Doc. 34).

[44] Order and Opinion (April 12, 2012) (Doc. 44).

[45] *A & D Auto Sales*, 748 F.3d at 1150.

[46] *Id.* at 1159.

On September 15, 2014, the Dealers filed their Amended Complaint—adding ten paragraphs of allegations regarding economic impact but otherwise not changing the Complaint—and on December 15, 2014 the Government filed this second Motion to Dismiss.[47]

**ARGUMENT**

I.     **Except for the new allegations on economic impact, to the extent that this motion addresses allegations in the original complaint, this motion is barred by the Federal Circuit's holding, which is law of the case**

Nothing in the Federal Circuit's opinion, affirming this Court's denial of the Government's first motion to dismiss, authorized the Government to raise the same issues again in this second motion to dismiss.  The Court held:

> [W]e reject the government's arguments for dismissal. While we hold that the complaints are deficient because they do not sufficiently allege that the economic value of the plaintiffs' franchises was reduced or eliminated as a result of the government's actions, we nonetheless affirm the Claims Court's decision to deny dismissal at this point in the proceedings. The proper remedy is to grant the plaintiffs leave to amend their complaints to include the necessary allegations, and on remand the Claims Court shall do so.[48]

That decision is the law of the case:  "The law of the case is a judicially created doctrine, the purposes of which are to prevent the relitigation of issues that have been decided and to ensure that trial courts follow the decisions of appellate courts."[49]

The Federal Circuit's affirmance of this Court's order denying the Government's first

---

[47] Since then, Plaintiffs have been given leave to file a Fifth Amended Complaint adding two dealerships. This Court granted Plaintiffs' Unopposed Motion and deemed the complaint filed on February 5, 2015 (Doc. 107).

[48] *A & D Auto Sales, Inc.*, 748 F.3d at 1147.

[49] *Gould, Inc. v. United States*, 67 F.3d 925, 930 (Fed. Cir. 1995) (quotation omitted).

motion to dismiss is now final and binding.[50]   The mandate rule, which is "encompassed by the broader law-of-the-case doctrine, dictates that 'an inferior court has no power or authority to deviate from the mandate issued by an appellate court.'"[51]

A glance at the Table of Contents from the Government's first motion to dismiss confirms that the Government is now trying for a fourth bite of the apple—making the same arguments now that it made in its first motion to dismiss, its motion for reconsideration, and in the appeal:

III.  Principles Of Waiver, Res Judicata And Collateral Estoppel Bar Plaintiffs' Claim . . .
IV. Plaintiffs' Complaint Should Be Dismissed Pursuant To Rule 12(b)(6) For Failure To State A Claim Upon Which Relief May Be Granted . . .
    2. Alleged Government Action Related To The GM And Chrysler Bankruptcies Did Not Constitute A Compensable Taking . . .
        a. The "Character Of The Government Action" Demonstrates That A Takings Theory Is Misplaced . . .
        b. The Government Does Not Take Plaintiffs' Property By Purportedly Engaging In Action That Allegedly Affected The Value Of Their Contract Rights . . .
        c.  Chrysler Was Not Government Controlled . . .
        d. Government Involvement Had No Harmful Economic Impact; The Alternative Was Liquidation . . .[52]

Apart from amending the allegations of economic loss as permitted by the Federal Circuit, the Dealers have made no changes to the substantive allegations of the Complaint to support a whole new round of briefing on issues already briefed, argued, and ruled on by this Court and the Federal Circuit.  Even if the Government did have the right to challenge the sufficiency of those new allegations, there is no authority permitting the Government to litigate a second time whether the original, unchanged allegations still state a claim for relief.  To the

---

[50] *In re Sanford Fork & Tool Co.*, 160 U.S. 247, 255 (1895).
[51] *Banks v. United States*, 741 F.3d 1268, 1276 (Fed. Cir. 2014) *(quoting Briggs v. Pa. R. Co.*, 334 U.S. 304, 306 (1948))
[52] Def.'s Mot. to Dismiss at i–ii (June 17, 2011) (Doc. 16).

contrary, the Federal Circuit's opinion strongly suggests that on the remand it expected the court to move onto the merits of the case: "Because we lack the benefit of a fully developed factual record, we do not at this stage address every issue the government raises."[53]

## II.     In its Rule 12(b)(6) motion the Government asks this Court to make factual findings that impermissibly contradict the allegations of the Complaint

### A.     Standard of Review

The Government bears the burden of showing that this Complaint should be dismissed under Rule 12(b)(6).[54]  Rather than meet this burden, the Government's motion ignores the fundamental requirement that the Court "accept as true all factual allegations in the complaint," and side-steps the requirement that the Court indulge "all reasonable inferences in favor of the non-movant to evaluate whether plaintiff has stated a claim upon which relief can be granted."[55] But a motion to dismiss under RCFC 12(b)(6) for failure to state a claim tests the sufficiency of the complaint, not the ultimate merits of the case.[56]  The Government's arguments that dispute the allegations of the complaint, and ask this Court in this motion to find those allegations untrue, should therefore be rejected.[57]

The Government relies on two cases in support of its motion, neither of which holds that the facts alleged in the Complaint can be challenged in a Rule 12(b)(6) motion.  The Government first cites *Bell Atlantic Corp. v. Twombly*,[58] which held that a complaint must "state a claim to

---

[53] *A & D Auto Sales, Inc.*, 748 F.3d at 1147.
[54] *See, e.g.*, *Lerner v. Fleet Bank, N.A.*, 318 F.3d 113, 128 (2d Cir. 2003).
[55] *Collins*, 101 Fed. Cl. at 443.
[56] *Love Terminal Partners v. United States*, 97 Fed. Cl. 355, 378 (2011).
[57] *Cambridge v. United States*, 558 F.3d 1331, 1335 (Fed. Cir. 2009) (*citing Papasan v. Allain*, 478 U.S. 265, 283 (1986); *Gould, Inc. v. United States*, 935 F.2d 1271, 1274 (Fed. Cir. 1991)).
[58] *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007).

relief that is plausible on its face . . . [and its f]actual allegations must be enough to raise a right to relief above the speculative level."[59]  But *Twombly* says nothing about challenging the plaintiffs' factual allegations as untrue, as the Government does here.  The Government also relies on *Ashcroft v. Iqbal*,[60] in which the Supreme Court held that "[t]he plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully."[61]  Likewise, nothing in *Iqbal* allows the defendant to challenge the truth of the complaint's allegations, as the Government does here.

As this Court held in *Petro-Hunt, L.L.C. v. United States*,[62] neither *Twombly* nor *Iqbal* threw out the notice pleading rule, nor "collapse[d] discovery, summary judgment and trial into the pleading stages of a case."[63]

### B.    Allegations in the Complaint

The Government also ignores the detailed allegations in the complaint, arguing that the allegations are untrue and that Dealers' franchises had no value before the taking.  The Government offers this speculation spun out of the single fact that "Chrysler faced serious financial difficulty . . . ."[64]  But of course the liquidity crisis of 2008–2009 affected many industries that rely on consumer credit in addition to auto manufacturing, such as real estate, construction, appliances and retail credit card purchases of all kinds.[65]  The Government

---

[59] *Id.* at 570.
[60] *Ashcroft v. Iqbal*, 556 U.S. 662 (2009).
[61] *Iqbal*, 556 U.S. at 678 (*quoting Twombly*, 550 U.S. at 556).
[62] *Petro-Hunt, L.L.C. v. United States*, 90 Fed. Cl. 51 (2009).
[63] *Id.* at 71 (2009).
[64] Def.'s Br. at 7.
[65] *See* U.S. Department of the Treasury, Why TARP was Necessary, available at http://www.treasury.gov/initiatives/financial-stability/about-tarp/Pages/Why-TARP-was-

presumably does not contend that all homebuilders, real estate agencies, construction contractors and subcontractors, appliance stores, and retail businesses were worthless in 2009.  Nor does the Government explain why the Chrysler Dealers differ from all of these other credit-dependent businesses, and alone became worthless in 2009.

Nor does the Government differentiate between all 3,000 Chrysler Dealers and the 789 terminated Dealers (25%), which were identified for termination on May 14, 2009.  Either way poses problems for the Government:  If it says all Chrysler dealers were worthless, then how and when did they regain their value?  And if only the 789 terminated Dealers were worthless, on what basis does the Government make this determination?  Without the individual financial records of each Plaintiff Dealer, how can the Government ask this Court to decide that every dealership was worthless without knowing if that dealership had positive cash flow on the termination date or could not have attracted a buyer?[66]

The Dealers' Complaint alleges that "[t]he Chrysler Restructuring Plan did not call for the termination of Plaintiffs' dealer franchises or the filing of bankruptcy."[67]  The Chrysler restructuring plan proposed three options for the company, each of which Dealers and Chrysler considered plausible.  Although the Government now calls this allegation implausible,[68] as late as March 29, 2009 (when the Government announced that it would guarantee new car warranties to stimulate auto sales) the Administration stated it was working with Chrysler to develop a restructuring plan that did not require taxpayer assistance:

---

Necessary.aspx.
[66] Dealers are prepared to offer evidence that several Chrysler dealerships sold for valuable consideration during the first months of 2009.
[67] Amend. Compl. ¶187.
[68] Def.'s Br. at 20.

The Administration has committed to working with both GM and Chrysler during a finite period to develop improved restructuring plans.  The goal in both cases is to help these companies emerge with a fresh start toward becoming competitive businesses without taxpayer assistance.[69]

The Government's argument that, contrary to the allegations of the Complaint, Chrysler could not have plausibly conducted an orderly bankruptcy liquidation also falls flat because it contradicts the President's announcement that one purpose of the loan to Chrysler was "if restructuring cannot be accomplished outside of bankruptcy, the loans will provide time for companies to make the legal and financial preparations necessary for an orderly Chapter 11 process that offers a better prospect of long-term success . . . ."[70]

Similarly, the Government's claim that Dealers could not have continued the valuable business of servicing the 31 million Chrysler vehicles already on the road not only contradicts the allegations of the Complaint, but fails to acknowledge that is exactly what Suzuki did, as the Dealers allege in paragraph 197 of their Complaint.

In addition, but-for scenarios, such as the Federal Circuit has instructed the Dealers to allege in this case, present issues of both fact and expert opinion that cannot be resolved on a motion to dismiss.  This Court is entitled to hear expert testimony on these complex financial, economic, and auto-industry issues.

The Dealers' Complaint identifies at least three scenarios in which their franchises would have retained value if the Government had not terminated them.  First, the Dealers allege that an

---

[69] White House Office of the Press Secretary, *Obama Administration's New Warrantee Commitment Program*, available at http://www.whitehouse.gov/assets/documents/Warrantee_Commitment_Program.pdf
[70] President George W. Bush, Remarks on the United States Auto Industry (Dec. 19, 2008), available at http://www.gpo.gov/fdsys/pkg/PPP-2008-book2/html/PPP-2008-book2-doc-pg1499.htm.

18

orderly liquidation would have enabled Dealers "to dispose of their existing inventories of new autos and parts and otherwise mitigate their losses . . . [rather than the Government-required Chrysler bankruptcy which] result[ed] in an economically disastrous firesale of their dealership property."[71]  The Government does not explain why it is implausible that, if Dealers had the usual 24–30-month period in a bankruptcy liquidation[72] to sell off their existing new car inventory (particularly with the Government guaranteeing the warranties on these new cars), they would not have recognized more value than under the Government's requirement that their businesses shut down and that Dealers "shall have no further rights (direct, indirect, contractual or otherwise) to act as an Authorized Dealer . . . ."[73]

Even if Chrysler had stopped manufacturing cars altogether, there were still millions of Chrysler vehicles in service as of June 9, 2009 and Dealers could have continued profitably servicing these vehicles years into the future.  As the Complaint alleges, this is plausible because it is exactly what Suzuki did.[74]

The Government also fails to explain why it is implausible that, in an orderly liquidation, the stronger Chrysler brands (Viper, Jeep) would not have been sold off so Dealers could have continued selling them:  "In an orderly liquidation in Chapter 11, the valuable brands and assets of Chrysler would very likely have been auctioned off through Bankruptcy Code Section 363 asset sales.  If Chrysler vehicle brands were sold, then some (or potentially all) of the dealers

---

[71] Amend. Compl. ¶196.
[72] Amend. Compl. ¶203.
[73] *In Re: OLD CARCO LLC.*, 2009 WL 5131557 (Bankr. S.D.N.Y. June 9, 2009).
[74] Amend. Compl. ¶197.

would have been able to continue as going concerns."[75]

Robert Manzo,[76] Chrysler's restructuring advisor, supplied a List of Interested Parties as of May 22, 2009 to the bankruptcy court, comprised of nine parties who were interested in a variety of purchase options.[77]   One Group of Former Big 3 retirees wanted to "spin off Dodge, Truck and/or Jeep."[78]   Another was interested in a stamping plant.[79]   Another expressed interest in buying a plant for testing a new engine technology.[80]   A group of Polish investors expressed possible interest in the Dodge Viper and offered to buy it for $5.5 million.[81]   Another interested party provided a Letter of Intent to purchase machinery, castings, tooling, and properties, and also the *transfer of 350–450 U.S. dealers* and 80–175 Canadian dealers.[82]   Based on these facts that demonstrate there were several parties interested in purchasing Chrysler vehicles lines or dealership agreements, the Government's argument, that Plaintiffs' allegations are implausible, must fail.

### C.   As this Court previously held, Dealers' allegations in this taking case are not barred by collateral estoppel

The Chrysler bankruptcy decision does not estop these Dealers from bringing their taking claims in this Court.  For collateral estoppel to apply, "both the facts and the legal standard used

---

[75] Amend. Compl. ¶196.
[76] Manzo served as Executive Director of Capstone Advisory Group, LLC.
[77] *See In re Chrysler LLC, et al.*, Case No. 09-50002 (AJG), Declaration of Robert Manzo, Doc. No. 2562, Ex. B at 2 (Bankr. S.D.N.Y. May 26, 2009).
[78] *Id.*
[79] *Id.*
[80] *Id.*
[81] *Id.*
[82] *Id.* at 3.

to assess [an issue] [must be] the same in both proceedings. . . ."[83]  In *Copeland v. Merrill Lynch & Company*, the Fifth Circuit held that a creditor was not collaterally estopped from re-litigating a reorganization agreement submitted during bankruptcy because "[b]oth the factual issue and legal analysis required in the . . . bankruptcy confirmation hearing differed from the issue presented by . . . [the] individual breach of contract claim."[84]

Here, the Chrysler bankruptcy did not involve all Plaintiff Dealers, and the Bankruptcy Court did not apply the same legal or evidentiary standards this Court applies in taking cases, and thus the bankruptcy has no collateral estoppel effect.  The Bankruptcy Court itself stated in the Chrysler proceedings that it did not intend its decision to have collateral estoppel or res judicata effect.[85]  Nor did the Bankruptcy Court or the Second Circuit have jurisdiction to decide any issue involved in Dealers' takings claims—claims that lie within the exclusive jurisdiction of the U.S. Court of Federal Claims under the Tucker Act.[86]

In its order denying the Government's first motion to dismiss, this Court flatly rejected the Government's argument that rulings in the Chrysler bankruptcy had collateral estoppel effect in this taking case:

> The bankruptcy proceedings were separate and apart from the issues before this court. So far as plaintiffs are concerned, the Chrysler bankruptcy was an irrelevant and complicating event. Bankruptcy court rulings should not be used by defendant to prevent plaintiffs from pursuing their takings claims in this court. . . . the Government cannot use rulings issued in a bankruptcy proceeding  involving different causes of action.[87]

---

[83] *Copeland v. Merrill Lynch & Co.*, 47 F.3d 1415, 1422 (5th Cir. 1995).
[84] *Id.*
[85] *In Re: OLD CARCO LLC.*, 2009 WL 5131557 (Bkrtcy. S.D.N.Y. June 9, 2009).
[86] 28 U.S.C. § 1491.
[87] Order and Opinion at 2 (Feb. 27, 2012) (Doc. 34).

Affirming this Court's ruling, the Federal Circuit likewise held "[w]hatever the bankruptcy court found is immaterial . . . ."[88]

Those rulings are now law of the case, and the Government is not free to once again argue, as it did unsuccessfully to both this Court and the Federal Circuit, that Dealers are estopped from making factually true allegations in their Complaint because of anything in the Bankruptcy Court's opinion.

Directly on point, this Court recently held in *McGuire v. United States*[89] that the ripeness determination of the Ninth Circuit, in an appeal from the Bankruptcy Court and a federal district court, was not law of the case because the Bankruptcy Court lacked jurisdiction to hear the takings claim.[90]   Consequently, the trial court and this Court were not bound by the Ninth Circuit's decision:  "We conclude that we are not bound by the Ninth Circuit's ripeness decision because the Ninth Circuit lacked authority to decide the question."[91]

This Court, in a governmental employment case, reached a similar conclusion, stating: "[A] court vested with exclusive jurisdiction to decide an issue is not precluded from deciding it, although it had been previously decided by another court as an incidental fact necessary to be determined in order to decide an issue within its jurisdiction."[92]   And because the Supreme Court vacated as moot the Second Circuit's opinion affirming the Chrysler bankruptcy decision, that

---

[88] *A&D Sales*, 748 F.3d at 1157-58.
[89] *McGuire v. United States*, 707 F.3d 1351 (Fed. Cir. 2013).
[90] *Id.* at 1357–1358.
[91] *Id.* at 1357.
[92] *Edgar v. United States*, 145 Ct. Cl. 9, 14 (1959).

vacated decision would in any event have no precedential effect.[93]

## II.   The Complaint adequately and plausibly alleges substantial economic loss caused by the Government's termination requirement

At the Federal Circuit the Government argued that its termination requirement of these

Dealers' auto sales and service businesses had no economic impact because all Chrysler

dealerships were already worthless:  "In this case, the government argues that the plaintiffs have

failed to sufficiently plead economic loss, and that in reality the franchise agreements were

worthless absent the government's financial assistance to the automakers,"[94] which did not

benefit these Dealers, who lost their franchises as a condition of that financial assistance.   Siding

with the Government, the Federal Circuit required Dealers on remand to amend their Complaint

to allege facts showing that their franchises were not worthless before the Government shut them

down.  This the Dealers have done in paragraphs 196–206 of their Amended Complaint.[95]

The Government argues that these allegations are not plausible, though supported by

Chrysler itself and by the TARP Special Inspector General, and asks this Court to make

sophisticated factual findings regarding the Dealers' businesses, finances and the economy

before hearing any evidence—just on the Government's say-so.

---

[93] *Ind. State Police Pension Trust v. Chrysler, LLC*, 556 U.S. 960 (2009).  On December 14, 2010 the Supreme Court issued an order stating:  "Judgment vacated, and case remanded to the United States Court of Appeals for the Second Circuit with instructions to dismiss the appeal as moot."
[94] *A & D Auto Sales, Inc.*, 748 F.3d at 1158.
[95] Amend. Compl. ¶¶196–206 (Doc. 106-1) (Feb. 4, 2015).

A.     **The Government improperly ignores the Complaint's allegations that the Dealers' businesses were profitable in 2009**

In their Complaint, Dealers have alleged that they had operational businesses with substantial income streams up to June 9, 2009, the date on which the Government's shut-down order took effect.  Contradicting this allegation, the Government argues that if Chrysler was in trouble, Dealers' franchises were worthless.  The facts do not support this non sequitur.  During the first half of 2009, while the Government was deciding to shut them down, Chrysler dealers— including Plaintiffs—were selling thousands of cars every day, as reflected in Chart 1.[96]

Nor does the Government discuss the Complaint's allegations in Paragraph 205 that many Chrysler dealers derive substantial income from servicing automobiles—income that would have continued even if Chrysler had stopped making cars altogether:

> [T]he plaintiffs would also have had the ability to continue to perform service and repair work on Chrysler vehicles, sell extended warranties of other third parties to their customers and continue to sell their customers used vehicles. According to the SIGTARP Report, one expert noted that some dealerships derived a large portion of revenue from used cars, service and parts, not from new vehicle sales.  As such, depriving the Plaintiffs of the ability to continue to provide service and parts to their customers after only a short time frame deprived the Plaintiffs of value.[97]

As the Complaint also alleges, when Suzuki stopped selling new cars in the U.S., it maintained a dealer network to service the vehicles that were already on the road:

> Similar to the Obama Administration's New Warrantee Commitment Program, Suzuki, in connection with its orderly liquidation, sought to honor warranties for

---

[96] FCA (Fiat Chrysler Automobiles), 2009 Chrysler Group LLC U.S. Sales Archive, available at http://media.chrysler.com/newsrelease.do?id=8480&mid=1 and links to monthly sales reports; FCA (Fiat Chrysler Automobiles), Award-winning Month Drives Chrysler Group LLC's December U.S. Sales (Jan. 5, 2010), available at http://media.chrysler.com/newsrelease.do?id=9330&mid=&searchresult.
[97] Amend. Compl., ¶ 205.

existing and new vehicle purchases by having its dealers perform a number of services, generating revenue for its dealers and also ensuring the general safety of Suzuki Products and compliance with various laws and regulations for the safety and benefit of consumers.[98]

The Government established its Warrantee Commitment Program early in 2009 to "give consumers who are considering new car purchases the confidence that even in this difficult economic period, their warrantees will be honored."[99]  The program covered all warranties on new vehicles purchased from participating auto manufacturers, including Chrysler, and this warranty work would have provided an income stream to Chrysler Dealers—including Plaintiffs—had the Government not terminated their franchises.

**B.**    **Chrysler's restructuring plan identified three plausible alternatives to save the company without terminating any Dealers' franchises**

The Complaint alleges that the restructuring plan Chrysler proposed to the Government, which did not require shutdown of any Dealers, described three plausible scenarios—each of which would have maintained at least some of Dealers' ongoing income from auto sales (or at least service)—making their franchises worth far more than nothing (as the Government contends):

> The Restructuring Plan that Chrysler presented to the Government on February 17, 2009 identified three scenarios that Chrysler was willing to pursue, none of which called for the forced termination of any existing Chrysler franchise dealer. . . . Under any of these three scenarios, Plaintiffs' Chrysler dealerships retained significantly more value because in each scenario Plaintiffs were entitled to continue generating revenues by selling and servicing Chrysler automobiles. Each of these three scenarios allowed time for the auto market and the economy

---

[98] *Id.* at ¶197.

[99] White House Press Release, *Obama Administration's New Warrantee Commitment Program*, available at http://www.whitehouse.gov/assets/documents/Warrantee_Commitment_Program.pdf

to improve, but even without material improvement, Plaintiffs' Chrysler dealerships would have retained value.[100]

The Government argues that none of the three alternative courses of action Chrysler proposed (each of which would have preserved Dealers' auto franchises) was plausible—that Chrysler provided the Government a completely implausible restructuring plan.  But the Government fails to provide this Court any explanation of why Chrysler would provide such a bogus restructuring plan, nor any evidence or expert opinion on which this Court could decide that Chrysler was entirely wrong about how to restructure its business without shutting down 25% of its Dealers, and that (as the Government incorrectly contends) the Dealers' franchises were already worthless.  Nor, of course, is it proper for the Court to make such findings of fact, contrary to the allegations of the Complaint, on a Rule 12(b)(6) motion to dismiss.[101]

Chrysler's first proposal involved restructuring but without terminating any of its Dealers.  While the Government now calls this proposal implausible, the Treasury Department's Special Inspector General for TARP reported to Congress that in his opinion this option was preferable to terminating Dealers' franchises:

> [I]t is not at all clear that the greatly accelerated pace of the dealership closings during one of the most severe economic downturns in our Nation's history was either necessary for the sake of the companies' economic survival or prudent for the sake of the Nation's economic recovery.
> . . .
> Chrysler officials themselves told SIGTARP [the Special Inspector General for TARP] that closing dealerships too quickly would have an adverse effect on sales. Chrysler officials said that they expected that their rapid terminations would result in lost sales in the short term, that Chrysler will take several years to recover lost

---

[100] Amend. Compl. ¶ 200.

[101] *See, e.g., Cedars-Sinai Med. Ctr. v. Watkins*, 11 F.3d 1573, 1583 (Fed. Cir. 1993).

26

sales, and that future increases in market share will depend on penetrating new markets.[102]

Nor does the Government support its argument that Chrysler's second alternative—to proceed with the Fiat merger (as set out in the January 20, 2009 term sheet) without terminating any franchises—was implausible:

> Under Chrysler's second restructuring scenario, Chrysler would proceed with its existing Fiat merger plan, retaining all of its existing dealers, including Plaintiffs.  Because Fiat never required that Chrysler terminate any of its existing dealers as a requirement of merger, Plaintiffs' dealerships would have retained significantly more value under this scenario.[103]

Under the terms of the agreement, Fiat could take a 35% stake in Chrysler and gain access to its North American dealer network in exchange for providing Chrysler with the platform to build smaller, more fuel-efficient vehicles in the U.S. and reciprocal access to Fiat's global distribution network.[104]  Fiat is one of the world's largest auto makers, owning Alfa Romeo, Ferrari, Lancia, and Maserati.  Critically, Fiat had been shut out of the United States market since 1984, and in the mid-2000s it had a strong desire to reenter the market.  In 2007 Fiat introduced the Fiat 500—a car that it produced between 1957 and 1975.  Fiat considered the new 500 to be critical to its continued growth.[105]

The challenge, however, was that launching a U.S. dealer network from the ground up would be extraordinarily time consuming and expensive.  Going from a clean sheet to a fully-

---

[102] Amend. Compl. ¶201.

[103] Amend. Compl. ¶202.

[104] Nardelli's Letter to Chrysler Stakeholders on Fiat Agreement (January 20, 2009), available at http://blogs.wsj.com/autoshow/2009/01/20/nardellis-letter-to-chrysler-stakeholders-on-fiat-agreement/.

[105] *See* Vlasic, Bill, and Bunkley, Nick, "Alliance with Fiat Gives Chrysler Another Partner and Lifeline," New York Times (January 20, 2009).

populated dealer network would have taken Fiat at least a decade, if not longer, at an exorbitant cost. A takeover of Chrysler would have solved these problems.[106] Had the U.S. not intervened, and Chrysler failed to remain viable, Fiat still could have purchased the franchise agreements from Chrysler (either in or out of bankruptcy court), which would have resulted in a near-instant dealer network for its Fiat and Alpha Romeo products (both of which had been locked out of the U.S. for decades).

Chrysler's third alternative was to file for bankruptcy and embark on an orderly wind down of the Company. As the Complaint alleges:

> In an orderly liquidation in Chapter 11, the valuable brands and assets of Chrysler would very likely have been auctioned off through Bankruptcy Code Section 363 asset sales. If Chrysler vehicle brands were sold, then some (or potentially all) of the dealers would have been able to continue as going concerns. However, even if none of the Chrysler brand assets were sold, in an orderly wind-down the dealers would have continued to operate their dealerships for a period of time. Under Chrysler's third worst-case scenario, an orderly Chapter 11 liquidation still would have allowed the Plaintiffs to continue operating their dealerships for an estimated period, e.g., twenty-four to thirty months, using the value of their customer lists and goodwill built up over the years to sell their remaining new vehicle inventory (including potentially new vehicles from Chrysler's inventory), service and repair vehicles, sell third-party warranties, and sell used vehicles.[107]

In an orderly Chapter 11 liquidation, it is likely that at a minimum, desirable Chrysler vehicle lines (such as Jeep and Dodge Ram Trucks) would have been sold to other manufacturers. These sales would have ensured that certain Plaintiffs selling these model lines would have continued as going concerns. And there would likely have been potential bidders, in addition to Fiat. In short, under even this worst-case scenario, Plaintiffs' dealerships would have

---

[106] *In re Chrysler LLC, et al.*, Case No. 09-50002, Declaration of T. Lasorda ¶7 (Doc. 51) (April 30, 2009).
[107] Amend. Compl. ¶203.

retained value.[108]  The Government also misreads Chrysler's restructuring plan when it argues

that the orderly liquidation alternative would have required $24 billion in Government financing.

Page 162 of the Chrysler plan actually states that "[i]nability to secure $24 billion of bankruptcy

DIP financing leads to liquidation over a 24 to 30 month period . . . ."[109]  And as the Complaint

alleges, a 24-to-30-month orderly liquidation would have allowed the Dealers time to liquidate

their existing vehicles and other assets in an orderly fashion—rather than the firesale required

when the Government immediately terminated their franchises:

> The primary difference between orderly and forced liquidation is the time
> allowed for selling the property.  Orderly liquidation results in higher value than
> does forced liquidation by allowing adequate time to market and sell assets and
> so maximize the value received.  With a focus on maximizing value over the
> speed at which assets can be sold, the orderly wind down of a business almost
> always generates more value than a forced or fire sale liquidation.  If a business
> is not given adequate time to conduct an orderly wind down, it is forced to do a
> fire sale of its business, as the Plaintiffs were forced to either "redistribute" their
> existing new vehicle inventory and parts inventory to other Chrysler dealers
> (former competitors who knew that they would only have to pay fire sale prices)
> or sell the vehicles to the public as used cars, without warranties.[110]

   As the Complaint alleges, Suzuki Motors adopted this strategy for orderly wind-down,

preserving substantial value for its dealers:

> This was the process undertaken by American Suzuki Motor Corporation in its
> Chapter 11 bankruptcy case where Suzuki determined that the best way to
> preserve and enhance the value of its overall business was to orderly wind down
> its operations in the continental U.S.   Suzuki further determined to honor
> automotive warranties and authorize the sale of genuine Suzuki automotive parts
> and services to retail customers through a network of parts and service only
> dealerships that would provide warranty services.  Suzuki also determined to
> authorize its dealers to continue to provide service and warranty work and to
> sell-off its inventory of new automobiles over a reasonable time period, an

---

[108] Amend. Compl. ¶203.
[109] Chrysler Restructuring Plan for Long-Term Viability at 162.
[110] Amend. Compl. ¶196.

arrangement allowed the continued provision of vital services and parts to customers and promote public safety. Similar to the Obama Administration's New Warrantee Commitment Program, Suzuki, in connection with its orderly liquidation, sought to honor warranties for existing and new vehicle purchases by having its dealers perform a number of services, generating revenue for its dealers and also ensuring the general safety of Suzuki Products and compliance with various laws and regulations for the safety and benefit of consumers.[111]

**C.     The Complaint alleges that after the Government forced Chrysler to abruptly terminate 25% of its dealerships, these Dealers' businesses were destroyed, depriving the Dealers of all economically beneficial or productive use of their businesses**

On May 14, 2009, Chrysler provided the bankruptcy court with a list of 789 dealers (including all of the Plaintiff Dealers in this case) whose franchises were to be terminated—25% of Chrysler's dealer network—as the Government required. Three weeks later (June 9, 2009) the bankruptcy court issued its order terminating their franchises and flatly prohibiting them from holding themselves out as Chrysler dealers, effective June 9, 2009. That order stated that each of Plaintiff Dealers:

> [S]hall have no further rights (direct, indirect, contractual or otherwise) to act as an Authorized Dealer As such, immediately as of the Rejection Effective Date, each such Affected Dealer is no longer authorized to, among other things:
>
> (a)     undertake any advertising, sales, repair or service of any of the Debtors' Products as an Authorized Dealer under the terms of the Rejected Dealer Agreements;
>
> (b)     hold itself out to any third party as an Authorized Dealer of the Debtors for any purpose; and
>
> (c)     display, distribute or otherwise use any signage, promotional or other materials bearing or containing the Debtors' trademarks, tradenames and servicemarks, except that it may use the Debtors' descriptive brand and vehicle model names solely for the purpose of identifying and advertising its inventory

---

[111] Amend. Compl. ¶197.

for sale to the extent permitted by applicable law for a party that is not an Authorized Dealer of the Debtors. . . . .[112]

As the Complaint alleges, the Government's shutdown of Dealers' Chrysler auto sales and service businesses deprived them of all economically beneficial and profitable use of their property.  The Government's intervention

> made Plaintiffs' dealerships immediately worthless because it terminated all of their rights to continue business as a Chrysler dealer. . . . Plaintiffs were prohibited from identifying themselves as Chrysler dealers, from selling new cars (including those in their showrooms) to the public, performing warranty service and other repair work, and continuing their profitable businesses as Chrysler dealers.[113]

The Federal Circuit has held that where the Government obtains a court order shutting down the plaintiff's business operations, this can constitute a Fifth Amendment taking,[114] as can a Government-obtained court order that destroys the plaintiff's intangible property interest (in one case, a mortgage lien).[115]  The Supreme Court too has held that the Government's destruction of a once-thriving laundry business is a Fifth Amendment taking even though the Government obtained no benefit from the business:

> [A]n exercise of the power of eminent domain which has the inevitable effect of depriving the owner of the going-concern value of his business is a compensable 'taking' of property. . . . '[T]he question is, What has the owner lost?  not, What has the taker gained[?]'[116]

The Government's argument that the Dealers received value for their franchises' unsecured claims fails because those claims were worthless after their franchises were

---

[112] *In Re: OLD CARCO LLC.*, 2009 WL 5131557 (Bankr. S.D.N.Y. June 9, 2009).

[113] Amend. Compl. ¶206.

[114] *Boise Cascade Corp. v. United States*, 296 F.3d 1339 (Fed. Cir. 2002).

[115] *Shelden v. United States*, 7 F.3d 1022 (Fed. Cir. 1993) (*abrogation on other grounds recognized at* 682 F.3d 1364).

[116] *Kimball Laundry Co. v. United States*, 338 U.S. 1, 13 (1949).

terminated.  Old Chrysler's secured creditors, who had priority over unsecured claims such as Dealers,'[117] did not receive full payment and unsecured claimants, like Dealers, received absolutely nothing.[118]

### D.      The Federal Circuit did not prohibit Dealers from alleging economic loss

The Government erroneously asserts that the Federal Circuit prohibited Dealers from making certain allegations of economic loss.  The Government's argument is built on a snippet from the Federal Circuit's opinion, out of context.

In context, the Federal Circuit's discussion is of the larger understanding of the economic impact element of the takings analysis:  "We turn next to the alleged economic impact of the government action."[119]  "We have measured the diminution in value of the plaintiff's property by 'the change, if any, in the fair market value caused by the regulatory imposition,'[120] and 'if the regulatory action is not shown to have had a negative economic impact on the [plaintiff's] property, there is no regulatory taking.'"[121]  In this context, the Court responded to the Government's argument that due to Chrysler's financial condition Dealers' franchises were already worthless before the Government action (franchise termination).  The Federal Circuit further explained that "[t]hus, by necessity, proving economic loss requires a plaintiff to show what use or value its property would have but for the government action,"[122] citing two cases in which the government action—permit denials—did not decrease the value of the plaintiff's

---

[117] *See Dewsnup v. Timm*, 502 U.S. 510 (1992).
[118] *See Liquidation Trust v. Daimler AG (In re Old CarCo LLC),* 509 Fed. Appx. 77 (2d Cir. 2013).
[119] *A & D Auto Sales, Inc.*, 748 F.3d at 1157.
[120] *Id.* at 1157 (citing *Forest Props., Inc. v. United States,* 177 F.3d 1360, 1367 (Fed. Cir. 1999)).
[121] *Id.* (citing  *Hendler v. United States,* 175 F.3d 1374, 1385 (Fed. Cir. 1999)).
[122] *Id.*

property.[123]   Quoting the Supreme Court, the Federal Circuit states ""just compensation for a net loss of zero is zero."[124]

Even stated in the abstract, the phrase on which the Government builds its argument does not mean what the Government says it does.  The phrase "an allegation that GM and Chrysler would have avoided bankruptcy but for the government's intervention and that the franchises would have had value in that scenario" means that the Dealers must allege that, but for the Government's requirement that Chrysler file bankruptcy under Section 363 to terminate Dealers' franchises, Chrysler would have avoided bankruptcy and Dealers' franchises would have retained value.  The Dealers have done just this, in paragraphs 200 and 203 of their Complaint.  The Government is thus flat wrong in contending that the Federal Circuit intended that the Dealers must allege that but for the Government's financial assistance Chrysler would have avoided bankruptcy, since the Government had already given Chrysler financial assistance on December 31, 2008—four months before the Government required Chrysler to file bankruptcy (April 30, 2009) and five months before Chrysler provided Dealers' names on the list of dealers to be terminated.

Nor is the Government's interpretation of this sentence in the Federal Circuit's decision consistent with takings jurisprudence.  The Government cites no case holding that its giving of financial assistance to one party allows it to take the property of another without Fifth Amendment just compensation.  And nothing in the Federal Circuit's opinion in this case

---

[123] *Forest Props., Inc. v. United States,* 177 F.3d 1360, 1367 (Fed. Cir. 1999); *Seiber v. United States*, 364 F.3d 1356, 1371 (Fed. Cir. 2004).
[124] *A & D Auto Sales, Inc.*, 748 F.3d at 1157 (*quoting Brown v. Legal Found. of Washington*, 538 U.S. 216, 240 n.11 (2003)).

suggests that the court was making a sea-change in takings jurisprudence.

But even if the Federal Circuit did mean that Dealers must allege a scenario in which they retained some value absent all Government assistance, they have done this, too, in paragraphs 203 and 204 of their complaint.  Had Chrysler liquidated all of its assets in an orderly fashion, as Option 3 of its restructuring plan proposed, Dealers would have been able to continue selling and servicing automobiles for at least the 24–30-month period of the wind-down, rather than precipitously shutting down on June 9, 2009.  The Government's argument that the multi-million-dollar income flow over this period had no value is implausible and unsupported—and certainly fails to support its motion to dismiss.

### III.   The Government incorrectly analyzes the reasonable expectations and character of the government action elements of the *Penn Central* test

Without waiving their contention that the Government is barred by law-of-the-case from relitigating this issue, the Dealers nevertheless state that the Government's *Penn Central* argument also fails to support dismissal.  Because the Government's cancellation of Dealers' franchises was a complete economic wipeout, leaving them no economically beneficial use, the *Lucas* takings test applies and this Court need not examine the other two *Penn Central* factors.[125] (The Government erroneously argues that the *Lucas* rule does not apply to intangible property, but cites a footnote in *Lucas* that distinguishes real from personal property—and says nothing about intangible property.)  As the Federal Circuit stated, "[w]e have applied the categorical test

---

[125] *Lucas v. S.C. Coastal Council*, 505 U.S. 1003 (1992) (loss of all economically viable use of property is a per se taking); *Penn Cent. Transp. Co. v. City of New York*, 438 U.S. 104 (1978) (setting forth factors used to analyze regulatory takings).

to personal property on occasion."[126]

Should this Court nevertheless decide to consider the other two *Penn Central* factors, it should find (as it did in denying the Government's first motion to dismiss) that Dealers' claims satisfy both of them.  The Federal Circuit did not find Dealers' Complaint deficient as to these two *Penn Central* factors—and neither should this Court:

- At the time they invested in their franchises, Dealers could not have reasonably expected that the Government, acting under the authority of a statute that did not yet exist (TARP), would shut down their auto sales and service businesses; and,

- The character of the Government's action—complete destruction of Dealers' franchises—is akin to other cases where complete destruction of an intangible property interest has been found to be a taking.

### A.    When they acquired their franchises, Dealers should not have reasonably expected that the Government would shut them down

As the Government admits,

the purpose of consideration of plaintiffs' investment-backed expectations is to limit recoveries to property owners who can demonstrate that 'they bought their property in reliance on a state of affairs that did not include the challenged regulatory regime.'" *Cienega Gardens v. United States*, 331 F.3d 1319, 1345-46 (Fed. Cir. 2003) (quoting *Loveladies Harbor, Inc. v. United States*, 28 F.3d 1171,1177 (Fed. Cir. 1994)).[127]

Reasonable expectations are measured at the time the property is purchased:  "A property owner's reasonable investment-backed expectations are defined at the time the property is purchased."[128]

---

[126] *A & D Auto Sales, Inc.*, 748 F.3d at 1151 (citing *Rose Acre Farms, Inc. v. United States*, 373 F.3d 1177, 1196–98 (Fed. Cir. 2004); *Maritrans, Inc. v. United States,* 342 F.3d 1344, 1353–55 (Fed. Cir. 2003).)

[127] Def.'s Br. at 32.

[128] *Norman v. United States*, 63 Fed. Cl. 231, 267 (2004) (*citing Appolo Fuels, Inc. v. United*

This reasonable expectations test charges the property owner with knowledge of the regulatory regime applicable at the time they acquired the property, but not to anticipate all future new regimes that Government might enact.  Since all Plaintiff Dealers acquired their franchises prior to the enactment of the Troubled Asset Relief Program (TARP) in 2008 their reasonable expectations did not include the sweeping powers Congress granted the Treasury Department when it passed TARP in October 2008.  Dealers could not have reasonably anticipated when they purchased their franchises and invested millions of dollars in showrooms, auto shops, supplies and personnel[129] that, years or decades in the future, the Treasury Department would create an Auto Task Force[130] with the power to abruptly shut down their businesses.

Dealers' expectations that they would continue in business were supported by statutes in every state that prohibited Chrysler from terminating them without good cause.  Although the specific list of protections given to auto dealers and automakers varies from state to state, every state where the plaintiff dealers did business gave the dealers a contractual right not to have their franchise terminated without "good cause."[131]

The Government repackages its argument to the Federal Circuit, which the court

---

*States*, 381 F.3d 1338, 1349 (Fed. Cir. 2004) ("Likewise, we conclude that Appolo's reasonable investment-backed expectations are shaped by the regulatory regime in place as of the date it purchased the leases at issue.")).

[129] Amend. Compl. ¶173.

[130] Amend. Compl. ¶185.

[131] See Third Amend. Compl. Appx. I (Aug. 17, 2012)(Doc. 60-1)( "List of States in Which Plaintiffs Conduct Their Chrysler Dealership Franchise Business and the Statutes That Would Have Protected Them From Losing Franchise But For The Government's Actions"); Carla Wong McMilian, *What Will it Take to Get You in a New Car Today?:  A Proposal for a New Federal Automobile Dealer Act*, 45 GONZ. L. REV. 67, 73 n.33 (2010) (collecting statutes).

rejected, that the threat of bankruptcy is always present, so the Government's use of the bankruptcy process (rather than direct regulation shutting down Dealers' businesses) exempts this Government action from the Fifth Amendment's just compensation requirement.  But the Federal Circuit rejected the Government's argument—and this Court should do  likewise— because the Government action causing the taking was the Government's requirement that Chrysler stop selling its vehicles through Plaintiff Dealers, and not the bankruptcy court's approval of this plan:

> The Government's problem is the alleged government action here is not the bankruptcy court's approval of the franchise terminations . . . . The plaintiffs allege that the government action was requiring dealer terminations as a condition of financial assistance to the automakers. The challenged government action did not predate the acquisition of the plaintiffs' interests. The plaintiffs' franchise agreements are valid and compensable property interests.[132]

As the Supreme Court held in *Louisville Joint Stock Land Bank v. Radford*, "[t]he bankruptcy power, like the other great substantive powers of Congress, is subject to the Fifth Amendment."[133]

The Federal Circuit did not rule on this issue, but certainly did not direct this fact-specific issue to be raised a second time in a motion to dismiss:

> The Claims Court should engage in "an objective, but fact-specific inquiry," *id.* at 1346, into the reasonableness of the plaintiffs' expectation that their franchise agreements would be continued absent government action. We express no opinion on the proper analysis of this factor. It will be up to the Claims Court to weigh the reasonableness of the plaintiffs' expectations in the first instance.[134]

---

[132] *A & D Auto Sales, Inc.*, 748 F.3d at 1153.
[133] *Louisville Jt. Stock Land Bank v. Radford*, 295 U.S. 555, 589 (1935).
[134] *A & D Auto Sales, Inc.*, 748 F.3d at 1159.

### B.    The character of the Government's action—shutting down Dealers' auto sales and service businesses—weighs in favor of a taking

Dealers agree with the Government that the Court should "analyze the character of the Governmental action by considering 'the actual burden imposed on property rights, or how that burden is allocated.'"[135]  But this does not mean, as the Government argues, that the property rights of some may be taken without just compensation for the benefit of the country as a whole. As the Supreme Court and Federal Circuit have repeatedly stated, the purpose of the Fifth Amendment's just compensation clause is precisely the opposite—to guarantee compensation when property owners are required to sacrifice their property interests for the common good:

> The Fifth Amendment's guarantee that private property shall not be taken for a public use without just compensation was designed to bar Government from forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole. [136]

As the Government's Answer to the Third Amended Complaint admits, Treasury established the Auto Industry Financing Program to protect the auto industry and American financial markets:

> Treasury established the Automotive Industry Financing Program ("AIFP") on December 19, 2008, to help prevent a significant disruption to the American automotive industry, which would have posed a systemic risk to financial market stability and had a negative effect on the economy.[137]

Characterizing the terms of the Chrysler bailout as a "political decision" on which "the Court does not express a view," the bankruptcy court recognized—as the Government refuses to

---

[135] Def.'s Br. at 35 (*quoting Rose Acre Farms, Inc. v. United States*, 559 F.3d 1260, 1278 (Fed. Cir. 2009)).

[136] *Armstrong v. United States*, 364 U.S. 40, 49 (1960).

[137] Def.'s Answer to 3d Amend. Compl. ¶159 (Doc. 69).  The Government has not filed separate answers to the Fourth or Fifth Amended Complaints.

admit here—that Plaintiff Dealers were required to sacrifice for the greater good of the auto industry:  "[A]ny dealership rejection that is approved will cause hardship to the particular dealership involved but may well be necessary if New Chrysler is to survive."[138]

The governmental entities, stated the bankruptcy court, had made the determination that the Chrysler bailout—including the sacrifice of 789 dealerships—is in the national interest (in Fifth Amendment terms, for a public use):

> The Governmental Entities have made the determination that it is in their respective national interests to save the automobile industry, in the same way that the U.S. Treasury concluded that it was in the national interest to protect financial institutions. Many of the jobs in the automobile industry that are being preserved would have been lost, as is the case in many struggling industries, if the government did not see them as part of an industry necessary to be preserved in the national interest.[139]

But the Fifth Amendment right to just compensation is not affected by the importance of the national interest that gave rise to the taking, as the Government contends.  In *International Paper Co. v. United States*[140] the Supreme Court held that the taking of a contractual water right needed by the nation to help win World War I nevertheless required that the owner of the water right be compensated for the taking.  In *Lynch v. United States*,[141] and *Louisville Joint Stock Land Bank v. Radford*,[142] the national financial effects of the Great Depression did not allow the government to take mortgages or GI insurance contracts without payment of just compensation. And in *Shelden v. United States*,[143] the Federal Circuit found the taking of a mortgage resulting

---

[138] *In re Chrysler LLC*, 405 B.R. 84, 104 (Bankr. S.D.N.Y. 2009).
[139] *Id.*
[140] *Int'l Paper Co. v. United States*, 282 U.S. 399 (1931).
[141] *Lynch v. United States*, 292 U.S. 571 (1934).
[142] *Louisville Jt. Stock Land Bank v. Radford*, 295 U.S. 555, 589 (1935).
[143] *Shelden v. United States*, 7 F.3d 1022 (Fed. Cir. 1993).

from the criminal asset forfeiture program nevertheless required that Shelden be compensated for the taking of the mortgage.

Nor are Dealers' rights to just compensation diminished by the fact that benefits flowed to New Chrysler, to the Government as 9.5% owner of New Chrysler, and to the remaining Chrysler dealers who were not terminated (those who picked up the vehicle sales and service customers who would have come to the Plaintiff Dealers had they not been shut down). As the Supreme Court has held, it is the destruction of the property owner's right, regardless of who gets the benefit (if anyone), that gives rise to the takings claim:

> It has never been the rule that only governmental acquisition or destruction of the property of an individual constitutes a taking, for
>
> "courts have held that the deprivation of the former owner rather than the accretion of a right or interest to the sovereign constitutes the taking. Governmental action short of acquisition of title or occupancy has been held, if its effects are so complete as to deprive the owner of all or most of his interest in the subject matter, to amount to a taking."[144]

**Conclusion**

For all these reasons, this Court should deny the Government's motion to dismiss.

Respectfully submitted,

_s/ Roger J. Marzulla_____
Nancie G. Marzulla
Roger J. Marzulla
MARZULLA LAW, LLC
1150 Connecticut Avenue, NW
Suite 1050
Washington, DC 20036
(202) 822-6760 (telephone)
(202) 822-6774 (facsimile)

---

[144] *Ruckelshaus v. Monsanto Co.*, 467 U.S. 986, 1004 (1984) (quoting *United States v. General Motors Corp.*, 323 U.S., at 378).

<div style="margin-left:40%">
nancie@marzulla.com
roger@marzulla.com
</div>

February 17, 2015                    Counsel for Plaintiffs

Of Counsel:

Thomas A. Holman, Esq.
HOLMAN LAW, P.C.
99 Park Avenue
Suite 2600
New York, New York 10016
(212) 481-1336 (telephone)
(866) 204-1020 (facsimile)

Leonard A. Bellavia, Esq.
BELLAVIA BLATT & CROSSETT, P.C.
200 Old Country Road
Mineola, New York 11501
(516) 873-3000 (telephone)
(516) 873-9032 (facsimile)