**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

_____
                                   )

Alley's of Kingsport, Inc., et al.,      )
                                   )

            Plaintiffs,      )     Case No. 11-100
                                   )     Hon. Nancy B. Firestone

      v.                     )

                                   )

United States,                 )

                                   )

            Defendant.      )
_____)

**Plaintiffs' Allegations of Economic Loss**

The termination of Plaintiff Dealers' franchises destroyed all their value and put these often family-owned operations out of business forever.  So the after-condition value of the franchises was zero.[1]  The Complaint alleges that Dealers' franchises—which were ongoing profitable auto sales and service businesses up to the date of termination—had value before the Government required them to be terminated.  And since Dealers received no financial assistance from the Government and no benefit from the Government's loan to Chrysler, none of the pre-termination value of their dealerships is traceable to Government assistance.  To comply with this Court's order,[2] Dealers provide this Court with a summary of the allegations of economic loss from their Amended Complaint:

      1.     Dealers' franchises, up to the date of termination, were profitable, thriving automobile dealerships that were selling and servicing cars.  Dealers' franchises entitled them to purchase automobiles at wholesale from Chrysler and sell them to the public at

---

[1] Fifth Am. Compl. ¶ 206.
[2] Order (Doc. 114) (Apr. 24, 2015).

retail; Chrysler did not sell cars directly to the public.[3]

2.    In late 2008 and 2009, the credit crisis made auto loans difficult to get and so consumers could not purchase new cars. So sales of Chrysler automobiles in 2009 dropped 37% below 2008 levels.[4] Dealers continued, however, to sell and service cars— reducing the manufacturer's inventory from a 151-day supply on January 2009 to a 71-day supply by June 9, 2009, when Dealers' franchises were terminated.[5] These new cars had been manufactured in 2008, before Chrysler received financial assistance from the Government.

3.    Under the authority of the Emergency Economic Stabilization Act of 2008,[6] the United States loaned money to Chrysler for the public purpose of restoring liquidity and stability to the American financial system.[7]

4.    But the United States did not provide any financial assistance to Dealers, and they received no benefit at all from the Government's loan to Chrysler. Thus, any value Dealers' franchises had prior to termination was not the result of the Government's financial assistance to Chrysler.

5.    Had there been no Government financing, "an orderly Chapter 11

---

[3] Fifth Am. Compl. ¶ 172.
[4] *Id.* ¶¶ 176.
[5] *See* FCA (Fiat Chrysler Automobiles), Chrysler Group LLC Increases Retail Market Share, Reports June 2009 U.S. Sales (July 1, 2009), *available at* http://media.chrysler.com/newsrelease.do?id=8480&fIId=8847&mid=1; FCA (Fiat Chrysler Automobiles), Chrysler LLC Announces January 2009 U.S. Sales (Feb. 3, 2009), *available at* http://media.chrysler.com/newsrelease.do?id=8480&fIId=8476&mid=1.
[6] Emergency Economic Stabilization Act of 2008, Pub. L. No. 110-343, 122 Stat. 3765 (codified at 12 U.S.C. §§ 5201–61).
[7] Fifth Am. Compl. ¶¶ 177–83.

liquidation still would have allowed Dealers to continue operating their dealerships for an estimated period, e.g., twenty-four to thirty months, using the value of their customer lists and goodwill built up over the years to sell their remaining new vehicle inventory (including new vehicles from Chrysler's inventory), service and repair vehicles, sell third-party warranties, and sell used vehicles."[8]

6.     Other possibilities might have included some combination of financing or investment from a non-government source.[9]

7.     In any event, Dealers continued to perform service and repair work, sell extended warranties of other third parties to their customers, and sell used vehicles to their customers until their franchises were terminated by the Government.  Dealers derived a large portion of revenue from used cars, service, and parts, not from new vehicle sales.[10]  Even if Chrysler had entirely liquidated its new car manufacturing, Dealers could have profitably continued dealer-authorized warranty and other service work—just as Suzuki dealers did.[11]

8.     In an orderly liquidation in Chapter 11, the valuable brands and assets of Chrysler would have been auctioned off through Bankruptcy Code Section 363 asset sales.[12]  Desirable Chrysler vehicle lines (such as Jeep and Dodge Ram Trucks) could have been sold to other manufacturers.  These sales would have ensured that certain

---

[8] Fifth Am. Compl. ¶ 203.
[9] *Id.* ¶¶ 198, 203, 204.
[10] *Id.* ¶ 205.
[11] *Id.* ¶¶ 197, 203, 205.
[12] *Id.* ¶ 203.

Plaintiffs selling these model lines could have continued as going concerns.[13] There also

would have been potential bidders for Chrysler vehicle lines in addition to Fiat.[14] A

prospective purchaser of the assets including the product lines of Chrysler may have

continued to utilize the existing dealer network to sell vehicles, thereby allowing the

dealers to continue operating as going concerns. Fiat was such a prospective purchaser.[15]

9.      In an orderly Chapter 11 liquidation, Chrysler's secured lenders likely

would have provided some Debtor in Possession financing or permitted the use of cash

collateral (cash balance at April 30, 2009 filing date was $407 million) to ensure an

orderly liquidation and to make some funding available to provide incentives to dealers to

sell the remaining new vehicles to customers rather than forcing them to sell at fire sale

prices to the remaining dealers.[16]

10.      If Plaintiffs had the additional time to operate their dealerships provided

under the Chrysler-proposed restructuring plan, rather than being forcibly and

immediately terminated via the Government intervention, their dealerships would have

retained significantly more value because even an orderly wind down of a business—as

Chrysler proposed as one of its three scenarios—generates more value than a forced or

fire sale liquidation as the Government's intervention required.[17] Even if none of the

Chrysler brand assets were sold, however, an orderly wind-down would have allowed the

---

[13] Fifth Am. Compl. ¶ 203.
[14] *Id.* ¶ 203.
[15] *Id.* ¶ 198.
[16] *Id.* ¶ 204.
[17] *Id.* ¶ 206.

dealers to continue operation of their dealerships for a period of time.[18]

**Conclusion**

Dealers contend that their allegations regarding the first two scenarios of the

Chrysler viability plan (Chrysler remains in business as a stand-alone or merges with Fiat

but the Government still makes a loan to Chrysler) are not precluded by the Federal

Circuit's decision, but have not listed these allegations[19] here to comply with this Court's

order.[20] Dealers do not waive their right to rely on these allegations in this case.

<div style="margin-left:50%">

Respectfully submitted,

 s/ Nancie G. Marzulla
Nancie G. Marzulla
Roger J. Marzulla
MARZULLA LAW LLC
1150 Connecticut Avenue, NW
Suite 1050
Washington, DC 20036
(202) 822-6760 (telephone)
(202) 822-6774 (facsimile)
Nancie@marzulla.com
Roger@marzulla.com

</div>

April 30, 2015                                       Counsel for Plaintiffs

Of counsel:

Thomas A. Holman
HOLMAN LAW, P.C.
99 Park Avenue
Suite 2600
New York, NY 10016
(212) 481-1336 (telephone)
(212) 481-1333 (facsimile)

---

[18] Fifth Am. Compl. ¶ 203.
[19] *See id.* ¶¶ 200–02.
[20] Order at 2 n.2 (Doc. 114).

TAHolman@holmanlawoffice.com

Leonard A. Bellavia
BELLAVIA BLATT & CROSSETT P.C.
200 Old Country Road
Mineola, NY  11501
(516) 873-3000 (telephone)
(516) 873-9032 (facsimile)
LBellavia@dealerlaw.com