# In the United States Court of Federal Claims

Nos. 10-647C, 11-100C, and 12-900C
(Filed: September 9, 2015)

|  |  |  |
|---|---|---|
| ) |  |  |
| COLONIAL CHEVROLET CO., INC., et al., ) |  |  |
| ) |  |  |
| Plaintiffs, ) |  |  |
| ) |  |  |
| v. ) |  |  |
| ) |  |  |
| THE UNITED STATES, ) |  |  |
| ) |  |  |
| Defendant. ) |  |  |
| * * * * * * * * * * * * * * * * * * * * ) |  |  |
| ) |  |  |
| ALLEY'S OF KINGSPORT, INC., et al., ) |  |  |
| ) |  | Motion to Dismiss for Failure to State |
| Plaintiffs, ) |  | a Claim; RCFC 12(b)(6); Allegations |
| ) |  | Sufficient to State a Fifth Amendment |
| v. ) |  | Taking; Allegations of Economic Loss |
| ) |  |  |
| THE UNITED STATES, ) |  |  |
| ) |  |  |
| Defendant. ) |  |  |
| * * * * * * * * * * * * * * * * * * * ) |  |  |
| ) |  |  |
| SPITZER MOTOR CITY., et al., ) |  |  |
| ) |  |  |
| Plaintiffs, ) |  |  |
| ) |  |  |
| v. ) |  |  |
| ) |  |  |
| THE UNITED STATES, ) |  |  |
| ) |  |  |
| Defendant. ) |  |  |
| ) |  |  |

*Richard D. Faulkner*, Richardson, TX, for plaintiffs Colonial Chevrolet Co., Inc., et al.. *Harry Zanville*, San Diego, CA and *Steven J. Eagle*, Arlington, VA, of counsel.

*Nancie G. Marzulla*, Washington, DC, for plaintiffs Alley's of Kingsport, Inc., et al.. *Roger J. Marzulla*, Washington, DC, *Thomas A. Holman*, New York, NY, and *Leonard A. Bellavia*, Mineola, NY, of counsel.

Jonathan A. Michaels, Newport Beach, CA, for plaintiffs Spitzer Motor City, Inc., et al.. *M. Todd Ratay* and *Kathryn J. Harvey*, Newport Beach, CA, of counsel.

*Kenneth M. Dintzer*, Deputy Director, with whom were *Benjamin C. Mizer*, Principal Deputy Assistant Attorney General, *Robert E. Kirschman, Jr.,* Director, and *Elizabeth M. Hosford*, Assistant Director, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, Washington, DC, for defendant.

## OPINION DENYING GOVERNMENT'S MOTION TO DISMISS

**FIRESTONE**, *Judge*.

The above-captioned cases concern three groups of plaintiffs who are former owners of dealerships authorized to sell cars manufactured by General Motors Co. ("GM") and Chrysler Group, LLC ("Chrysler") (collectively, "the manufacturers").[1]  In February of 2009, as part of the Automotive Industry Financing Program ("AIFP"), the government agreed to give $30 billion in loans and equity to GM and $8 billion in loans to Chrysler to prevent the manufacturers from having to liquidate in bankruptcy.  See A & D Auto Sales v. United States, 748 F.3d 1142, 1148 (Fed. Cir. 2014).[2]  As a condition to receiving this financing, GM and Chrysler had to agree to cancel many of their

---

[1] The plaintiffs in Colonial Chevrolet Co., Inc v. United States, No. 10-647 (the "Colonial plaintiffs") include both Chrysler and GM franchisees.  See Colonial Second Am. Compl., ECF No. 101 ("Colonial Compl.").  The plaintiffs in Alley's of Kingsport v. United States, No. 11-100 (the "Alley's plaintiffs") and Spitzer Motor City, Inc. v. United States, No. 12-900 (the "Spitzer plaintiffs), only include Chrysler franchisees.   See Alley's Fourth Am. Compl., ECF No. 95 ("Alley's Compl."); Spitzer Third Am. Compl., ECF No. 28 ("Spitzer Compl.").

[2] The AIFP was part of the larger Troubled Asset Relief Plan ("TARP") of 2008-2009.

franchise agreements, forcing the dealerships to close.  Id.  Consequently, Chrysler

terminated 789 dealerships and GM terminated 1,454 dealerships.  Spitzer Compl. ¶ 38;

Colonial Compl. ¶¶ 59-60; Alley's Compl. ¶ 194.  The plaintiffs argue that this forced

cancellation of their franchise agreements constituted a taking without just compensation

in violation of the Fifth Amendment.

After this court denied the government's prior motion to dismiss the Alley's and

Colonial cases,[3] the Federal Circuit held in an interlocutory appeal that plaintiffs had

alleged a valid property interest in their franchise agreements.  A & D Auto Sales, 748

F.3d at 1152-53.  However, the Circuit also found in light of the fact that the

manufacturers were near insolvency when the government intervened, the plaintiffs had

failed to allege sufficient facts to establish whether they had suffered an economic loss as

a result of the government's alleged taking, noting that plaintiffs cannot state a takings

claim if the property allegedly taken has no value, and remanded the case to this court to

allow the plaintiffs to amend their complaints to include allegations of economic loss.  Id.

at 1157-59.  The Circuit stated that to survive a motion to dismiss the plaintiffs must

make "specific allegations" establishing that their franchise agreements would have

retained value in a scenario known as the "but-for world" in which the government did

not enter into an agreement with the manufactures to provide financing, conditioned upon

---

[3] See Order Denying Motion to Dismiss Alley's Am. Compl., ECF No. 34 (Feb 27, 2012); Order
Denying Motion to Dismiss Colonial 2d Am. Compl., ECF No. 43 (Feb 27, 2012).  The Spitzer
plaintiffs filed their complaint in December of 2012, after the first motions to dismiss were
decided.  However, the Spitzer plaintiffs participated as amicus curiae in the interlocutory appeal
from the denial of the motions to dismiss the Alley's and Colonial complaints.

closing dealerships, to save the companies.   Id. at 1159.   The Circuit remanded the case to this court to allow plaintiffs to amend their complaints to include allegations that their dealerships had an economic value at the time of the alleged taking and consequently suffered an economic loss as a result of the government's action.   Each of the three groups of plaintiffs filed amended complaints on September 15, 2014, alleging several but-for scenarios under which they argue their dealerships would have retained value,

Pending before the court is the government's motion to dismiss the amended complaints pursuant to Rule 12(b)(6) of the Rules of the United States Court of Federal Claims ("RCFC").   The government argues that plaintiffs have failed to allege sufficient facts in their amended complaints to meet the "economic loss" requirement for establishing a taking under the Fifth Amendment.   According to the government, nothing was taken from plaintiffs because, in the but-for worlds where the alleged taking did not occur, GM and Chrysler would have been liquidated, making plaintiffs' franchise agreements worthless.   The government contends that plaintiffs' but-for world allegations are either inconsistent with the Circuit's holding or lack sufficient detail to meet the "plausibility" standard set by the Supreme Court in Ashcroft v. Iqbal, 556 U.S. 662 (2009).   Plaintiffs argue that they have met their burden and have alleged sufficiently plausible facts to show that their franchises would have had economic value under several but-for scenarios.   According to plaintiffs, the government is seeking a level of factual detail at the complaint stage that goes beyond the pleading standards set by the Circuit and Supreme Court in Iqbal.

4

This case raises a novel question regarding the level of factual detail that must be pleaded to withstand a motion to dismiss in a Fifth Amendment takings case where the claim requires plaintiffs to establish a plausible but-for world. Ultimately, it may prove difficult for each of the plaintiffs to demonstrate that their franchise would have had value absent the alleged taking. However, for the reasons set forth below, the court finds that plaintiffs have alleged sufficient facts to survive a motion to dismiss. The plaintiffs will have an opportunity to further develop the facts that they have alleged in their complaints. The government's motion is therefore **DENIED**.

## I.   LEGAL FRAMEWORK[4]

### A.   Standard of Review for a Motion to Dismiss

When deciding a motion to dismiss a complaint pursuant to RCFC 12(b)(6), the court must accept the material facts alleged in the complaint to be true, draw all reasonable inferences in favor of the plaintiffs, and decide whether it is plausible that plaintiffs have a valid claim for relief. Iqbal, 556 U.S. at 679; Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555-56 (2007). Under Twombly, "factual allegations must be enough to raise a right to relief above the speculative level," and assert "enough facts to state a claim to relief that is plausible on its face." 550 U.S. at 555. Plausibility at the pleading stage is distinct from probability and "a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable, and 'that a

---

[4] The basic facts surrounding the government's assistance to GM and Chrysler during the financial crisis of 2008-2009 are set forth in detail in the Federal Circuit's decision in A & D Auto Sales and will not be repeated here.

recovery is very remote or unlikely.'"  Id. at 556 (quoting Scheuer v. Rhodes, 416 U.S.

232, 236 (1974)).  While a court "primarily consider[s] the allegations in the complaint,"

it "may also look to 'matters incorporated by reference or integral to the claim, items

subject to judicial notice, [and] matters of public record.'"  A & D Auto Sales, 748 F.3d

at 1147 (quoting 5B Charles Alan Wright & Arthur R. Miller, Federal Practice and

Procedure § 1357 (3d ed. 2004)).

### B.      The Federal Circuit's Requirements for Pleading a Takings Claim

In A & D Auto Sales, the government argued before the Federal Circuit, as it does

now, that GM and Chrysler would have been forced to liquidate and plaintiffs' franchises

would have been worthless without the government's assistance that was conditioned on

cancelling plaintiffs' franchises.  Therefore, according to the government, because the

plaintiff's property would have zero value but for the government's intervention, there

was no taking.

The Federal Circuit agreed with plaintiffs that government action requiring a third

party to eliminate a private property right "may give rise to takings liability depending on

the circumstances."  A & D Auto Sales, 48 F.3d. at 1153.  However, the Circuit accepted

government's premise that if the plaintiffs' franchises were worth nothing, no taking had

occurred, noting that "[j]ust compensation for a net loss of zero is zero."  Id. at 1157

(citing Brown v. Legal Found. of Washington, 538 U.S. 216, 240 n.11 (2003)).  The

Circuit stated that "[i]n order to establish a regulatory taking, a plaintiff must show that

his property suffered a diminution in value or a deprivation of economically beneficial

use."  Id.  Therefore, the Circuit found, "by necessity, proving economic loss requires a

plaintiff to show what use or value its property would have but for the government

action." Id.  The court found that, in order to survive a motion to dismiss for a takings

claim, a plaintiff must "allege sufficient facts in its complaint to show what use or value

its property would have had." Id.

The Federal Circuit also agreed with the government that plaintiffs' complaints

"contain no allegations regarding the but-for economic loss of value of the plaintiffs'

franchises from which to establish an economic loss." Id. at 1158.  The Circuit explained

that:

> Absent an allegation that GM and Chrysler would have avoided bankruptcy
> but for the government's intervention and that the franchises would have
> had value in that scenario, or that such bankruptcies would have preserved
> some value for the plaintiffs' franchises, the terminations actually had no
> net negative economic impact on the plaintiffs because their franchises
> would have lost all value regardless of the government action.

Id.  The Circuit remanded the case to give plaintiffs the opportunity to amend their

complaint to allege the type of economic value/loss described in its opinion.  Id. at 1158-

59.

### C. Pleading Economic Value/Loss of the Allegedly Taken Property is Necessary Regardless of What Takings Test this Court Ultimately Applies

In A & D Auto Sales, the Federal Circuit treated this case as alleging a regulatory

taking as opposed to a physical taking, noting that "plaintiffs do not allege, and their

complaints do not assert facts supporting an allegation of, a 'direct government

appropriation or physical invasion of [their] private property.'" Id. at 1150 (alteration in

original) (quoting Lingle v. Chevron U.S.A. Inc., 544 U.S. 528, 537 (2005)).  Within the

regulatory takings framework, the Federal Circuit "decline[d] to decide" whether the alleged taking should be considered under the Supreme Court's test for regulatory takings in Penn Central Transportation Co. v. City of New York, 438 U.S. 104 (1978), or the "categorical" test established in Lucas v. S.C. Coastal Council, 505 U.S. 1003 (1992). Id. at 1151-52. Because a showing of economic loss is necessary under either test, id. at 1157 (citing Lucas, 505 U.S. at 1015; Penn Central, 438 U.S. at 124), this court need not address the issue in order to resolve the government's motion to dismiss.

Following the Supreme Court's decision in Horne v. United States, 135 S. Ct. 2419 (2015), this court asked the parties for additional briefing regarding the potential impact of that decision on the correct takings jurisprudence to be applied to this case. In Horne, the Supreme Court found that a physical taking had occurred under a government program which required raisin growers to relinquish a percentage of their crop to United States. Id. at 2428-29. Therefore, the Court found, the takings claim must be analyzed under the Supreme Court's decision in Loretto v. Teleprompter Manhattan CATV Corp., 458 U.S. 419 (1982), rather than under Lucas or Penn Central. Id.

The Alley's plaintiffs argue that, like the raisins in Horne, a franchise agreement is personal property subject to the Supreme Court's physical or per se takings jurisprudence. Alley's Supp. Mem. 1, ECF No. 121. Plaintiffs note that the Horne Court discussed a case in which the alleged appropriation of a patent was a per se taking, arguing that intangible property such as contracts should be treated similarly. Id. at 1-2. According to plaintiffs, the difference between regulatory and per se takings jurisprudence is significant to this case because, unlike regulatory takings which require

8

the plaintiff to plead a diminution in value as a result of the government's action, just compensation for a physical taking "should be measured according to 'the market value of the property at the time of the taking.'"  Id. (quoting Horne, 135 S. Ct. at 2432). Plaintiffs also note that in Horne, the Supreme Court rejected the government's argument that the raisin growers were economically better off under the government program because taking a percentage of their crops off the market artificially kept prices high. Therefore, according to plaintiffs, this court should not now consider the issue of economic loss as a result of the government's action because such an inquiry is confined to regulatory takings.

Plaintiffs may be correct that their claims will ultimately be appropriately considered under the physical takings rubric of Horne and other cases rather than the regulatory takings tests of Lucas or Penn Central.  But for the purpose of the government's present motion to dismiss, the plaintiffs will still have to show that their property would have had value absent the alleged taking regardless of the test ultimately applied.  In Brown v. Legal Foundation of Washington, the Supreme Court found that a state law, which required client funds that could not otherwise generate net earnings for the client be deposited in an IOLTA account, should be analyzed as per se or physical taking allegation.  538 U.S. at 235.  However, the Supreme Court noted that even if property is taken, "the Fifth Amendment only protects against a taking without just compensation."  Id. at 240.  In Brown, the plaintiffs suffered no pecuniary loss as a result of the law.  Id.  Therefore, there was "no constitutional violation" when the plaintiffs in that case were not compensated.  Id.  Conversely, in Horne, there was no dispute that the

actual raisins did have a market value at the time they were taken.  In this case, the

government argues that the plaintiffs' franchises had no value at the time of the alleged

taking.  Whether analyzed under <u>Loretto</u>, <u>Lucas</u>, or <u>Penn Central</u>, "just compensation for

a net loss of zero is zero." <u>Brown</u>, 538 U.S. at 240 n.11.  Likewise, if the plaintiffs in this

case cannot demonstrate the value of the property allegedly taken—their franchise

agreements—was greater than zero at the time of the alleged taking, they cannot state a

takings claim regardless of what test applies.[5]

## II.   DISCUSSION

The plaintiffs allege in their amended complaints that their franchises would have

had value under four but-for world scenarios posited as directed by the Circuit.  First, the

Alley's and Colonial plaintiffs argue that the correct but-for world is one in which the

government gave financial assistance to the manufacturers but did not require dealerships

to close.  Second, the Spitzer plaintiffs argue that Chrysler was financially strong enough

to survive the economic downturn even without government assistance, and that the

company would have continued to exist and kept its dealerships open.  Third, the Alley's,

---

[5] The government also argues that the plaintiffs have failed to allege sufficient facts to satisfy two other elements of the <u>Penn Central</u> test.  Specifically, the government argues that the plaintiffs did not allege a reasonable investment-backed expectation that their franchises would have survived absent government action, and that the actual burden imposed on the property rights was not sufficient to support a taking.  The government did not make these arguments before the Federal Circuit or in its prior motion to dismiss.  Assuming that prior decisions in this case do not bar the government from raising these arguments, and assuming that <u>Penn Central</u> will be the correct takings test applied, the government's arguments with respect to the other elements of the <u>Penn Central</u> test need not be separately addressed.  To the extent that the plaintiffs can show an economic loss as a result of the government's action in a but-for world, the plaintiffs will have necessarily have also shown that the character of the government action completely destroyed the value of their franchise agreements and that they had a reasonable investment-backed expectation that their franchise agreements would not have been cancelled.

Colonial, and Spitzer plaintiffs argue that some or all of GM and Chrysler would have been acquired during a bankruptcy proceeding, and that the purchaser would have kept the dealerships open.  Finally, the Alley's, Colonial, and Spitzer plaintiffs argue that, even in a but-for world where GM and Chrysler entered bankruptcy, their dealerships would have maintained value during an orderly wind-down period.

The government argues that the first but-for scenario—a significant government contribution without closing franchises—is contrary to the Circuit's holding in A & D Auto Sales and must be rejected.  As for plaintiffs' allegations that their franchise agreements would have had value under other but-for scenarios, the government argues that none of the allegations in plaintiffs' complaints are sufficient to survive a motion to dismiss because the allegations are not plausible and are too speculative to satisfy the test set by the Supreme Court in Iqbal and Twombly.

As explained below, the court agrees with the government that the Federal Circuit's decision in A & D Auto Sales precludes plaintiffs from alleging the value of their dealerships under a but-for scenario that includes the government loan of $30 billion to GM and $8 billion to Chrysler without requiring dealerships to close.  However, with respect to the other allegations in plaintiffs' complaints, the court finds that the government's demands for greater specificity in the pleadings with respect to economic loss go beyond Iqbal and Twombly's requirements.  With respect to the plaintiffs who allege a taking of a Chrysler dealership, the court finds that the plaintiffs have sufficiently alleged that their franchise agreements had an economic value under the three but-for scenarios alleged in the respective complaints.

However, the plaintiffs who allege a taking of a GM dealership as part of the Colonial complaint have only alleged facts sufficient to state a claim that their dealerships had value under the fourth but-for scenario, that is, that the dealerships could have remained open during liquidation to sell existing inventory and service cars already on the road.  The Colonial plaintiffs only provide conclusory allegations that GM would have been acquired by another entity, with no facts to support that assertion.  That argument regarding economic value is therefore too speculative to survive under Iqbal and Twombly.

The court is mindful that individual plaintiffs will have to support their allegations regarding a but-for world with sufficient real world facts to prove their cases.  However, this "is the sort of information that is appropriately the subject of discovery, rather than what is required to satisfy the limited pleading requirements" under this court's rules. Pelman ex rel. Pelman v. McDonald's Corp., 396 F.3d 508, 512 (2d Cir. 2005). Therefore, the court finds that these claims can proceed, and plaintiffs will be given an opportunity to seek discovery and procure experts to show economic value at the time of the taking and loss of that value as a result of the government's action.  Further, though the court is treating all the Chrysler and GM dealerships as two unified groups for the purposes the motions to dismiss, in order to prevail in this litigation, each plaintiff will have to demonstrate that, absent the government's assistance to the auto manufacturers, his or her franchise agreement would have had an economic value at the time of the alleged taking.

12

**A.      Scenario 1: The Government Provides Loans without Requiring Termination of Dealership Agreements**

**1.      Facts Alleged in the Complaints**

The Alley's and Colonial plaintiffs argue that the proper but-for scenario under which the court should analyze plaintiffs' allegations of economic loss is one in which the government provided loans and equity to the automakers in February of 2009 but did not require them to terminate their dealerships.  Alley's Compl. ¶ 201; Colonial Compl. ¶ 70.  Plaintiffs allege that, in the but-for world where GM and Chrysler were not forced to close their franchises in exchange for government assistance, GM and Chrysler would have survived bankruptcy and kept their dealerships open.  Alley's Compl. ¶ 201; Colonial Compl. ¶ 70.

To support their argument that the franchises did not need to be closed in order for the manufacturers to survive, and, therefore, would have maintained an economic value had the government not forced them to close, the Alley's plaintiffs rely on a report to Congress by the Treasury Department's Special Inspector General for TARP ("SIGTARP Report"), dated July 19, 2010, which stated that:

> [I]t is not at all clear that the greatly accelerated pace of the dealership closings during one of the most severe economic downturns in our Nation's history was either necessary for the sake of the companies' economic survival or prudent for the sake of the Nation's economic recovery.
> . . .
> Chrysler officials themselves told SIGTARP [the Special Inspector General for TARP] that closing dealerships too quickly would have an adverse effect on sales. Chrysler officials said that they expected that their rapid terminations would result in lost sales in the short term, that Chrysler will take several years to recover lost sales, and that future increases in market share will depend on penetrating new markets.

Alley's Compl. ¶ 201 (quoting SIGTARP Report).  Therefore, plaintiffs argue, not only was closing the dealerships unnecessary to ensure the manufacturers survival, closing the dealerships was actually counterproductive and harmed the companies.  The Alley's plaintiffs cite an expert quoted in the SIGTARP report as opining that "closing dealerships in an environment already disrupted by the recession could result in an even greater crisis in sales."  Alley's Compl. ¶ 192; <u>see also</u> Spitzer Compl. ¶¶ 26-28; Colonial Compl. ¶ 70.

> **2.    This Scenario is Precluded by the Federal Circuit's Decision in <u>A & D Auto Sales</u>**

In <u>A & D Auto Sales</u>, the Federal Circuit stated that the plaintiffs must "show what use or value its property would have but for the government action." <u>A & D Auto Sales</u>, 748 F.3d at 1157.  The Alley's and Colonial plaintiffs ask the court to find that the relevant "government action" is limited to the government's requirement that GM and Chrysler close some of their dealerships.  The Colonial plaintiffs argue that this is an appropriate but-for scenario because the government considered Chrysler and GM to be "too big to fail," and therefore there is no realistic scenario under which the government would have allowed the companies to go out of business.  Colonial Compl. ¶ 70(a).

The government counters that the Federal Circuit's decision in <u>A & D Auto Sales</u> bars plaintiffs from establishing economic loss or value of their franchise agreements based on a but-for world where the automakers received the February 2009 government assistance but were not required to close plaintiffs' dealerships as part of the bargain. The government notes that <u>A & D Auto Sales</u> required the plaintiffs to "allege sufficient facts

to show what value its dealership would have had 'but for the government's intervention.'"  Def.'s Mot. to Dismiss Alley's Compl. at 20 (quoting <u>A & D Auto Sales</u>, 748 F.3d at 1157-58);  Def.'s Mot. to Dismiss Colonial Compl. at 22 (quoting <u>A & D Auto Sales</u>, 748 F.3d at 1157-58).  According to the government, "[t]he appropriate but-for world . . . examines the value of plaintiffs' franchises <u>without any government assistance to the automakers</u>."  Def.'s Mot. to Dismiss Colonial Compl. at 22 (emphasis in original); <u>see also</u> Def.'s Mot. to Dismiss Alley's Compl. at 20.

The court agrees with the government that <u>A & D Auto Sales</u> precludes the plaintiffs from alleging a but-for scenario that includes the government's February 2009 assistance to GM and Chrysler but not the requirement that the plaintiffs' dealerships be closed.  It is undisputed that the February 2009 AIFP loans of approximately $30 billion to GM and $8 billion to Chrysler were specifically contingent on the manufacturers' agreement to close dealerships.  Whether or not closing the dealerships was ultimately the right decision from a financial perspective, had the manufacturers not agreed to close dealerships, the government would not have provided the February 2009 financing.  These loans are therefore part-and-parcel of the alleged taking.  Though the Federal Circuit's use of the phrases "government action" and "government intervention" is somewhat ambiguous, the context makes it clear that the court intended the but-for world to be one in which the government did not provide the loans in February 2009 that the manufacturers and the government believed were necessary to prevent GM and Chrysler's liquidation in bankruptcy.  <u>See</u> <u>A & D Auto Sales</u>, 748 F.3d at 1158.  If requiring the manufacturers to cancel franchise agreements was the only "government

intervention" the Federal Circuit was referring to, there would be no need for the discussion of GM and Chrysler's potential insolvency absent the government's financial assistance.  Consequently, plaintiffs will not be permitted to establish value/loss based on this but-for scenario.

The court disagrees with the government, however, that the plaintiffs are required to show that their "dealerships would have had value without any government assistance to the automakers."  Def.'s Mot. to Dismiss Colonial Compl. at 22 (emphasis altered).  In December 2008, the government had provided bridge loans to Chrysler and GM in the amount of $4 billion and $13.4 billion, respectively, in order to keep the companies operational pending talks regarding additional assistance.  See A & D Auto Sales, 748 F.3d at 1148.  The court does not read A & D Auto Sales as requiring plaintiffs to prove value in a but-for world that excludes these stop-gap loans because the loans were not contingent upon the alleged taking—the closure of their dealerships.  Plaintiffs are allowed to show economic value in but-for scenarios that take into account economic conditions as they were before they were forced to close their franchises, including these earlier government loans.[6]

---

[6] In their opposition to the government's motion to dismiss, Colonial points out other ways that the government provided assistance to the auto manufacturers other than a direct infusion of capital, including subsidizing fuel-efficient cars, implementing the "cash for clunkers" program, and purchasing new Ford Motor Co. ("Ford"), GM, and Chrysler vehicles for its own use, and contends that these programs may also be considered in the but-for world.  Colonial Opp. 25. Though allegations regarding programs of this nature are not specifically addressed in any of the plaintiffs' complaints, the court does not read A & D Auto Sales as prohibiting the argument that other government assistance contributed to the dealerships' economic viability.

**B.     Scenario 2: Chrysler Survives without Government Assistance**

**1.     Facts Alleged in the Complaint**

The Spitzer plaintiffs allege that "absent the bailout Chrysler would have continued to operate, and the Plaintiffs would have maintained the economic value of their franchises." Spitzer Compl. ¶ 40.  The complaint alleges that in November and December of 2008, Ford was in a similarly dire financial situation and initially told Congress that it required billions of dollars in economic support or it would cease to exist.  Id. at ¶ 40(a).  Therefore, according to plaintiffs, "[w]ith problems similar to those of Chrysler (and in some cases worse), Ford was able to survive the economic crisis of 2008, and so too would have Chrysler." Id. at ¶ 40(b).  Plaintiffs note that, despite heavy losses, Chrysler's "December 31, 2008 balance sheet shows that the company had (before receiving TARP funds) $1.9 billion in cash" to meet the demands of creditors.  Id.  According to plaintiffs, "Chrysler had endured substantial hardship throughout its . . . 90 year existence, surviving the Great Depression, countless recessions, World War II and several oil crises," and therefore "there is no reason to believe that Chrysler—as with Ford—would not have survived the economic downturn." Id.  Therefore, according to the Spitzer plaintiffs, "[w]ith cost cutting, Chrysler would have survived as a stand-alone business." Id. at ¶ 40(a).

**2.     The Spitzer Plaintiffs will be Allowed to Establish Economic Loss from the Closure of their Dealerships in a But-For World based on Chrysler's Survival Absent Government Intervention**

The government contends in its motion to dismiss that the Spitzer plaintiffs do not identify the cost-cutting measures that Chrysler would have had to employ in order to

survive with only $1.9 billion in hand.  Def.'s Mot. to Dismiss Spitzer Compl. at 21.  In

support of its arguments, the government cites the bankruptcy court's finding that the

"only other alternative" to government intervention was "the immediate liquidation of the

company."  Id. at 22 (quoting In re Chrysler LLC, 405 B.R. 84, 96 (Bankr. S.D.N.Y.

2009)).  However, the plaintiff franchisees in this case were not parties to the bankruptcy

proceedings and are not bound by its conclusions.  As Judge Hodges has already found in

his opinion denying the government's previous motion to dismiss this case,

> So far as plaintiffs are concerned, the Chrysler bankruptcy was an irrelevant
> and complicating event.  Bankruptcy court rulings should not be used by
> defendant to prevent plaintiffs from pursuing their takings claims in this
> court. . . .  [T]he Government cannot use rulings issued in a bankruptcy
> proceeding to control prospective legal and factual findings in the Court of
> Federal Claims in a separate proceeding involving different causes of
> action.

Alley's of Kingsport, Inc. v. United States, 103 Fed. Cl. 449, 453 (2012); see also A & D

Auto Sales, 748 F.3d at 1156 (finding that the bankruptcy court's findings on good faith

did not estop plaintiffs from arguing in this litigation that the government coerced the

automakers into action).

The government also relies on statements from the Chrysler Restructuring Plan

submitted to the government in 2009 in which Chrysler informed the government that

Chrysler needed approximately $11 billion to survive.  Mot. to Dismiss Spitzer Compl. at

21 (citing Chrysler Restructuring Plan at 11, 39).  Regardless of whether the court can

review the Plans without triggering the need to convert the government's motion into one

for summary judgment, see RCFC 12(d) (motion to dismiss may be converted to motion

for summary judgment if "matters outside the pleadings are presented to and not

excluded by the court"), plaintiffs are independent franchisees and are not bound by Chrysler's statements.  While it may be appropriate to consider this report at some future point in this litigation, the court is obliged to assume that factual "allegations in the complaint are true (even if doubtful in fact)" in a motion to dismiss for failure to state a claim.  Kam-Almaz v. United States, 682 F.3d 1364, 1368 (Fed. Cir. 2012) (quoting Twombly, 550 U.S. at 555).

The government also argues that Chrysler's situation was not analogous to Ford's, given that Ford had $6.3 billion on hand compared to Chrysler's $1.9 billion and Ford's sales were better than Chrysler's.  The court finds that, though it may be difficult for plaintiffs to prove that $1.9 billion and cost cutting could have saved Chrysler from liquidation, given Ford's history the court cannot now say that the allegations are so speculative to be facially implausible.  As the Supreme Court has stated, a "well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable," Twombly, 550 U.S. at 556.  The court cannot say whether or not Chrysler had sufficient assets to continue operations without expert testimony, making the issue inappropriate for resolution through a motion to dismiss.  See In re Burlington Coat Factory Sec. Litig., 114 F.3d 1410, 1421 (3d Cir. 1997) (noting that if an issue is "best resolved by expert testimony," it "should not be addressed in a motion to dismiss." (citation omitted)).

Similarly, the court would have to make detailed factual determinations in order to decide whether Chrysler and Ford's financial situations were sufficiently similar to draw conclusions about the likelihood of Chrysler's survival.  At this stage of the litigation, the

plaintiffs have pleaded sufficient facts to "raise a reasonable expectation that discovery will reveal" that the allegations in their complaint are correct.  <u>Twombly</u>, 550 U.S. 556. Therefore, the Spitzer plaintiffs will be allowed to attempt to establish the economic value of their franchise agreements at the time of the taking and subsequent loss of that value as a result of the government's action under this scenario.

C. **Scenario 3: Plaintiffs' Dealerships Would Have Retained Value as Part of a Merger with Another Entity**

In the third potential but-for scenario, the Alley's, Colonial, and Spitzer plaintiffs allege that an entity other than the United States government would have entered into restructuring agreements with GM and Chrysler and purchased some or all of the manufacturers' assets in a bankruptcy proceeding.  Alley's Compl. ¶ 198; Colonial Compl. ¶ 70; Spitzer Compl. ¶ 40.  In that scenario, a purchaser of GM or Chrysler product lines "would likely have continued to utilize the existing dealer network to sell vehicles, thereby allowing the dealers to continue operating as going concerns."  Alley's Compl. ¶ 198; <u>see also</u> Colonial Compl. ¶ 70(b) (purchasers of GM and Chrysler lines would have "likely utilize[ed] the Plaintiffs to act as franchised members of a distribution channel of these products and associated services."); Spitzer Compl. ¶ 40(d).

Because the court finds that the allegations in the Alley's and Spitzer complaints with respect to Chrysler vary greatly from the allegations in the Colonial complaint with respect to GM, they will be treated separately.

1. **Facts Alleged in the Complaints Regarding Chrysler**

The Alley's and Spitzer plaintiffs allege that, at the time of the alleged taking, Fiat Automobiles ("Fiat") was a likely purchaser of Chrysler's assets and successful lines.

Alley's Compl. ¶ 198; Spitzer Compl. ¶ 40(d).  Had the government not intervened, plaintiffs allege, Fiat would have "merge[d] Chrysler into its operations" and the plaintiffs' dealerships would have "survive[d] as newly merged Chrysler-Fiat dealerships."  Spitzer Compl. ¶ 40(d).  The plaintiffs allege that Chrysler was in talks for a potential partnership agreement with Fiat in 2008, and, in January of 2009, the two companies had entered into a non-binding merger agreement which would have given Fiat a 35% stake in Chrysler.  Spitzer Compl. ¶ 40(c); see also Alley's Compl. ¶ 198. According to the Spitzer plaintiffs, this deal would have been beneficial for Fiat because it would give Fiat access to the American market "without having to endure the massive time and expense required to establish a ground up dealer network."  Spitzer Compl. ¶ 40(c).  The Spitzer plaintiffs allege that Fiat was "financially healthy" with $4.8 billion cash on hand and $79.9 billion in assets in 2008.  Id. at ¶ 40(d).

Plaintiffs further allege that "[t]here would likely have been potential bidders, in addition to Fiat."  Alley's Compl. ¶ 203.  The Spitzer plaintiffs note that Daimler AG ("Daimler"), which "still owned 19.9 percent" of Chrysler and "at the time had $6 billion" in cash, "would have been a likely pursuer of the business opportunity."  Spitzer Compl. ¶ 40(e).  The plaintiffs argue that, at the very least, certain successful product lines, particularly Jeep and Dodge Ram Trucks, would have been purchased and the new owners would have maintained the existing dealership network.  Alley's Compl. ¶ 203.

    2.      **The Chrysler Plaintiffs will be Allowed to Establish Economic Loss from the Closure of their Dealerships in a But-For World based on a Potential Merger between Chrysler and Fiat or Daimler**

The government contends that the plaintiffs' allegation that the dealerships would have value based on Chrysler merging with Fiat or Diamler is "entirely unsupported and speculative." Def.'s Mot. to Dismiss Spitzer Compl. at 23; Def.'s Mot. to Dismiss Spitzer Compl. at 25; <u>see also</u> Def.'s Mot. to Dismiss Alley's Compl. at 22.  To show that no merger would have occurred without government funding, the government cites the bankruptcy court's finding that no entity other than the United States and Canada was "willing and able to provide funding for the purchase of Chrysler's assets."  Def.'s Mot. to Dismiss Spitzer Compl. at 23 (quoting <u>In re Chrysler LLC</u>, 405 B.R. at 104).  The government further argues that the letter of intent between Fiat and Chrysler was conditioned on Chrysler receiving additional government funding, and states that the plaintiffs have not alleged any facts supporting the allegation that Fiat would have consummated such a merger without government financing.

The court finds that each of these arguments demands a level of certainty and specificity beyond what is required to survive a motion to dismiss.  As the Federal Circuit has explained, the court's role at this stage of the proceedings is limited to determining whether a complaint's "factual allegations go beyond being 'merely consistent with'

liability to 'plausibly suggest[ing]' liability." <u>ABB Turbo Sys. AG v. Turbousa, Inc.</u>, 774 F.3d 979, 987 (Fed. Cir. 2014) (quoting <u>Twombly</u>, 550 U.S. at 557).[7]

The plaintiffs have plausibly alleged in sufficient detail how the merger with Fiat would have come about, including allegations of Fiat's available assets and its motivation to enter the United States market.  It is true that Fiat and Chrysler's January 20, 2009 letter of intent was contingent on receiving additional government financing.  However, the plaintiffs' allegations regarding that letter are still relevant as evidence of Fiat's interest in acquiring Chrysler.  The court also finds the Spitzer plaintiffs have pleaded facts sufficient to show that Daimler, which would lose its stake in Chrysler if the company failed, had an interest in investing in Chrysler and had sufficient assets to offer financial support.  The court further finds plaintiffs' allegations that Fiat would have kept Chrysler's existing dealership network rather than going through the expense of building a new network are plausible.  Consequently, plaintiffs must be given an opportunity to seek discovery and procure experts to attempt to establish the economic value of their franchise agreements in a but-for world based on a potential merger with Fiat or Daimler.

> **3.      The GM Plaintiffs will <u>Not</u> be Allowed to Establish Economic Loss from the Closure of their Dealerships in a But-For World based on a Potential Merger between GM and Another Entity**

The Colonial plaintiffs, the only group to include former GM franchisees, also allege that "[i]nvestors would have purchased the right to manufacture lines of cars, other

---

[7] As discussed, the plaintiffs are not bound by the bankruptcy court's findings.  The government cannot rely on these documents, which are wholly outside the pleadings, to contravene the Supreme Court's instructions to accept well-pleaded facts in the complaint as true, "even if doubtful in fact.," <u>Iqbal</u>, 556 U.S. at 555.

products, and other assets from GM."  Colonial Compl. ¶ 70(b)(1).  In their supplemental

briefing, the Colonial plaintiffs also identify Cadillac and Chevrolet as "nameplates that

would have unquestionably survived."  Colonial Supp. Mem. at 6 (ECF No. 118).

However, the Colonial plaintiffs have not identified any potential purchasers for GM or

any of its lines.

    While the Alley's and Spitzer complaints provide significant detail regarding the

potential purchasers' ability and motivation to consummate a merger with Chrysler,

including descriptions of negotiations which had actually occurred, the Colonial plaintiffs

provide no such factual allegations with respect to GM.  In A & D Auto Sales, the

Federal Circuit instructed that on remand, "it would not be sufficient to include

conclusory loss of value allegations."  A & D Auto Sales, 748 F.3d at 1159 (citing Iqbal,

556 U.S. at 678).  The Colonial plaintiffs have only alleged conclusory assumptions, with

no supporting facts.  The court therefore finds that the Colonial plaintiffs have not alleged

facts sufficient to show that GM or any of its lines would have been purchased by another

entity and that its franchisees would survive, and thus have not satisfied the Federal

Circuit's requirements for showing economic value of their franchise agreements based

on this but-for scenario.  As such, the GM dealership plaintiffs will not be able to pursue

a takings claim based on this theory of economic loss.

    **D.    Scenario 4: The Dealerships would have had Value During an Orderly
            Wind Down**

            **1.    Facts Alleged in the Complaints**

    Finally, the Alley's, Colonial, and Spitzer plaintiffs allege that, if the government

had not intervened and the manufacturers had entered bankruptcy, their franchises would

still have maintained some value.  Alley's Compl. ¶ 197; Colonial Compl. ¶ 70(b)(2);

Spitzer Compl. 40(e).  The plaintiffs point to several revenue sources that would make

their franchises valuable during an orderly wind-down.  The dealers could sell existing

inventory, including new vehicles in the manufacturer's inventory.  Alley's Compl. ¶

203; Colonial Compl. ¶ 70(b)(2).  In addition, the dealers could sell parts and service and

repair vehicles on the road, which, according to plaintiffs, made up a significant part of

the dealerships' business.  Alley's Compl. ¶ 205 (noting that "some dealerships derived a

large portion of revenue from used cars, service and parts, not from new vehicle sales.");

see also Colonial Compl. ¶ 70(b)(2).

    The plaintiffs argue that in an orderly bankruptcy proceeding, the trustee or

debtor-in-possession would have kept dealerships open as a revenue source during the

wind-down process.  Alley's Compl. ¶ 197 (noting that "Chrysler would have been

expected to seek ways to maximize its revenue opportunities and thus recoveries to its

creditors by using its dealer network."); see also Spitzer Compl. ¶ 40(e).  The funding for

the orderly liquidation would come from "Chrysler's secured lenders," who

> would have provided some Debtor in Possession financing or permitted the
> use of cash collateral . . . to ensure an orderly liquidation and to make some
> funding available to provide incentives to dealers to sell the remaining new
> vehicles to customers rather than forcing them to sell at firesale prices to
> the remaining dealers.

Alley's Compl. ¶ 204.  The Spitzer plaintiffs allege that the funding necessary to keep the

dealerships open during the wind-down period would have come from the sale of

Chrysler's valuable assets, "such as its intellectual property rights."  Spitzer Compl. ¶

40(e).  The Alley's plaintiffs estimated that the wind-down period would last
approximately twenty-four to thirty months.  Alley's Compl. ¶ 203

The Alley's plaintiffs also allege that there is historical precedent for keeping
dealerships open during bankruptcy proceedings.  According to the complaint, when
American Suzuki Motor Company entered bankruptcy, Suzuki kept its dealerships open
and continued to provide services to cars on the road, "generating revenue for its dealers
and also ensuring the general safety of Suzuki Products and compliance with various
laws and regulations for the safety and benefit of consumers."  Alley's Compl. ¶ 197.

**2.    All Plaintiffs will be Allowed to Establish Economic Loss from the Closure of their Dealerships in a But-For World in which the Dealerships Remained Open in Bankruptcy to Sell Parts and Inventory and Service Cars**

The government argues that in a but-for world where the auto manufacturers were
liquidated in bankruptcy, the manufacturers would not have been able to provide the
necessary funds to support the dealerships during the wind-down period.  The
government further argues that the plaintiffs failed to allege other funding sources to
demonstrate how the dealerships would have stayed open during liquidation to sell parts
and service cars.

The court finds that plaintiffs have alleged sufficiently plausible facts to show that
their dealerships would not have been valueless even in a manufacturers' liquidation
scenario.  Plaintiffs' allegations that when Suzuki entered bankruptcy, dealerships stayed
open to sell parts and service cars on the road—precisely what plaintiffs allege would

have occurred in this scenario—demonstrate the "plausibility" of the plaintiffs'

allegations regarding the survival of their dealerships in this similar situation.

For the purpose of the present motion, the court accepts as true the plaintiffs' allegations

that there would have been a financial incentive to keep the dealerships open as a revenue

source during an orderly wind-down.[8]  The plaintiffs have also alleged that manufacturers

would have been able to sell intellectual property rights as a source of funding to keep the

dealerships operational.  The government's contention that the plaintiffs are required to

allege exactly how the trustee in bankruptcy could have financed the expenses relating to

keeping the dealerships open goes beyond the standard of "plausibility" to requiring

allegations that meet the standard of "probability," a standard which the Supreme Court

has expressly rejected.  See Twombly, 550 U.S. at 556.  Therefore, the plaintiffs will be

allowed to to attempt to establish the economic value of their franchise agreements in a

but-for world in which the manufacturers were liquidated in bankruptcy.

## III.   CONCLUSION

For the reasons stated above, the court finds that plaintiffs have satisfied the

pleading requirements necessary to survive a motion to dismiss for failure to state a

claim.  Therefore, the government's motion to dismiss in each of the three above

captioned cases is **DENIED**.

---

[8] In this connection, the court notes that there is a great deal of uncertainty at this stage of the
case regarding how a bankruptcy trustee or debtor in possession would have behaved in a but-for
world. If, after discovery, it turns out that none of plaintiffs' alleged but-for scenarios would
have been lawful or possible under the bankruptcy code, then plaintiffs' takings claim based on
this theory of economic loss will not survive.

The Spitzer plaintiffs may seek to establish the economic value of their franchise agreements, and the loss of that value as a consequence of the government's action, based upon all of the but-for scenarios alleged in their complaint.  The Alley's plaintiffs and the Colonial plaintiffs who allege a taking of a Chrysler dealership may seek to establish the economic value of their franchise agreements, and the loss of that value as a consequence of the government's action, based upon all of the but-for scenarios alleged in their complaints other than the scenario positing that the government would have provided financial assistance to the manufacturers in February of 2009 but would not have required dealerships to close.  The Colonial plaintiffs who allege a taking of a GM dealership may only seek to establish the economic value of their franchise agreement, and the loss of that value as a consequence of the government's action, based upon the franchise's alleged value in selling remaining inventory and servicing cars on the road during a liquidation process.

The court will schedule a status conference for later this month to discuss next steps in the proceedings, including a procedure for resolving the outstanding motion for class certification in Colonial v. United States, No. 10-647.

**IT IS SO ORDERED.**

s/Nancy B. Firestone
NANCY B. FIRESTONE
Judge